## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JUDY HALCOM, HUGH PENSON, HAROLD CHERRY, and RICHARD LANDINO, individually, and on behalf of all others similarly situated, | **Civil Action No.: 3:21cv00019** <br><br> **CLASS ACTION COMPLAINT** |
| *Plaintiffs*, <br> v. | **DEMAND FOR JURY TRIAL** |
| GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK, | |
| *Defendants*. | |

Plaintiffs Judy Halcom, Hugh Penson, Harold Cherry, and Richard Landino ("Plaintiffs") bring this Class Action Complaint, individually and on behalf of the proposed Classes defined below, against Defendants Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of New York ("GLICNY") (collectively "Genworth," "Defendants," or the "Company"). Plaintiffs allege the following based upon information and belief and the investigation of their undersigned counsel, except for those allegations that pertain to themselves, which are based on Plaintiffs' personal knowledge.

## INTRODUCTION

1.      This lawsuit alleges a course of conduct by Genworth that is very similar to that alleged in *Skochin v. Genworth Life Ins. Co.*, No. 19-cv-00049 (REP) (ED. VA. 2019), but on behalf of policyholders that were not included in that prior lawsuit.

2.      Plaintiffs and the Class members each purchased and currently have long term care ("LTC") insurance policies provided by Genworth. Those policies include Genworth LTC product "blocks" referred to as PCS I (issued from 1994-1997) and PCS II (issued from 1997-2001). None of these products are still being sold by Genworth.

3.      Since 2008, Genworth has steadily and substantially increased the premiums on these policies. To be clear, this case does not challenge Genworth's contractual right to increase these premiums, or its need for premium increases given changes in certain of Genworth's actuarial assumptions and the historical experience of these policy blocks. Nor does this case ask the Court to reconstitute any of the premium rates or otherwise substitute its judgment for that of any insurance regulator in approving the increased rates. Rather, this case seeks to remedy the harm caused to Plaintiffs and the Classes from Genworth's partial disclosures of material information when communicating the premium increases, and the omission of material information necessary

1

to make those partial disclosures adequate.  Without this material information, Plaintiffs and the Classes could not make informed decisions in response to the premium increases and ultimately made policy option renewal elections they never would have made had the Company adequately disclosed the staggering scope and magnitude of its internal rate increase action plans in the first place.

4.      LTC is expensive.  So, too, is LTC insurance.  LTC insurance is intended to help defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living (such as dressing, eating, toileting, continence, or transferring – getting in and out of a bed or chair).

5.      When a consumer evaluates an LTC insurance policy for purchase, they compare the premium rates to the coverage options they are provided and choose a plan that is affordable while providing adequate future benefits.  Since the consumer is committing to make decades of premium payments before they ever plan to make a claim on the policy, it is important that the premiums they pay will continue to be affordable.  After all, under any LTC policy that lacks a non-forfeiture provision, if a policy holder can no longer afford the premiums, they walk away from the policy with *nothing*; perhaps after paying tens of thousands of dollars in premiums.

6.      To keep premium levels lower, consumers generally begin shopping for LTC insurance in their 50s or 60s.  As noted by the WALL STREET JOURNAL in 2014, "[f]or each year applicants in their 50s delay buying coverage, carriers typically raise premiums by 3% to 4%, simply because they are a year older … [but], for every year someone in their 60s waits, they can expect to pay an additional 6% or more."  Anne Tergesen, *Mistakes to Avoid When Shopping for Long-Term-Care Insurance*, WALL ST. J. (Apr. 13, 2014),

https://www.wsj.com/articles/SB10001424052702304756104579449482245063704 (last visited Nov. 28, 2020).

7.      While LTC contracts are guaranteed renewable, most allow the provider to increase premiums if: (1) the increases will be made across the entire policy class; and (2) those new rates are first approved by the policyholder's state insurance regulator.

8.      Although the decision to pay an increased rate can be characterized as a renewal of the existing contract, a rate increase actually restructures all the essential terms of the agreement. Facing a premium increase, a policyholder must evaluate anew whether the increased premiums remain justified expenses in exchange for the same level of benefits, or whether a reduction in benefits and premiums is preferable.  To do this, they must also evaluate the likelihood of any future premium increases, the frequency of those increases, and the amount of those increases. They will also want to reassess the provider's financial stability.  These are all material data points that insureds first considered when they purchased their policy, and which they must reevaluate in light of the new premiums that will be charged.

9.      To allow policyholders to make informed decisions, any insurance company that raises premiums must inform their insureds of all material information in its possession regarding these important recalculations.  Only a full-disclosure of all these material data points will allow insureds to fairly evaluate the new policy terms in light of a rate increase.

**Summary of the Claims**

10.      Plaintiffs and each Class member purchased their Genworth LTC policies prior to 2002.  During this time, Genworth and its sales agents typically emphasized that the Company had never raised rates on its LTC policies over the decades it had been providing such insurance.  While these representations were not necessarily guarantees that rates would not increase in the future,

3

they set a reasonable expectation that rates would not increase, or that any increases would be minimal.

11.     Plaintiffs paid stable premiums to Genworth for the first several years of their LTC policies.  But by 2008, Genworth began to recognize that some premium rate increases would be needed on its older policy blocks, including the PCS I and PCS II blocks at issue in this litigation. By 2012, serious cracks in Genworth's stability began to show *inside* Genworth that would necessitate truly substantial rate increases on all the policies at issue in this case for years to come.

12.     As part of a "deep dive" into its LTC claim reserves, the Company acknowledged internally that it had a substantial shortfall in its LTC reserves, much larger than it ever anticipated. While Genworth Life Insurance Company continued to pay dividends to its holding company parent, a hole in its claims reserves was growing exponentially.

13.     In 2014, Genworth completed an asset adequacy test and determined that its loss recognition testing margin,[1] an important indicator of insurer solvency, had shrunk from $3.2 billion at the end of 2013 to *negative $2.6 billion* by the end of 2014 (a deficit that exceeds its LTC premium revenue from that year).  According to Genworth, the decrease was "driven by changes to assumptions and methodologies primarily impacting claim termination rates … and benefit utilization rates."

---

[1] Loss recognition testing is an impairment test, mandated by U.S. Generally Accepted Accounting Principles ("GAAP"), that requires insurance companies to recognize reserve deficiencies as they occur.  Loss recognition testing is the GAAP analog to statutory cash flow testing with the exception that, while the present value of future surplus is the key deficiency metric on a statutory basis, loss recognition is performed using a gross premium valuation method, which considers not the ending surplus, but the sum of the present value of liabilities throughout the projection period of the product being tested. The loss recognition testing margin is the deficiency metric for loss recognition testing and is equal to the sum of the present value of liabilities offset by the present value of any profits throughout the projection period of the product being tested – here, LTC insurance.

14.     To right the ship and plug the growing hole in its reserves, Genworth created a series of internal action plans known as the "In-Force Management Project," later the In-Force Rate Actions II and III ("IFA II" and "IFA III"), and culminating with the Multi Year Rate Increase Action Plan (the "MYRAP").  These internal plans each called for significant premium rate increases systematically across its older policy classes.  By 2013, Genworth had planned to seek significant rate increases on all of its LTC insurance products, including all of the policy blocks at issue in this case.

15.     These future rate increases, however, would not be recognized in Genworth's asset adequacy testing until that increased revenue began flowing into its reserves over the next decade.  So as to avoid reporting a current negative loss recognition testing margin, Genworth instead began to utilize in its actuarial testing assumptions for "significant anticipated (*but not yet filed*) future premium rate increases or benefit reductions" to increase its reported loss recognition testing margin by *$4.9 billion*.  *See* GFI's Form 10-K for the period ending Dec. 31, 2014 at 61, 128 & 240 (emphasis added).  To put that in perspective, Genworth's annual revenue from its entire LTC insurance operation was only $3.5 billion in 2014.

16.     In other words, *Genworth relied almost entirely upon billions of dollars in anticipated future (**but not yet filed**) rate increases to plug this massive hole in its reserves*.  And it was so confident in its ability to achieve these rate increases that it relied on them in its then-current financial reporting and when paying executive compensation bonuses that were tied to successful execution of these plans.

17.     This material information about Genworth's plan for (and need for) massive future rate increases, however, was never shared with Genworth's policyholders who would be required to pay the increases.

5

18.     Between 2014 and 2020, Genworth continued to adjust its assumptions to claim termination and benefit utilization rates, resulting in continued decreases in its loss recognition testing margin.  As of December 31, 2016, Genworth's assumptions for "significant anticipated (but not yet filed) future premium rate increases or benefit reductions" had exploded to a reported **$7.3 billion**.  By the end of 2019, that number had grown to **$7.6 billion**.  This is the ever-escalating amount of future premium increases that would largely fall upon Plaintiffs and the Classes.

19.     None of the details of this massive rate increase plan, however, were shared with policy holders.  For example, when Genworth informed policyholders of the first modest rate increases in 2008 and 2010, it said nothing about the Company's plans for additional future rate increases.  When announcing the more substantial rate increases later in the Class Period, Genworth said only that "in accordance with the terms of your policy, we reserve the right to change premiums and it is [likely <or> possible] that your premium rate will increase again in the future."  Although Genworth later acknowledged future rate increases were "possible" or "likely," it made no further attempt to inform policyholders that not only were they possible, they were part of the Company's internal rate increase action plans to raise rates substantially and repeatedly.

20.     For a policyholder, deciding whether to pay each *current* premium increase was decidedly different from buying into a *series* of sequential rate increases that would more than double or triple the premiums they were then paying. This is especially true because each of those increased rates would have to be absorbed into the policyholder's financial planning for years or decades to come.  These nationwide rate increase action plans were material information about future LTC policy terms that Genworth withheld from its insureds in each premium increase notice the Company sent.

6

21.     Genworth knew throughout the Class Period that it needed staggering and successive premium rate increases to remain in the LTC business.  It planned to push these rate increases through state insurance departments whenever it could and for as much as possible. Since the beginning of the Class Period, Genworth's actuarial testing demonstrated that increases of perhaps over 100% would be immediately required on all policies that are the subject of this lawsuit.  It never disclosed this material information to Plaintiffs or any of the Class members. The statements it did make about the likelihood or possibility of future rate increases were not adequate, omitted material information necessary to make the partial disclosures adequate, and resulted in Plaintiffs and the Class members making policy renewal elections they never would have made.

22.      The Class seeks, among other relief, rescission of the policy renewal elections they made, an adequate, forthright and full disclosure of Genworth's current financial condition and plan for future rate increases, and an opportunity to decide, with the benefit of that material information, what policy renewal options they will elect going forward.

## JURISDICTION AND VENUE

23.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of Pennsylvania, Connecticut, North Carolina, and New York.  Defendant GLIC has its principal place of business in Virginia. Defendant GLICNY has its principal place of business in New York.  The amount in controversy exceeds $5,000,000, and there are more than 100 members in each of the Classes.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant GLIC regularly conducts business in this District, has its administrative offices in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## PARTIES

A.     **Plaintiffs**

25.     **Plaintiff Judy Halcom** resides in Erie, Pennsylvania.  On April 9, 1996, Mrs. Halcom purchased a LTC insurance policy from General Electric Capital Assurance Company ("GE") (which became Genworth on January 1, 2006). The policy she purchased was part of Genworth's PCS I policy series, offered on Form 7000L, among others.   Mrs. Halcom's policy was purchased as a Lifetime benefit policy.

26.     **Plaintiff Hugh Penson** resides in Mount Holly, North Carolina.  On December 31, 1997, Mr. Penson purchased a LTC insurance policy from GE (which became Genworth on January 1, 2006). The policy he purchased was part of Genworth's PCS I policy series, offered on Form 7021, among others.   Mr. Penson's policy was purchased as a Limited benefit policy.

27.     **Plaintiff Harold Cherry** resides in Westbury, New York.  On February 2, 1998, Mr. Cherry purchased a LTC insurance policy from GE (which became Genworth on January 1, 2006). The policy he purchased was part of Genworth's PCS II policy series, offered on Form 51002, among others.   Mr. Cherry's policy was purchased as a Lifetime benefit policy.

28.     **Plaintiff Richard Landino** resides in Sun Lakes, Arizona.  When he purchased his policy, Mr. Landino resided in Branford, Connecticut.  Therefore, Mr. Landino's policy is subject to the oversight of the Connecticut Insurance Department.  On August 14, 2001, Mr. Landino purchased a LTC insurance policy from GE (which became Genworth on January 1, 2006). The policy he purchased was part of Genworth's PCS II policy series, offered on Form 7030F, among others.   Mr. Landino's policy was purchased as a Limited term benefit policy.

**B.**    **Defendants**

29.    Defendants GLIC and GLICNY are related entities that issue Genworth LTC insurance, including the PSC I and PCS II policy series at issue here.

30.    Genworth's business is divided into two divisions: Global Mortgage and U.S. Life Insurance.   The U.S. Life Insurance Division includes its LTC insurance business unit.   As Genworth's Chief Executive Officer acknowledged during a September 25, 2013 investor conference, "our core business is long-term care."  Genworth began selling LTC insurance in 1974, and today is the largest LTC insurance provider in the country.  Between 2010 and 2014, over 50% of Genworth's U.S. Life Insurance revenues came from its LTC insurance business unit.

31.    Genworth's corporate structure is set forth in the following graphic.



32.    Genworth's headquarters for LTC insurance is located in this District, in Richmond, Virginia.

33.    Defendant GLIC is an indirect subsidiary of Genworth Financial, Inc. and is organized under the laws of Delaware with its main administrative office in Richmond, Virginia. Among other products, GLIC issues LTC insurance policies nationwide.

34.    Defendant GLICNY is a subsidiary of GLIC.  GLICNY is organized under the laws of New York.  GLICNY issues insurance policies, including LTC insurance policies that are filed

in and issued from New York, and most of its policyholders reside in New York.  However, some of its policyholders currently reside in states other than New York.  For example, GLICNY typically receives around $500,000 in annual LTC premiums from policyholders residing in Virginia.

35.     GLIC and GLICNY are referred to collectively throughout as "Defendants," "Genworth" or "the Company."

## FACTUAL BACKGROUND

**A.      LTC Insurance Background**

**1.      LTC Insurance Basics**

36.     LTC insurance is a long duration insurance contract that insures the policyholder against the costs of assisted living care in the event they become unable to perform the basic activities of daily living.  In such event, the LTC policy will reimburse the policyholder for costs incurred for care and treatment in assisted living facilities, nursing homes and/or in connection with home health assistance and related expenses.  Some LTC insurance contracts have daily, annual, or lifetime limits that cap the insurance company's exposure of these costs.

37.     Premiums for LTC insurance are based on underwriting factors as well as the age of the insured at the time the policy is issued.  The latter accounts for the fact that premiums paid in the early years of the policy fund claims incurred later.

38.     Purchasing LTC insurance at a younger age typically results in lower annual premiums.  This is because almost all LTC policies are intended to have level premiums payable for life, meaning that premiums do not increase because of the policyholders' increased age or changes in health condition.  Thus, claims are expected to be less than premiums paid in the early years and will exceed premiums in later years as depicted in the chart below.  Moreover, a policyholder that purchases their coverage at a younger age will obtain lower premiums, in part

because their premium-paying period is expected to be longer and, in part because as the issue age increases claim rates are expected to rise.



39.     As the policyholder ages, the expected incurred claims will increase over and above the premium that would be paid by the policyholder if the LTC policy contract were entered into earlier in life.  Thus, individuals who delay purchase of a LTC policy, or who seek to change providers, typically have to pay a far higher premium than they would have been required to pay had they obtained LTC insurance earlier in life.  In other words, once obtained and after the policyholder pays premiums for a number of years, the likelihood that the policyholder would be able to find alternative insurance at a lower price than his or her existing policy trends to zero.

40.     As a result of this dynamic, reserves build in the early years of a block of business and release to claimants in later years.



41.     Over 95 percent of LTC policyholders in the United States are issued at age 45 or older.

42.     According to a Genworth presentation dated February 11, 2015 (revised February 27, 2015) and titled "Long Term Care Insurance Annual Margin Testing", the average LTC policyholder in Genworth's blocks of business acquired their policy between 57 and 65 years of age, depending on the block.

**2.    An Insurance Company's Financial Condition and Expertise in LTC Insurance Are Important Considerations for Insureds When Maintaining a Policy or to New Insureds Looking to Purchase a Policy**

43.     When purchasing LTC insurance, consumers place a large degree of trust in their insurance provider.

44.     In a LTC insurance contract, the insured is required to make modal payments with the expectation that the insurance provider will be there years down the road when an insured's claim might eventually accrue.

45.     Consumers of LTC insurance, like Plaintiffs, often purchase their policies years or decades before they anticipate making any claim on the policy.  LTC insurance is typically

characterized by a long-term outlook such that policyholders pay premiums, on average, for 20 to 25 years before making a claim.  The typical LTC policyholder is issued the policy at 58 to 60 years of age and, if they make a claim at all, it is typically between the ages of 80 and 85.

46.     Due to this long time horizon, a primary consideration in choosing a LTC insurance provider is the insurer's financial condition and stability.

47.     In addition, while LTC insurance is intended to have level premiums, they are not guaranteed. Premiums normally remain the same but can change over time based on insurer experience that deviates from previous assumptions. As a result, consumers of LTC insurance, like Plaintiffs, consider the LTC insurance provider's purported expertise in devising accurate assumptions to accrue appropriate reserves and minimize shocks associated with rate increases on existing policies.

48.     The financial condition and stability of an insurer is reflected, in part, in a company's financial statements and in financial ratings, as issued by ratings agencies such as A.M. Best, Moody's Investor Services ("Moody's"), Standard & Poor's Ratings Services ("S&P"), or Fitch Ratings ("Fitch").

49.     State insurance commissioners, through their websites, specifically advise consumers to consider such financial information when choosing an insurance provider.

50.     For example, in its Guide to Consumers on LTC policies (*revised January 2014*) the California Insurance Commissioner advises, "[a]n insurance company's financial standing and track record are important in choosing a long-term care insurance policy" and "[a] company's size and ratings are important factors to take into consideration when making your long-term care insurance choice."

51.     The New York Insurance Commissioner offers similar advice, suggesting (http://www.dfs.ny.gov/consumer/ratings_stability.htm):

**Insurance Company Ratings and Stability**

When selecting an insurance policy, you are also selecting an insurance company and you may wish to know how stable that company is financially. Many firms rate the financial soundness of insurance companies … Each firm has a different rating scale and firms may differ in the conclusions they reach about a specific insurance company. Therefore, you may wish to check with more than one firm before selecting an insurance company.

52.     The NAIC is the United States standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.

53.     In its publication *A Shopper's Guide to Long-Term Care Insurance*, the NAIC advises:

**Check the financial stability of the insurance company.**

Insurer ratings can show you how analysts see the financial health of individual insurance companies. Different rating agencies use different rating scales. Be sure to find out how the agency labels its highest ratings and the meaning of the ratings for the companies you're considering.

54.     In addition to the financial condition and stability of the insurance company, potential LTC policyholders consider an insurer's experience and expertise in setting premiums and accruing reserves.

55.     Insurance companies conduct periodic experience studies (examinations of their historical experience and how it compares to the assumptions the insurer used when it first priced the policy) to evaluate its assumptions and make confident decisions in the development of future products and the underwriting of its business.

56.     Companies with more experience—*i.e.*, with larger blocks of policies in force over longer time periods—have more data to use in creating more accurate assumptions.

14

57.     Consumers rightfully consider the breadth and duration of an insurer's experience in the LTC market as a material factor in selecting an LTC insurance carrier.

**B.**     **Genworth's Conduct with Regard to Its LTC Business**

**1.**     **Genworth Marketed its Financial Strength, Sound Reserves and Breadth of Experience**

58.     Plaintiffs and Class members purchased their policies from Genworth's predecessor, GE.

59.     Genworth, and its predecessor GE, marketed its experience and financial condition to induce new policyholders to purchase LTC policies and to keep its LTC policyholders renewing their policies.

60.     For example, in its marketing materials, GE asked "Why Choose General Electric Capital Assurance Company?"  The answer according to the pamphlet:

> Selecting a long term care insurance company is an important decision. You need to find a company you can trust to help protect your assets and lifestyle as you grow older.  A company that's respected and recognized as a leader in quality service and products.  A company with an innovative portfolio of plans that offer comprehensive benefits, and with a proven track record of paying its claims.

> General Electric Capital Assurance Company gives you all this and more.  Our Long Term Care Division pioneered the development of long term care insurance over 28 years ago and we've been an industry leader ever since.  Over the years we have continued to meet our customers' changing needs by improving and updating our policies and staying one step ahead in the long term care insurance industry.  We believe that our experience and expertise set us apart from the rest and make us your best choice for helping to protect your future.

> General Electric Capital Assurance Company is a member of the General Electric Company family.  We practice the principles that give GE its good name. You can depend on us to provide you with excellent service and quality long term care insurance plans.

61.     Around 2006, GE, including its LTC division, was being spun off to create Genworth Financial.  In an announcement to existing policyholders and consumers then shopping

for insurance, Genworth introduced itself ensuring everyone knew the new company still adhered to all the things that made GE attractive to consumers.  It stated,

> Genworth is a new public insurance holding company comprised of the businesses you know from GE Financial and GE Mortgage Insurance. We are an established global company – and we are something new.
>
> Over the years, as part of the GE family, we built financial strength, operational discipline and a reputation for integrity.  Now, as we become an independent company, we have the benefit of drawing on this heritage to make sure we are there for our customers throughout their lives, when they need us most.
>
> While our name is changing, our commitments are clear.  We will honor our policies. We will continue to help protect our customers' lifestyles, to help them during difficult times and to help make their dreams come true.  And while we are in a complex industry, we will strive to make things clear and simple.
>
> "Built on GE Heritage" clearly signals our strong foundation. As we begin to roll out our brand in the coming months, you will see the Genworth Financial name become more prominent in our marketing and communications.
>
> **STRENGTH AND STABILITY**
>
> We are among the largest U.S. Insurance companies, with an expanding global presence.  Built on a tradition of innovative products, customer services and an extensive distribution network, we are dedicated to providing the best for our business partners and customers.

62.    In a 2012 brochure, Genworth boasted that "[t]here is no substitute for experience [and that] Genworth Life helped pioneer long term care insurance in **1974** and is an industry leader."  (emphasis original).  Genworth also notes in its marketing materials that its "years of experience have allowed [it] to design products and services to fit [its] customers' needs and a range of budgets."

63.    Genworth has also routinely touted its financial health.  For example, in a March 2011 PowerPoint presentation for insurance brokers and agents, Genworth boasted that it had been

"Setting Aside Assets to Pay Future Claims for 37 [y]ears" by putting reserve funds into: "investment grade bonds", "corporate securities", "treasury bonds, etc.", and reported a $17.91 billion reserve fund that it built while incurring only $6.7 billion in claims.



### 2.   Genworth Claims to Buck Industry Trends and Sets Itself Apart From the Rest of the LTC Insurance Market

64.     Between 1988 and 1998, "long-term care insurance ha[d] emerged as the fastest growing type of insurance coverage in the United States, with sales increasing at 20% to 25% a year."[2]  By the late 1990's over 100 carriers were aggressively competing for new policyholders in the LTC insurance market.

65.     By 2012, however, the LTC market had deteriorated and several large carriers had exited the market.  As a February 10, 2012, Fitch report explained, "[t]he long-term care insurance market continues to be plagued by adverse claims experience and poor overall results, which has led to rate instability, insurer solvency concerns, and market exits by several insurers."  A July

---

[2] Evan Simoff, *LTC Goes Mainstream*, FIN. PLANNING (Sept. 1, 1998).

2013 U.S. Dept. of Health and Human Services study of the LTC market noted that half of the companies who exited the market left after a "new evaluation/assessment of the risk of the product and market."

66.     In the midst of this market upheaval, Genworth consistently denied any such effects on its own large book of LTC policies.  It attributed its success in the market to its vast experience with the product, and routinely cited its extensive actual claims experience to assure both existing policyholders and potential new customers that its management of its LTC products was superior and not in distress.

67.     Genworth emphasized the importance of its own robust database covering over 40 years of actual claims experience – data which included information on the age and gender of policyholders, the rate of claims, the cause of claims, the duration of claims, the amount paid on claims, and so on.

68.     For example, in December 2013, Genworth stated it had "very credible experience" data, as a result of its having the "largest insured long-term care database and claims history in [the] industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day."  Similarly, in a March 20, 2014 Genworth presentation, its CEO boasted "we're the best in the business, we know more about the business, we have more data, and more experience, than anybody else."

69.     Genworth essentially bragged that its depth of experience and large book of business continued to set it apart from other LTC insurance providers that were struggling to keep afloat in the face of changing claims experience.

**C.** **The Unraveling of Genworth's LTC Business and the Need for Substantial Future LTC Premium Increases**

70.     Despite public statements to the contrary, as early as 2012, Genworth had recognized that significant premium increases were needed on its older blocks of LTC policies (such as the PCS I and PCS II policies at issue in this litigation) in order to shore up its reserves.

71.     On October 30, 2013, Genworth Financial held a press conference for investors and analysts to announce the Company's Third Quarter financial results.  The market was anxious to hear how Genworth's flagging LTC business was faring.  Genworth's CEO told his audience that the Company "had beg[u]n an intensive, very broad and deep review of all aspects of [our] long-term care business about 4 months ago," and that "[t]he first area of focus for us was our reserving." He explained, "we have been assessing our long-term care reserves under both GAAP and statutory reporting, and determining whether to make any changes" and that review "consider[ed] all important aspects" including "[t]he assumptions, best estimates and also a detailed review of our statutory reserves."

72.     By this time, Genworth had already instituted its first wave of substantial premium increases on the policies at issue in this litigation.

73.     On July 29, 2014, while still reporting a profit, Genworth announced to investors – but not its policyholders – that its operating income on its LTC insurance business was just $6 million.  Genworth noted that claims on its LTC policies were more "severe", *i.e.*, had a longer duration and were more expensive than reflected in its carefully monitored reserve calculations.

74.     On July 30, 2014, the Company shockingly admitted that, despite its earlier statements to the contrary, its reserves had "really been based on experience we had up through about 2010," experience that showed the average claim duration was only 2.2 years.  Yet even as analysts expressed shocked that the "deep dive" into all aspects of the Company's LTC business

and reserves appeared to be a smokescreen, Genworth explained that everyone "seem[ed] to be missing a very big point:  This is an issue around our **claim reserve**," *i.e.*, not an issue with its **active life reserves** (which is the far larger reserve component).  Genworth's CEO later confirmed the upcoming reserve review would be focused only on the claim reserve and reiterated "the review would not impact the Company's assessment of its **active life reserves** or margins" and that "we have a much larger **active life reserve**, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]".

75.     But by September 2014, Genworth began acknowledging to its shareholders that the review of its disabled life claims reserve could "require a corresponding or related change" to the Company's active life reserves.

76.     On November 5, 2014, Genworth revealed that its post-2010 claims data showed the Company's **active life reserves** were materially under-reserved to the tune of **$531 million**. In its slide presentation explaining this new information, Genworth acknowledged that its new reserve calculations were based on updated data showing a claim duration of 2.9 years, as opposed to the 2.2 years that had previously been used to set reserves and determine operating income.

77.     As a result, Genworth's consolidated risk-based capital ratio fell from 490% at the end of the second quarter of 2014 to 445% at the end of the third quarter of 2014 and continued to fall to 370% at the end of the second quarter of 2016.

78.     Unbeknownst to Plaintiffs and the Classes, this shortfall in reserves was going to be filled primarily from one source**: significant future rate increases on existing LTC policies**. As described hereafter, this reserve shortfall was only the tip of the iceberg.  As Genworth internally began recognizing, the reserve shortfall continued to grow almost exponentially and

those ever increasing shortfalls would require even more severe LTC rate increases.  None of this information, however, was shared with Genworth's LTC policyholders.

### 3.  Facing a Growing Hole in Reserves, Genworth Initiates A Plan For Significant Rate Increases on its LTC Policies

79.     The discovery of inaccurate claim duration assumptions revealed staggering projected losses in future years.  To account for this, Genworth instituted an internal plan to significantly increase premium rates across all policies at issue in this litigation.

80.      In Genworth's Annual Report for 2012, filed with the U.S. Securities and Exchange Commission ("SEC") on Form 10-K on February 28, 2013, the Company disclosed to investors that,

> **In the third quarter of 2012, we initiated another round of long-term care insurance in-force premium rate increases with the goal of achieving an average premium increase in excess of 50% on the older generation policies** and an average premium increase in excess of 25% on an earlier series of new generation policies over the next five years. Subject to regulatory approval, this premium rate increase is expected to generate approximately $200 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior which could include taking reduced benefits or non-forfeiture options within their policy coverage.** The goal of these rate actions is to mitigate losses on the older generation products and help offset higher than priced-for loss ratios due to unfavorable business mix and lower lapse rates than expected on certain newer generation products. **As of December 31, 2012, this round of rate action had been filed in 49 states and we have approvals representing approximately 20% of the expected additional annual premiums of $200 million to $300 million once fully implemented**.

81.     In Genworth's Annual Report for 2013, filed with the SEC on Form 10-K on March 3, 2014, the Company again discussed its action plan for future rate increases, telling *investors*,

> In our U.S. Life Insurance business, **we are focused on the execution of our longterm care insurance strategy, which includes: obtaining significant premium rate increases on our older generation inforce blocks of longterm care insurance to improve profitability and reduce the strain on capital**; requesting smaller rate increases more proactively on newer inforce blocks of longterm care insurance as needed; and introducing

21

new products with appropriate price benefits, using more conservative assumptions.

*      *      *

**In the third quarter of 2012, we initiated a round of longterm care insurance inforce premium rate increases with the goal of achieving an average premium increase in excess of 50% on the older generation policies** and an average premium increase in excess of 25% on an earlier series of new generation policies. Subject to regulatory approval, this premium rate increase is expected to generate approximately $250 million to $300 million of additional annual premiums when fully implemented. **We also expect our reserve levels, and thus our expected profitability, to be impacted by policyholder behavior in cases where policyholders elect to take reduced benefits or nonforfeiture options within their policy coverage.** The goal of our rate actions is to mitigate losses on the older generation products and help offset higher than priced for loss ratios due to unfavorable business mix and lower lapse rates than expected on certain newer generation products which remain profitable but with returns lower than in pricing assumptions. **As of December 31, 2013, this round of rate actions had been approved in 41 states representing approximately $195 million to $200 million of the targeted premium increase when fully implemented in 2017.**

(emphasis added).

82.    The Company then reiterated this rate action plan in each annual report thereafter. For example, in Genworth's Annual Report for 2016, filed with the SEC on Form 10-K on February 27, 2017, the Company again discussed its future rate increase plans, telling *investors*,

***In-force rate actions***

**As part of our strategy for our long-term care insurance business, we have been implementing, and will continue to pursue, significant premium rate increases on our in-force blocks of business, as needed**. **The goal of our rate actions already implemented, as well as future rate actions, is to mitigate losses on our older generation policy series and help offset higher than priced-for loss ratios and lower returns on newer generation products**. Our approved premium rate actions may cause fluctuations in our loss ratios during the period when reserves are adjusted to reflect policyholders taking reduced benefits or non-forfeiture options within their policy coverage. **For all of these rate action filings, we received 96 filing approvals from 25 states in 2016, representing a weighted-average increase of 28% on approximately**

> **$719 million in annualized in-force premiums. We also submitted 79 new filings in 32 states in 2016 on approximately $834 million in annualized in-force premiums.**

(emphasis added).

83.    In Genworth's Annual Report for 2017, filed with the SEC on Form 10-K on February 28, 2018, the Company again described its future rate increase plans, telling investors,

> *In-force rate actions*
>
> **As part of our strategy for our long-term care insurance business, we have been implementing, and expect to continue to pursue, significant premium rate increases on older generation blocks of business in order to bring those blocks closer to a break-even point over time and reduce the strain on earnings and capital**. We are also requesting premium rate increases on newer blocks of business, as needed, some of which may be significant, to help bring their loss ratios back towards their original pricing. Our approved premium rate actions may cause fluctuations in our loss ratios during the period when reserves are adjusted to reflect policyholders taking reduced benefits or non-forfeiture options within their policy coverage. **For all of these rate action filings, we received 114 filing approvals from 36 states in 2017, representing a weighted-average increase of 28% on approximately $714 million in annualized in-force premiums. We also submitted 226 new filings in 45 states in 2017 on approximately $1.3 billion in annualized in-force premiums.**

(emphasis added).

84.    No similar disclosures about Genworth's future rate increase plans were made to policyholders such as Plaintiffs and the Class.

### 4.    <u>Genworth Internal Asset Adequacy and Cash Flow Testing Confirms the Need for Significant Future Rate Increases</u>

85.    Genworth performed asset adequacy and cash flow tests on its LTC business in at least 2014 and 2016.

86.    As a result of those tests, claim termination rates were lowered in 2014 and again in 2016.  As a result, Genworth was required to significantly strengthen its Disabled Life Reserves ("DLR") on existing claimants.  Strengthening the DLR resulted in a corresponding magnified

effect on its projections, as claimants were increasingly expected to stay on claim for longer periods and therefore use more of their available benefits than Genworth had previously assumed. Genworth also continued to recognize that more policyholders were surviving to claim than was previously assumed.  In other words, Genworth's internally projected future earned premiums based on existing premium rates were not adequate to offset its revised projections for future incurred claims.

87.     In addition to the **95-60%** rate increases[3] for PCS I policies and the **78-63%** rate increases[4] sought on PCS II policies in 2012 (as discussed in more detail below at paragraphs 135 - 190), Genworth's 2014 asset adequacy test showed the need for **additional** premium increases of more than **100%** for PCS I policies and nearly **100%** for PCS II policies.

88.     By 2016-2017, Genworth was including assumptions in its Cash Flow Testing **for additional future rate increases of well over 100%** on **both** PCS I and PCS II policies.

**5.     Genworth Relies Upon its Internal Rate Increase Action Plans to Stabilize Its LTC Reserves**

89.     In Genworth's annual reports, the Company warned its investors, but not its policyholders, that "[t]he continued viability of our long-term care insurance business and GLIC and GLICNY **is based on our ability to obtain significant price increases or benefit reductions**, as warranted and actuarially justified. **The adequacy of our current long-term care insurance reserves also depends significantly on various assumptions and our ability to successfully execute our in-force management plan through increased premiums or reduced benefits as anticipated**."  (Emphasis added)

---

[3] These numbers reflect a 95% rate increase for policies with lifetime benefits and a 60% increase for policies with limited benefits.
[4] These numbers reflect a 78% rate increase for policies with lifetime benefits and a 63% increase for policies with limited benefits.

90.     Those "assumptions," Genworth explained, rely heavily on "assumptions for significant anticipated (**but not yet filed**) future premium rate increases or benefit reductions."  In other words, Genworth admitted to investors that it must obtain these significant rate increases or its LTC reserves, and indeed its LTC business, will be significantly imperiled.

91.     To illustrate the magnitude of Genworth's staggering rate increase action plan, one can look at the material impact Genworth estimated premium increases would have on the Company's LTC reserves.

92.     For example, in Genworth's Annual Report for 2014 the Company reported that its "loss recognition testing of our long-term care insurance reserves under U.S. GAAP and asset adequacy testing of our statutory long-term care insurance reserves" included "assumptions for significant **anticipated (but not yet filed) future premium rate increases or benefit reductions**" and that the "assumption for future anticipated rate actions [] increased our margin by approximately **$4.9 billion**."

93.     In 2015, the Company reported that Genworth was in an even deeper hole.  At that point, it reported a margin of $2.5 billion to $3.0 billion, but included an assumption of **$6.0 billion** in "**anticipated (but not yet filed) future premium rate increases or benefit reductions**."

94.     The Company's 2016 Form 10-K reports a further deepening hole.  GFI reported that Genworth had a Margin of only $800 million to $1.3 billion, but included a staggering assumption of **$7.3 billion** in to-be-filed premiums.

95.     The Company's 2017 Form 10-K reports shows no end in sight, reporting "[a]s of December 31, 2017, the assumption for future anticipated rate actions increased our U.S. GAAP long-term care insurance margin by approximately **$8.0 billion**."

96.     The ratio of the recognized value of the to-be-filed rate increases to the Margin has increased over time as well.  Indeed, that ratio was zero in 2013, 2.13 in 2014, between 2 and 2.4 in 2015 and between 5.6 and 9.13 in 2016.

97.     As the proverbial chickens return home to roost, the ratio will continue to increase in the future.  **In other words, Genworth has recognized that the only way out of this predicament is for it to rely upon even greater premium increases on policies that were already substantially increased.**

98.     Even accounting for the to-be-filed rate increases, Genworth's Margin has seen a staggering decline.  Since 2013, the reported Margin has declined by as much as 75%.



99.     As shown above, Genworth's reliance on to-be-filed rate increases has been used to backfill a massive decline in the future prospects of its LTC book of business.

100.    Genworth's rate increase action plans were not just aspirational.  The Company has admitted to its shareholders that executing this rate increase plan was a critical component of

Genworth's future viability in the LTC insurance industry.  The Company's assumptions for future approvals of truly massive premium increases has been a material part of Genworth's asset adequacy testing and financial reporting since 2012.  Genworth has known throughout that period that it will either attain massive and successive premium increases, or it faces a material risk of not being able to support the policies it has written.  None of this information has been shared with Plaintiffs or the Class members.

101.    It bears repeating that Plaintiffs do not challenge Genworth's need for these rate increases.  They challenge Genworth's *failure to inform policyholders* of its rate increase action plan that calls for successive and substantial rate increases, and the need for even more increases in the future.  Genworth has already pushed through massive LTC premium increases on the Classes.  They did so piecemeal and without ever informing Plaintiffs or the Class members of the Company's reliance upon and need for these increases and *future increases* just to rebuild adequate reserves.

102.    Full disclosures as early as 2012 of the massive reserve hole Genworth needed to fill with rate increases would have afforded policyholders material information about the successive waves of rate increases, the need for more immediate increases, and the staggering size of the increases needed in the future.  Genworth also failed to warn policyholders of the effect that not getting those increases approved might have on the future viability of their LTC insurer.

### 6.    To Ensure Execution of its Rate Increase Action Plans, Genworth Ties Executive Compensation to Rate Increase Approvals

103.    To motivate the executives in charge of executing Genworth's internal rate increase action plans to execute those plans quickly and fully, Genworth ties aspects of those executives' compensation to approvals of the rate increases themselves.

104.    For example, in Genworth's 2019 Proxy Statement filed with the SEC on November 1, 2019, the Company featured for its shareholders the "2018 Company Performance Highlights," which included "**Continued progress on multi-year LTC rate action plan – with $400 million incremental annual premium increases approved in 2018, with an N[et] P[resent] V[alue] of over $2 billion**" and "**Cumulative NPV of $10.5 billion of approved LTC rate actions since 2012**."   To be clear, this was the staggering aggregate amount of premium increases Genworth had obtained (largely on the policies at issue in this litigation) since 2012.

105.    Genworth also acknowledged to its shareholders that while it still experienced "[n]egative performance in U.S. Life Insurance driven by actuarial assumption updates on legacy LTC and life insurance policies," it promised them **"[w]e expect to manage these businesses within their existing capital and future LTC premium rate actions, with no further plans to infuse or extract capital**."   In other words, Genworth reassured its investors that it had no plans to bolster flagging LTC reserves with any more cash from the Company, **and would instead rely entirely on future premium rate increases on Class members and other policyholders to bring these reserves to adequate levels**.

106.    Explaining how its executive compensation was then directly tied to successful execution of these rate increase action plans, Genworth stated, "[o]ur executive compensation program supports our business strategy through program design that links executive compensation to achievement of business and financial growth goals," noting "[a] significant portion of our targeted executive pay (79% or more in 2018) is variable and covers annual and multi-year performance periods."

107.    Lest there be any doubt that these performance goals included execution of the multi-year rate increase action plans, Genworth stated that the "financial objectives" for its named

executive officers included a metric specifically for "Gross incremental premiums for LTC in-force rate actions."   And while Genworth noted that "at the request of certain state insurance regulators, the company did not set specific incremental LTC premium increase financial targets for Genworth's Chief Executive Officer," his compensation does include "U.S. Life Insurance: Operating Income metrics" which, on information and belief, still accounts for premium increases that add income to each current fiscal year.

108.   For fiscal year 2018, Genworth reported that it "exceeded our internal targets for premium rate increases on our unprofitable legacy blocks of LTC insurance, and continued execution of our multi-year rate action filing plan."   As a result, Genworth's "2016-2018 performance stock unit ("PSU") awards paid out above target, driven by strong mortgage insurance performance **and LTC rate action achievements**."   In other words, Genworth was even more successful than internally forecast at achieving rate increases on Class member's policies, and as a result, Genworth paid significant additional compensation to its named executives.

109.   To justify the enhanced compensation to its executives in 2018, Genworth also quantified for investors the success it achieved, noting "[i]n our U.S. life insurance companies, we measured incremental premiums approved for LTC insurance in-force actions and operating income metrics."   Its "2018 Target" for "Gross incremental premiums approved for LTC in-force actions" was $304 million.   But Genworth was actually successful in recognizing $394 million from premium increases in 2018, **a 30% positive variance from its target**.   This means that not only was Genworth successfully executing its rate increase action plans, it was actually far surpassing its internally forecast targets.

D.     **The Parable of Penn Treaty**

110.    One need not look far to find an example of the what looms in policyholders' future if they continue to pay staggering premium increases, but even those increases prove inadequate to shore up Genworth's reserves.

111.    On March 2, 2017, Commonwealth Court Judge Mary Hannah Leavitt in Pennsylvania ordered the liquidation of Penn Treaty Network America Insurance Company and American Network Insurance Company (together, "Penn Treaty"), insurance companies primarily in the business of issuing LTC insurance policies (more than 98% of Penn Treaty's policies were LTC policies).  Penn Treaty had 76,000 policyholders nationwide.  At its peak, in 2000, Penn Treaty had about 250,000 policies in force and $363 million in annual premium revenue.  But by October 2008, the company had ceased to sell new policies and was in dire financial straits, rather similar to Genworth's position today if its plan for staggering future rate increases is frustrated.

112.    In January 2009, the Commonwealth Court placed Penn Treaty into rehabilitation and appointed the Pennsylvania Insurance Department ("PID"), the regulator in Penn Treaty's domiciliary state, as the rehabilitator.  Following various analyses, PID sought to liquidate Penn Treaty.  Immediately prior to the rehabilitation in 2008, Penn Treaty had $1.1 billion in admitted assets and $1.2 billion in liabilities.  By 2015, the company's assets had dwindled to $656 million and its liabilities had ballooned to $4.4 billion.  At liquidation in 2017, Penn Treaty had $500 million in assets to cover LTC claims projected to be $4.6 billion.

113.    By the time PID got involved, it was too late for Penn Treaty policyholders.  Although signs of Penn Treaty's insolvency were apparent in the mid-2000s, the Pennsylvania regulators did not take action until 2009.

114.    Genworth's problems might run even deeper and affect a far larger group of policyholders.

30

115.    For its part, Genworth cites the Penn Treaty episode as support for regulators to approve pending and future rate increases.  In a November 2016 article, Genworth's CEO chided regulators for failing to approve premium increases that would assist in keeping insurers solvent, citing the Penn Treaty issues.  Allison Bell, *Genworth says higher LTCI rates beat liquidation*, THINKADVISOR (Nov. 4, 2016), *available at* http://www.lifehealthpro.com/2016/11/04/genworth-says-higher-ltci-rates-beat-liquidation (last visited Nov. 28, 2020).

116.    Premium increases can be warranted when actuarial experience justifies them and regulators approve them.  Again, this case does not challenge Genworth's LTC premiums or the increases in those premiums over time.  A problem arises, though, when policyholders elect to renew their policies for years at substantially increased premiums rates (with no disclosure of specifically anticipated future rate increases), only to see the insurer still fold.  In that instance, the policyholders are merely throwing good money after bad.

117.    Genworth owes its insureds a candid and full disclosure of its current financial condition, the role future premium increases play in achieving financial stability, and the magnitude of future increases necessary to ensure that stability.  Genworth has offered none of this to Plaintiffs and the Classes.

E.    **At First, Genworth Internally Recognizes the Need to be Transparent with its Rate Increase Plan**

118.    In an internal PowerPoint presentation, Genworth described the need for rate increases across several of its major LTC policy classes, including those at issue here.  In line with what it told investors, Genworth explained that its "actuaries lead a team to perform in-depth review of our in-force long term care insurance business."  The Company summarized its findings as follows:

> We continue to see higher than expected persistency among the older blocks
> of our in-force long term care insurance products. While this demonstrates

that policyholders value their coverage, it is one of our pricing challenges. Because more people than expected are retaining coverage, we are seeing a higher number of claims than expected when the product was priced. Prior rate increases partially mitigated these impacts. We have adjusted for this persistence with our newer products, priced with updated lapse rates assumptions of 1% or less.

119.    Genworth then laid out its plan to address these findings,

In conjunction with this ongoing review process, Genworth has adopted a more proactive strategy in managing our long term care business. **First, we will continue to work closely with regulators to implement rate increases on certain older blocks of long term care business in an attempt to bring these blocks closer to break even going forward.** Second, we will continue to evaluate the experience of our newer blocks of long term care insurance business. If the actual or projected experience warrants, we will seek a premium rate increase earlier in the product lifecycle. And third, we will continue to leverage our more than 40 years of experience to develop new products that are both innovative and incorporate our most current pricing assumptions.

(emphasis added).

120.    Genworth then further described the inforce rate action plans, several of which are the subject of this lawsuit (those covering the "PCS I" and "PCS II" policies) as follows:

**In-Force Management Project (IFMP)**

In 2007, after identifying a higher than anticipated persistency rate, Genworth implemented a rate increase of 8-12% on 3-Day, PrePCS, PCS I and PCS II policies.

**In-Force Rate Action I (IFA I)**

In 2010, Genworth applied an 18% increase on PCS I and PCS II policies.

**In-Force Rate Action II (IFA II)**

In 2012, Genworth applied rate increases on Pre-PCS, PCS I, PCS II and Choice I policies. During IFA II we applied larger increases to policies with lifetime benefit periods.  Among other things, this is because lifetime benefits can correlate to longer claim durations.  The average claim on a policy with lifetime benefits lasts 45% longer than the average limited duration policy claim.  Lifetime policies represent a greater, less predictable risk because the maximum benefit is uncapped.

**In-Force Rate Action III (IFA III)**

In the third quarter of 2013, Genworth began filing rate increases on Privileged Choice and Classic Select policies. **Our intent is to intervene earlier in the life of the products to avoid larger increases in the future and provide greater transparency to our policyholders and distribution partners.**

(emphasis added).

121.    Genworth also included the following slide outlining then extent of its various rate increase actions:

| Policy Series (Years Sold) | Requested Rate Increase Amount (Year Increase Requested) | | | | |
|---|---|---|---|---|---|
| | FMP (2007) | IFA I (2010) | IFA II Limited (2012 Benefit Period) | IFA II Lifetime (2012 Benefit Period) | IFA III (2013) |
| 3-Day (1974 - 1988) | 8% | - | - | - | |
| Pre-PCS (1988 - 2003) | 9% | - | 35% | 88% | |
| **PCS I (1993 - 2005)** | **12%** | **18%** | **60%** | **95%** | - |
| **PCS II (1997 - 2005)** | **11%** | **18%** | **63%** | **78%** | - |
| Choice I (2001 - 2008) | - | - | 44% | 60% | - |
| Classic Select (2003 - 2013) | - | - | - | - | 5% - 12.8% |
| Privileged Choice (2003 - 2013) | - | - | - | - | 5% - 12.8% |

122.    In subsequent slides, Genworth explained,

Our understanding of policyholder behavior has deepened considerably since our first rate increase in 2007. Specifically, very few policyholders lapse their policies in connection with a rate increase. This demonstrates that policyholders value their coverage.

> **However, we recognize that policyholders are increasingly frustrated by the potential lack of transparency into possible future increases. For this reason, Genworth adopted a different approach in connection with IFA II, specifically for rate actions requested in 2012.**
>
> **In situations where the state approves the entire amount requested, whether implemented completely in the first year or over a multi-year period, we intend to not seek additional increases for at least five years from the time a state approves the premium rate increase.**
>
> **We believe this approach allows our policyholders to plan and gives them the time and information necessary to understand and fully consider options**.

(emphasis added).

123.     Addressing the admitted need for transparent communication of its rate increases to policyholders, Genworth stated,

> We recognize the impact rate actions have on our policyholders and distribution partners, and we are committed to providing dedicated support throughout the process. As states approve requested rate increases, we communicate by:
>
> \*          \*          \*
>
> 3. Mailing initial notices to impacted policyholders at least 60 days before their anniversary billing dates.

124.     Genworth also fully appreciated the conundrum significant rate increases foist upon policyholders,

> Although policies with increased premiums still provide considerable value in light of the significant benefits they provide, **some clients may not be in a financial position, or be willing, to pay for the same level of coverage at the new rates.** There are several options available to clients who want to maximize the value of their coverage while keeping premiums at approximately the same level. Many of these options may be used together to balance policyholders' coverage needs with their budgets. Policyholders have 60 days from the date Genworth receives their benefit change confirmation to return to their original benefits, should they change their minds.

125.    Of course, for policyholders to make informed decisions about which of these various options to choose in light of the rate increases, they need a complete picture of Genworth's reserves on these policies and what future rate increases will be required.

126.    Genworth then noted, "**We continue to make tough but smart decisions designed to give our policyholders transparency into rate increases, coverage options and greater predictability of premiums**."

127.    Unfortunately, material information about Genworth's plans for future rate increases was *not* included in letters sent to Plaintiffs or Class members.  As illustrated below, none of them were provided material information that would have afforded them the necessary transparency into Genworth's future rate increase plans that would have, in turn, allowed them to make informed decisions.  The omission of this material information is central to their claims.

**F.    Other LTC Providers Disclose Information About Future Rate Increases While Genworth Remains Silent**

128.    Other LTC providers have afforded their policyholders information about their future rate increase requests, recognizing this information must be provided to allow policyholders to adequately consider their election options in response to each rate increase and thus avoid frustrating their ability to make informed elections.

129.    For example, in a letter informing its policyholders of a recently approved 10% rate increase, John Hancock explained

> We do want you to know that, based on our analysis, *we had determined there was a need for a 46.54% increase and this was the amount we filed with the New York Insurance Department*.  However, the rate increase we are able to implement at this time is 10%.  *As a result, we anticipate that we will be requesting further premium increases in the future, and your premiums may be affected.  Please note that due to the delayed implementation of the full rate increase, the total future increase amount that we request may change.*

Ex. A, p. 3 (emphasis added).

130.    That information explained to John Hancock's policyholders the extent of the increase it had initially sought and that having only a small portion of the increase approved meant that future rate increase requests would be forthcoming.  It also informed policyholders that since the full request had not been approved and would need to be phased in, that future rate increase requests might be even larger than initially requested.

131.    But John Hancock made a further disclosure.  On page 2 of the same letter, John Hancock also included the following "**Important Notice**",

> *Following a more recent analysis of our business in 2016, we have determined a need for a premium rate increase in addition to the remaining balance of the current increase described on page 1.  The additional rate increase has been or will be filed.*  Although the final amount and timing of the additional rate increase to be implemented is not known at this time, we are requesting an average increase of approximately 30% across all of our policy series, which is in addition to the remaining balance of the current increase described on page 1.

Ex. A, p. 4 (emphasis added).  This disclosure further informed policyholders that John Hancock's recent internal analysis determined the need for even greater increases than had been initially requested.

132.    Genworth possessed the same information about its own needs and plans for future rate increases. Instead of disclosing that information, however, Genworth withheld it from its policyholders.

133.    When John Hancock sent its next rate increase announcement, it informed policyholders that "[w]e do want you to know that this premium rate increase *only represents a portion of the total requested rate increase we filed with the applicable Insurance Department*. As a result, we *will be* requesting further premium increases in the future, and your premiums may be affected." Ex. A, p. 1 (emphasis added).

36

134.     These are precisely the type of disclosures Genworth had a duty to make, but did not.

## G.     Experience of the PCS I Block

135.     Genworth began selling its PCS I LTC policies throughout the country in 1994. The policies were generally sold on Genworth policy form numbers 7000 et al, 7020 et al, and 62150 et al.  Genworth had over 100,000 PCS I policyholders in 2006.

136.     These policyholders paid level premiums until 2008, when Genworth began requesting 12% premium increases from state insurance regulators nationwide.  Genworth justified this rate increase request by demonstrating the expected lifetime loss ratio "*with and without* the requested rate increase exceeds the minimum loss ratio of 60%."  In fact, as it explained to regulators, Genworth's lifetime loss ratios *even after a 12% rate increase* would be more than double the originally expected loss ratio when the policies were sold.  That meant that *even if Genworth were to obtain the requested 12% rate increase*, it should have known that future rate increases would not only be justified, but needed to bring this block even close to its originally anticipated profitability (if not just to return to a break-even point).

137.     Genworth obtained approval for this 12% increase nationwide.  On information and belief, PCS I policyholders in the Class were never informed that Genworth was even considering additional future rate increases on these policies.

138.     But less than two years later, in 2010, Genworth began seeking a second round of nationwide rate increases on the PCS I block, this time seeking an additional 18% increase.

139.     Genworth again justified this rate increase request by demonstrating the expected lifetime loss ratio "*with and without* the requested rate increase exceeds the minimum loss ratio of 60%."  That again meant that *even if Genworth were to obtain the additional requested 18% rate increase*, it knew or should have known that still more rate increases would be justified and needed

to bring this block even close to its originally anticipated profitability (if not just to return to a break-even point).

140.    Genworth obtained approval for this 18% increase nationwide.  On information and belief, as with the initial increase, PCS I policyholders in the Class were never informed that at that time Genworth could justify and knew it would seek additional future rate increases.

141.    Although premiums on these policies had now increased by 30%, things were about to get much worse for PCS I policyholders.  By 2012, Genworth had begun work on a much more significant rate increase that was part of the Companies' internal IFA2 rate increase action plan.  In filings across the country, Genworth began asking insurance regulators to approve a staggering increase of **95%** for policies with lifetime benefits and **60%** for those with limited benefit terms.

142.    Forecasting the need for even more rate increases in the future, Genworth told regulators when making this substantial request that "…it is important to note that the company could actuarially justify a **significantly higher increase based on our assumptions**."  Moreover, according to the tables filed with regulators in connection with this rate increase request, Genworth's lifetime loss ratio on these policies, *including* the effect of this substantial increase, was more than double that projected when the policies were sold.  By this point, that lifetime loss ratio alone clearly indicated to Genworth that even more rate increases would be needed in the coming years.

143.    Nevertheless, Genworth again failed to inform policyholders of the Company's projected need for additional future rate increases, or the magnitude or timing of those future increases.

144.    Some portion of this rate increase request was ultimately approved in nearly all states.  Approximately 20 states approved Genworth's request in full.

145.    For example, in North Carolina, where Plaintiff Penson resides, the North Carolina Department of Insurance ("NC DOI") approved the entire 95% rate increase for lifetime policies and 60% increase for limited term policies that Genworth had requested.  In exchange for approval of this increase, Genworth promised not to seek another rate increase on these policies for five years (the "Moratorium").  This increase raised the average annual premiums for North Carolina policyholders from $1,924 to $3,383.  Nationwide, the 2012 increases brought average annual premiums from $1,977 to $3,444.

146.    Other states approved only a portion of Genworth's requested increase.  For these states, each had either an informal "desk drawer" rule capping the annual amount of an increase they would approve, or there was a state regulation in place which limited the annual increases that could be approved.  In each of those states, Genworth informed the regulators, *but not the policyholders in those states*, that Genworth would continue to make premium increase requests – annually if necessary – in an attempt to meet the initially requested 95% and 60% increases.

147.    For example, in Pennsylvania, where Plaintiff Halcom resides, the Pennsylvania Department of Insurance ("PA DOI") told Genworth it would only approve increases up to 20% per year.  So, in December 2012, Genworth requested a 20% increase.  Making that request, Genworth explained to the PA DOI,

> Based on the experience of the PCS Series of policies, we are pursuing a nationwide premium increase of 95% for all lifetime benefit policies and 60% for all non-lifetime benefit periods.  **Pursuant to our discussion with the Department, however, we understand that the Department has proposed a limit on the rate increase it will approve on an annual basis.** Therefore, we are limiting the amount of our initial rate increase request to 20% for both lifetime benefit period and non-lifetime benefit period policies. **Based on both the adverse experience on these policies forms and our desire to consistently apply actuarially equivalent rate increases across all states in which each policy form was sold, however, we anticipate the submission of subsequent filings**.

148.    As Genworth made clear to the PA DOI, this was only the first of several increase requests it would be making to execute its internal rate increase action plans of a 95% increase for policies with lifetime benefit periods and a 60% increase for policies with limited benefit period. Genworth did not, however, share that information with its policyholders such as Plaintiff Halcom.

149.    After the PA DOI approved this 20% rate increase request in 2013, as planned, Genworth made another 20% rate increase request the very next year.  After reminding the PA DOI that it initially sought a rate increase request of 95% for lifetime benefit periods and 60% for limited benefit periods, Genworth explained,

> At this time, we are submitting a subsequent request for 20% for policies with lifetime benefit periods and 20% for policies with limited benefit periods.  Although Genworth could justify significantly more, this request is consistent with the filing and approval process for our request made in 2012.  **As indicated, the company intends to pursue rate increase requests until the full, actuarial equivalent of our nationwide 2012 rate increase request has been approved in your state**.

150.    The PA DOI approved this 20% rate increase on December 29, 2014.  Again, Genworth did not share its plans to request additional future rate increases with Plaintiff Halcom or other PCS I policyholders in Pennsylvania.

151.    By December of 2015, Genworth's updated internal rate action plan (now the MYRAP plan) called for substantial *additional* future rate increases nationwide, even for states that had already approved the full 95%/60% increases requested in 2012.  For the 20 states that had already approved the full increases requested, Genworth would have to wait until its offered five-year rate increase Moratorium expired to seek these new increases.  But in the other states that only partially approved the prior increase requests, Genworth got to work immediately.

152.    For example, in Pennsylvania, Genworth issued another rate increase request on December 28, 2015, this time seeking 103% increases on lifetime policies and 67% increases on limited term policies.  In its cover letter to the PA DOI, Genworth explained:

> This rate increase is being made to: 1) continue to work to achieve the actuarial equivalent of [sic] rate increase originally requested in 2012; and to begin to implement the required increases that were included in GLIC's 2014 asset adequacy testing.  To achieve these goals, GLIC is requesting a 103% rate increase for policies with lifetime benefit periods and a 67% rate increase for policies with limited benefit periods.  These amounts include 1) the balance of the 2012 rate increase request that was not approved and 2) an additional 50% rate increase which was included in GLIC's 2014 asset adequacy testing.

153.    Genworth also noted that "[t]hese requested amounts are **significantly less than the amount GLIC can justify in total**" and "Consistent with GLIC's 2014 Asset Adequacy Testing, **we anticipate filing future rate increase requests of similar magnitude**."  In 2016, the PA DOI approved increases of 30% for policies with lifetime benefit periods and 15% for limited benefit periods.  Again, Genworth did not share any of the information about its anticipated future rate increase requests with its policyholders, including Plaintiff Halcom.

154.    In August 2017, Genworth sought yet another increase from the PA DOI.  This time, Genworth requested a 72% increase for policies with lifetime benefit periods and 55% for those with limited benefit periods.  Again, Genworth explained to the PA DOI that the "goals of this new rate increase filing [were] to:

> • Begin to pursue a cumulative rate increase of 165% for Lifetime benefits and 125% for Limited benefits by filing for 72% Lifetime/55% Limited now in 2017, and 53% Lifetime/45% Limited in 2020; and
>
> • Continue to achieve the balance of the 2012 rate increase request that we were not permitted to implement.

155.    The PA DOI approved rate increase of 20% for policies with lifetime benefits and 7% for policies with limited benefits on December 5, 2017.  Yet again, although Genworth had

informed the PA DOI of its plans to seek additional future rate increases, it did not share that information with its policyholders, including Plaintiff Halcom.

156. Meanwhile, in the states that had approved Genworth's 2012 rate increase request in full, the five year Moratorium on future rate increases in those states expired in 2017 and Genworth got right to work on its next round of increase requests.

157. For example, in North Carolina (where the NC DOI approved the 95%/60% increase requested on December 14, 2012) Genworth made its next rate increase request on December 15, 2017, exactly one day after the Moratorium expired. Clearly, this request had been in the works since at least 2015, when Genworth's updated internal MYRAP demonstrated the need for these significant additional rate increases, and where its asset adequacy testing as far back as 2014 already included most, if not all, of these rate increases.

158. In its correspondence with the NC DOI, Genworth explained:

> **The goal of this new rate increase filing is to pursue the Multi-Year Rate Action Plan**, consistent with the basis of the future rate increases assumed in 2016 Cash Flow Testing (CFT). The current Multi-Year Rate Action Plan for PCS is a cumulative rate increase of 165% for Lifetime benefits and 125% for Limited benefits by filing for 72% Lifetime/55% Limited now in 2017, and 53% Lifetime/45% Limited in 2020. In this filing, GLIC is requesting a rate increase of 72% for policies with Lifetime benefit periods and 55% for policies with Limited benefit periods.
>
> Alternatively, in lieu of the **rate increase filings contemplated by the Multi-Year Rate Action Plan (in 2017 and 2020)**, we are willing to accept a one-time rate increase now of 115% for policyholders with Lifetime benefits and 82% for policyholders with Limited benefits. These rate increase amounts are the actuarial equivalent of the cumulative rate increases, planned through 2020, of 165% and 125% for Lifetime benefits and Limited benefits, respectively.

159. Again, the fact that Genworth's MYRAP called for cumulative increases of 165% Lifetime/125% Limited, but that Genworth was currently seeking only a portion of that increase meant that Genworth and the NC DOI knew this was not the last rate increase Genworth would be

seeking.  In fact, Genworth noted in its correspondence with the NC DOI that Genworth's internal MYRAP contemplated *another* substantial rate increase request in 2020, unless the NC DOI approved a higher increase of 115% for lifetime benefit period and 82% for limited benefit periods immediately.

160.    These seriatim rate increase requests have continued in the states that did not fully approve Genworth's initial rate increase requests and in the 20 states that did.  Moreover, as forecast internally and to regulators, Genworth has now begun seeking approval for the very significant 2020 MYRAP rate increases on all PCS I policies, even in states that fully approved prior requests.

161.    For all PCS I policyholders in the Class, Genworth withheld from them material information about its plans to seek additional future rate increases, including its dependence on obtaining those increases to maintain claims paying ability, and the timing, frequency and magnitude of those requests.

162.    Whether the policyholder was subjected to nearly annual rate increases (of lesser amounts) in states that essentially phased-in the rate increases, or whether they were subjected to fewer (more substantial) rate increases in states that approved Genworth's initial requests in full, those policyholders all suffered like harm through Genworth's lack of disclosure.  Genworth corresponded with all PCS I policyholders at least annually, but never afforded them this material information.  As a result, PCS I policyholders made annual decisions about their coverage and premiums they would have made differently if afforded this information.

## H.    Experience of the PSC II Block

163.    Genworth began selling its PCS II LTC policies throughout the country in 1998. The policies were generally sold on Genworth policy form numbers 7030 et al, 7031 et al, 7032 et

al, 62171 et al, 62172 et al and 62173 et al.  Genworth had over 220,000 PCS II policyholders in 2006.

164.    These policyholders paid level premiums until 2008, when Genworth began requesting 11% premium increases from state insurance regulators nationwide.  Genworth justified this rate increase request by demonstrating the expected lifetime loss ratio "*with and without* the requested rate increase exceeds the minimum loss ratio of 60%."  In fact, it explained to insurance regulators across the country that its lifetime loss ratios *even after an 11% rate increase* would be nearly double the originally expected loss ratio when the policies were sold.  That meant that even if Genworth were to obtain the requested 11% rate increase, it knew or should have known that future rate increases would not only be justified, but needed to bring this block even close to its originally anticipated profitability (if not just to return to a break-even point).

165.    Genworth obtained approval for this 11% increase nationwide.  On information and belief, PCS II policyholders were never informed that Genworth was even considering additional future rate increases on these policies.

166.    Less than two years later, in 2010, Genworth began working on a second round of nationwide rate increases on the PCS II block, this time seeking an additional 18% increase.

167.    Genworth again justified this rate increase request by demonstrating the expected lifetime loss ratio "*with and without* the requested rate increase exceeds the minimum loss ratio of 60%."  That again meant that even if Genworth were to obtain the additional requested 18% rate increase, it knew or should have known that future rate increases would be justified and needed to bring this block even close to its originally anticipated profitability (if not just to return to a break-even point).

168.     Genworth obtained approval for this 18% increase nationwide.  On information and belief, as with the initial increase, PCS II policyholders in the Class were never informed that at that time Genworth could justify and knew it would seek additional future rate increases.

169.     Although premiums on these policies had now increased by 30%, things were about to get much worse for PCS II policyholders.  By 2012, Genworth began work on a much more significant increase.  In filings across the country, Genworth began asking insurance regulators to approve a staggering increase of at least 78% for those with lifetime benefits and 63% for those with limited benefit terms.  These increases were part of Genworth's IFA2 internal plan.

170.     For example, in Connecticut, where Plaintiff Landino purchased his policy, Genworth requested a 78% increase on policies with lifetime benefits and a 63% increase on policies with limited benefit terms in 2012.

171.     When making that request, Genworth added "…**it is important to note that the company could actuarially justify a significantly higher increase based on our assumptions**."

172.     Moreover, according to the tables filed with the Connecticut Insurance Department ("CT ID") and insurance commissions nationwide in connection with this rate increase request, Genworth's lifetime loss ratio on these policies *including* the effect of this substantial increase was significantly higher than that projected when the policies were sold.  Again, this clearly meant to Genworth that even more rate increases would be needed in the coming years.

173.     Nevertheless, Genworth again failed to inform policyholders of their projected need for additional future rate increases, or the magnitude or timing of those future increases.

174.     Some portion of this rate increase request was ultimately approved in nearly all states.  Approximately 21 states approved Genworth's request in full.

175.    For those state that approved only a portion of Genworth's requested increase, each had either an informal "desk drawer" rule capping the annual amount of an increase they would approve, or there was a state regulation in place which limited the annual increases that could be approved.  In each of those states, Genworth informed the regulators, but not the policyholders in those states, that Genworth would be making annual increase requests in an attempt to meet the initially requested increases.

176.    For example, the CT ID approved an increase of 40% for all benefit periods on January 25, 2013.  As Connecticut approved only a portion of the increase requested, Genworth sought another premium increase in Connecticut for 32% on lifetime benefit policies and 19.9% for limited benefits period policies on September 19, 2014.

177.    Genworth explained in that filing that **"[a]lthough Genworth could justify significantly more, this request is consistent with the filing and approval process for our request made in 2012.  As indicated, the company intends to pursue rate increase requests until the full, actuarial equivalent of our nationwide 2012 rate increase request has been approved in your state**."  Genworth, however, did not share this information about future rate increase requests with Mr. Landino or Genworth's other Connecticut PCS II policyholders.

178.    The CT ID approved a rate increase of 19% for all benefit periods on January 5, 2015.

179.    By the end of 2015, Genworth had begun implementation of the even more substantial increases required by the internal MYRAP by seeking another round of nationwide rate increases on the PCS II policy block.  Again, in states that had approved the 2012 nationwide increase requests in full, these new requests were made in addition to those substantial rate increases.  In states like Connecticut, that had only approved a portion of the 2012 increases, these

Case 3:21-cv-00019-REP   Document 1   Filed 01/11/21   Page 48 of 62 PageID# 112

requests were made *on top of* those prior requests.  In all instances, Genworth sought to obtain approvals for the full amount of the rate increases initially sought, plus the additional rate increases called by the MYRAP.

180.     For example, on December 29, 2015, Genworth filed a rate increase request with the CT ID seeking a 99% increase for policies with lifetime benefit periods and 82% for policies with limited benefit periods.  Genworth explained in this filing:

> This rate increase filing is being made to: 1) **continue to work to achieve the actuarial equivalent of rate increase originally requested in 2012**; and 2) **begin to implement the required increases that were included in GLIC's 2014 asset adequacy testing**. To achieve these goals, GLIC is requesting a 99% rate increase for policies with lifetime benefit periods and an 82% rate increase for policies with limited benefit periods. **This amount includes 1) the balance of the 2012 rate increase request that was not approved, and 2) an additional 86% rate increase, which was included in GLIC's 2014 asset adequacy testing**.

181.     Genworth also warned the CT ID:

> • These requested amounts are significantly less than the amount GLIC can justify in total.

> • Consistent with GLIC's 2014 Asset Adequacy Testing, **we anticipate filing future rate increase requests of similar magnitude**.

182.     Thereafter, CT ID approved a three year phased-in rate increase of 13.7% per year for all benefit periods.  Yet again, although Genworth had informed the CT ID of its plans to seek additional future rate increases (beyond the approved phased-in increases), it did not share that information with Mr. Landino or Genworth's other Connecticut PCS II policyholders.

183.     Then in 2017, while the phased-in increases previously approved were still being rolled out, Genworth made *another* rate increase request in Connecticut. Genworth explained to the CT ID:

> The goal of this new rate increase filing **is to continue to pursue the Multi-Year Rate Action Plan, consistent with the basis of the future rate**

**increases assumed in 2016 CFT**. The current Multi-Year Rate Action Plan for PCS II is a cumulative rate increase of 152% for Lifetime benefits and 91% for Limited benefits by filing for 72% Lifetime/55% Limited now in 2017, and 45% Lifetime/23% Limited in 2020. **With the 2015 disposition, the Department has already dispositioned a portion of the Multi-Year Rate Action Plan. Therefore, GLIC is requesting a rate increase of 72% for Lifetime benefits and 27% for Limited benefits in this filing.** As a result, the rate increase that will be pursued in year 2020 will be limited to 5% for Lifetime benefits, plus any remaining balance of the requested rate increase in the current filing. Alternatively, in lieu of the rate increase filings contemplated by the Multi-Year Rate Action Plan (in 2017 and 2020), we are willing to accept a one-time rate increase now of 58% for policyholders with Lifetime benefits and 12% for policyholders with Limited benefits. These rate increase amounts are the actuarial equivalent of the cumulative rate increases, planned through 2020, of 152% and 91% for Lifetime benefits and Limited benefits, respectively, accounting for the portion Connecticut already approved in 2015.

184.    Although future rate increase requests were all but assured, Genworth did not share that information with Mr. Landino or Genworth's other Connecticut PCS II policyholders.

185.    Meanwhile, in the other 21 states that had approved Genworth's 2012 rate increase request in full, Genworth began implementation of the next phase of its internal MYRAP in 2017.

186.    In those states, Genworth explained:

> **The goal of this new rate increase filing is to pursue the Multi-Year Rate Action Plan, consistent with the basis of the future rate increases assumed in 2016 Cash Flow Testing (CFT)**. The current Multi-Year Rate Action Plan for PCS II is a cumulative rate increase of 152% for Lifetime benefits and 91% for Limited benefits by filing for 72% Lifetime/55% Limited now in 2017, and 45% Lifetime/23% Limited in 2020. In this filing, GLIC is requesting a rate increase of 72% for policies with Lifetime benefit periods and 55% for policies with Limited benefit periods.
>
> Alternatively, in lieu of the rate increase filings contemplated by the Multi-Year Rate Action Plan (in 2017 and 2020), we are willing to accept a one-time rate increase now of 117% for policyholders with Lifetime benefits and 68% for policyholders with Limited benefits. These rate increase amounts are the actuarial equivalent of the cumulative rate increases, planned through 2020, of 152% and 91% for Lifetime benefits and Limited benefits, respectively.

187.    Again, the fact that Genworth's MYRAP called for cumulative increases of 152% Lifetime 91% Limited, but that Genworth was currently seeking only a portion of that increase nationwide, meant that Genworth and regulators knew that this would not be the last rate increase Genworth would request.  In fact, Genworth noted in its correspondence with regulators that its MYRAP contemplated *another* substantial rate increase request in 2020, unless the regulators approved a higher increase than even Genworth had requested.

188.    These seriatim rate increase requests have continued in the states that did not fully approve Genworth's initial rate increase requests and in the 21 states that did.  Moreover, as forecast internally and to regulators, Genworth has now begun seeking approval for the very significant 2020 rate increases on all PCS II policies, even in states that fully approved prior requests.

189.    For all PCS II policyholders in the Class, Genworth withheld from them material information about its plans to seek additional future rate increases, including its dependence on obtaining those increases to maintain claims paying ability, and the timing, frequency and magnitude of those requests.

190.    Whether the policyholder was subjected to nearly annual rate increases (of lesser amounts) in states that essentially phased-in the rate increases, or whether they were subjected to fewer (more substantial) rate increases in states that approved Genworth's initial requests in full, those policyholders all suffered harm through Genworth's lack of disclosure.  Genworth corresponded with all PCS II policyholders at least annually, but never afforded them this material information.  As a result, PCS II policyholders made annual decisions about their coverage and premiums they may have made differently if afforded this information

I.     **Genworth Withheld Material Information From All Class Members Throughout the Class Period**

191.    Each time Genworth raised premium rates for either the PCS I or PCS II policy block, it sent each affected policyholder a rate increase announcement letter.  On information and belief, the letters sent to Class members pursuant to the IFA and IFA2 (prior to 2012), did not include *any* discussion of possible future rate increases or of Genworth's need for such rate increases to properly reserve for claims and to remain solvent.

192.    In some later rate increase announcement letters sent to Class members, Genworth told policyholders only: "please note that in accordance with the terms of your policy, we reserve the right to change premiums and it is [likely <or> possible] that your premium will increase again in the future."

193.    While these disclosures reiterate Genworth's "right" to increase premiums and note future premium increases are either "possible" or "likely," they do not begin to afford policyholders with necessary material information about the "possible" or "likely" future increases.

194.    *First*, they fail to inform policyholders that Genworth initially requested approval for significantly higher increases and having only a partial increase approved all but ensured successive rate increases in the very near future as the initial increase requested was "phased-in." Even in states that approved the initial rate increase requests in full, the disclosures do not even mention that Genworth was already planning to request significant additional rate increases in the immediate future.

195.    *Second*, they fail to inform policyholders of the sheer magnitude of the first rate increase initially requested (if it were not granted in full) and the staggering increases that were to come.

196.    *Third*, they fail to disclose to policyholders that Genworth had initiated a rate increase action plan that would require doubling, tripling, or even quadrupling the current premium rates at certain points.

197.    *Fourth*, they fail to inform policyholders that Genworth's asset adequacy testing and financial reporting depended upon these massive rate increases to ensure reserves were adequate to pay future claims.

198.    When Genworth sold these policies to Plaintiffs and the Class members in the late 1990s and early 2000s, they emphasized the Company's long track record with LTC insurance and highlighted the fact that Genworth had never before raised rates. When policyholders started receiving the first rate increase letters announcing increases of 12%, 18%, or even 40+%, they could have never imagined that successive increases in *greater* amounts would still be coming in the next several years.

199.    Genworth, though, possessed this material information when it sent the increase announcements to its policyholders. It also possessed this information when it sent annual renewal notices to its policyholders. Informing them that future increases were "possible" or even "likely" does not begin to afford its insureds all material information needed to make informed decisions.

200.    Each time a policyholder received an increase announcement, they were forced to make an election of various options that included paying the increased premiums to retain their current benefits, reducing benefits for a lesser premium, or walking away from the policy and retaining a "paid-up" benefit. It essentially required the policyholders to make the same assessments and decisions they made when they first purchased the policy, based on information about the costs and benefits of the policies and Genworth's future financial stability. Moreover,

any election policyholders made decreasing benefits would be permanent.[5]  For a policyholder that had already made a decade's worth of premiums payments, essentially investments in future benefits, these were not easy decisions.  Without the benefit of full information, policyholders simply could not make an informed decision.

201.    Genworth's need for rate increases was consistent across all policies blocks in this litigation.  Genworth's reserves for these Classes are not individual to any state, but are collective. These policyholders also all received the same form letters announcing the price increases and were denied the same material information about the need for significant and successive future rate increases.

## CLASS ACTION ALLEGATIONS

202.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of themselves and the following Classes:

> All persons residing in the United States who have Genworth PCS I long term care insurance policies with Genworth (the "PCS I Class").

> All persons residing in the United States who have Genworth PCS II long term care insurance policies with Genworth (the "PCS II Class").

203.    Excluded from each of the Classes are: (1) those policyholders whose policies either went into Non-forfeiture status prior to January 1, 2014, or whose policies lapsed or have otherwise been terminated and have not since been reinstated at any time between January 1, 2012 and the date Class Notice is mailed; (2) Genworth's current officers, directors, and employees as of the date Class Notice is mailed; and (3) the Judge and the Judge's immediate family and staff.

---

[5] While policyholders were given the option to decrease benefits or elect a non-forfeiture option, they could not later elect to increase premiums to restore their benefits to their original level.

204. Plaintiffs Halcom and Penson represent the PCS I Class. Plaintiffs Cherry and Landino represent the PCS II Class.

205. The PCS I Class and PCS II Class are referred to collectively as the Classes.

206. Each of the Classes satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

207. The members of each Class contain thousands of Class members and are thus so numerous that joinder of all members is impracticable. For example, as of December 31, 2019 there are more than 36,000 PCS I policyholders and over 137,000 PCS II policyholders nationwide.

208. Plaintiffs and each of the Class members have renewed their LTC policies with GLIC since 2012 and were damaged by Defendants' failure to adequately inform them of material information necessary to make important decisions about what policy options to elect at that time. Plaintiffs are each members of their respective Classes, and their claims are typical of the claims of the members of the Classes. The harm suffered by Plaintiffs and all other Class members was, and is, caused by the same misconduct by Genworth.

209. Common questions of law and fact exist as to all members of the Classes, which predominate over any questions that may affect individual Class Members. Among the many questions of law and fact common to the Classes are the following:

- whether Genworth omitted information from the rate increase letters and other correspondence with the Classes necessary to make their partial disclosures not misleading;

- whether the omitted information was material;

- whether Plaintiffs and the Classes are entitled to a declaration that Genworth's prior correspondence omitted material information necessary to make their partial disclosures not misleading;

- whether Genworth should be enjoined from further misconduct; and

- the appropriate measure of damages or other relief to which Plaintiffs and the Class members are entitled.

210.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs do not have any interest antagonistic to, or in conflict with, the Classes.

211.    Plaintiffs have retained competent counsel, who are experienced in consumer and commercial class action litigation, to further ensure such protection and who intend to prosecute this action vigorously.

212.    Class action status is warranted under Rule 23(b)(1) because the prosecution of separate actions by or against individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants, or because the prosecution of separate actions by or against individual Class members would create the risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other policyholders that are not parties to the adjudications or substantially impair or impede their ability to protect their interests.

213.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

214.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members are relatively small in comparison to the expense of this litigation, those expenses and the burden of individual litigation make it impractical for individual Class members to seek redress for the

wrongful conduct asserted herein.  If class treatment of these claims were not available, Defendants would likely continue their wrongful conduct, would unjustly retain improperly obtained revenues, and/or would otherwise escape liability for their wrongdoing as asserted herein.

215.    Information relating to Defendants' alleged misconduct and the identity of the various Class members is available from Defendants' books and records, including, but not limited to, their policyholder records, financial statements, and other records and reports filed with the SEC as well as financial statements, actuarial reports and memorandum, and correspondence filed with various state Insurance Commissions or Departments.

216.    Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

217.    The prosecution of separate actions by individual Class Members would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious or inconsistent litigation.

218.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT ONE:  FRAUDULENT INDUCEMENT BY OMISSION
### (By Plaintiffs On Behalf of the Classes Against Defendants GLIC and GLICNY)

219.    Plaintiffs and the Class members each purchased guaranteed renewable PCS I or PCS II LTC insurance contracts from Genworth.

220.    The fact that the policies are "guaranteed renewable" means the policies renew annually, and Genworth cannot cancel the policies or change benefits due under the policies if the policyholder pays the full premium each year.

221.    Each time Genworth announced a premium rate increase in connection with a renewal, it materially restructured the terms of the contract to be renewed.  In each instance, it offered Plaintiffs and the Class members three choices for renewal: (1) pay the increased premiums to maintain the same level of benefits; (2) pay a lower premium for decreased benefits; or (3) elect the limited "non-forfeiture" option and pay no further premiums.

222.    When a policyholder decides whether to renew their LTC policy, the premium rate is a material term of the renewal.  Whether the insurer plans to increase rates in the future, the frequency of those planned increases, and the amount of future increase needed by the insurer to remain financial stable are also material to all policyholders.

223.    While Genworth informed policyholders that future increases were "possible" or "likely," it withheld from them material information about the frequency and amount of future increases it had already planned to seek, including the fact that Genworth knew with certainty at the time those statements were made that its claims experience *already warranted* additional increases and that Genworth *would be* seeking (or had *already sought*) additional future rate increases.

224.    More detailed allegations specifying what Genworth knew and did not disclose to its policyholders are set forth above at paragraphs 135 to 162 for PCS I policyholders and paragraphs 163 to 190 for PCS II policyholders.

225.    By offering only a partial statement about future rate increases, Genworth assumed a duty to provide a full and complete statement.  Considering the staggering premium increases

Genworth planned to seek in the immediate future, and its reliance on these and other future rate increases on LTC policies to remain financially stable, this information was highly material to Plaintiffs and the Class members' renewal decisions, and its disclosure was necessary to complete a full disclosure about the "possibility" or "likelihood" of future rate increases.

226.    Genworth acknowledged internally that all this information was material, and that it needed to be "transparent" with policyholders about the future increases.  In the end, however, the Company intentionally withheld this material information from Plaintiffs and the Class members.

227.    Other LTC providers disclose information to policyholders about future rate increase requests, recognizing this information is material and must be provided to allow policyholders to adequately consider their election options in response to each rate increase and thus avoid frustrating their ability to make informed elections.

228.    More detailed allegations about what those insurance companies disclosed to their policyholders is set for above at paragraphs 191-202.

229.    By failing to adequately disclose material information about Genworth's rate increase action plans, current reliance on its planned future increases actually being approved, the risks to Genworth's solvency if such increases were not approved, and that different rate increases would be sought on lifetime and limited benefit period policies, Genworth withheld material information from Plaintiffs and the Classes.

230.    Genworth intended that Plaintiffs and the Class members rely upon the incomplete information it did provide in the hope that policyholders would make policy elections that were in Genworth's best interest and not the policyholder's best interest.

231.    As a result, Plaintiffs and the Class members were unaware of the scope and magnitude of Genworth's entire rate increase action plan when they made their renewal elections. They were also unaware of Genworth's reliance on this rate action plan, which included significant increases on other LTC policies, to build adequate reserves to pay Genworth's future claims.

232.    Without a complete picture of Genworth's massive rate increase plan, Plaintiffs and the Class members made certain elections in response to each rate increase announcement.  Had they known the full scope and magnitude of Genworth's rate action plans, and the Company's reliance on massive rate increases in the future to remain viable, they would have made different policy option elections.

233.    As a direct, proximate, and legal result of the aforementioned conduct, Plaintiffs and the Class members have suffered damages and are entitled to relief.

234.    Plaintiffs and the Classes seek the following relief:

a.      a finding that Genworth withheld material information from Plaintiffs and the Classes regarding its plans for future rate increases and its reliance upon obtaining at least some portion of future rate increases on its LTC policies to be able to pay future claims;

b.      injunctive relief in the form of an adequate and corrective disclosure to Plaintiffs and the Classes that reveals the omitted information, and the right to make new policy renewal elections in light of the new disclosures;

c.      if Genworth is found to have omitted material information, then rescission of Plaintiffs' and the Classes' policy renewals each year since Genworth first made those omissions; and

d.      return of premiums paid for each year a renewal of the policy was rescinded.

235.     To avoid doubt, if the above relief is obtained, Plaintiffs and the Classes seek to be placed in the same position they were in before Genworth made the aforementioned omissions, meaning they would still have the same guaranteed renewable PCS I or PCS II LTC policies they had prior to the omissions, and must then decide whether to maintain the respective policies in light of the current premiums that would be due, or what level of coverage they prefer in light of the new premiums they would be charged.

### COUNT TWO:  DECLARATORY RELIEF
### (By Plaintiffs and The Classes Against Defendants GLIC and GLICNY)

236.     This Count is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

237.     The Declaratory Judgement Act states:

> In a case of actual controversy within its jurisdiction, …, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

238.     Here, there is an actual controversy: whether Genworth had a duty to disclose to each Class member, among other things, (1) the amount of future rate increases it planned to request for each class member's policy; (2) the timing of those requested increases; (3) Genworth's reliance on obtaining those increases to maintain claims paying ability; (4) that Genworth would seek different rate increase amounts for lifetime benefit policies and limited term benefit policies; and (5) information about Genworth's current financial condition.

239.     Declaring that Genworth had a duty to make those disclosures would serve a useful purpose, in that it would resolve one of the primary issues in this litigation.  If the Court were to declare Genworth had a duty to disclose that information, injunctive relief would be necessary and

warranted.  Specifically, a corrective disclosure to all class members providing this information would be required.  Genworth would also be required to allow policyholders to make new elections in response to this information and all prior elections should be nullified.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A. That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Classes and Plaintiffs' counsel as counsel for the Classes;

B. That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C. That Plaintiffs and the Classes they represent be awarded compensatory, consequential, and general damages in an amount to be determined at trial;

D. Injunctive relief as is warranted;

E. Costs and disbursements of the action;

F. Pre-and post-judgment interest;

G. Reasonable attorneys' fees; and

H. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated: January 11, 2021

Respectfully submitted,

_____/s/ Jonathan M. Petty_____

Jonathan M. Petty VSB No. 43100
Michael G. Phelan VSB No. 29725
PHELAN PETTY PLC

3315 W. Broad Street
Richmond, VA 23230
(804) 980-7100 (telephone)
(804) 767-4601 (fax)

jpetty@phelanpetty.com
mphelan@phelanpetty.com

Brian Douglas Penny*
GOLDMAN SCARLATO & PENNY, P.C.
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Tel. 484-342-0700
Fax 484-580-8747
penny@lawgsp.com

Stuart A. Davidson*
Christopher C. Gold*
Bradley M. Beall
ROBBINS GELLER RUDMAN
& DOWD LLP
120 E Palmetto Park Road
Boca Raton, FL 33432
Telephone: (561) 750-3000
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
Shanon J. Carson*
Glen L. Abramson*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
scarson@bm.net
gabramson@bm.net

*Counsel for Plaintiffs and the Proposed Classes*

*Application for Admission *Pro Hac Vice*
Forthcoming