IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |  |
|---|---|---|
| JUDY HALCOM, HUGH PENSON, HAROLD CHERRY, and RICHARD LANDINO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civil Action No. 3:21-cv-00019-REP <br><br> <u>CLASS ACTION</u> |
| Plaintiffs, | ) ) |  |
| vs. | ) ) |  |
| GENWORTH LIFE INSURANCE COMPANY and GENWORTH LIFE INSURANCE COMPANY OF NEW YORK, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ...................................................................................................... 1

II.   ARGUMENT .............................................................................................................. 2

   A.   Standards for Reviewing Objections to Class Settlements ................................... 2

   B.   The Objections to the Settlement Should Be Overruled ...................................... 3

      1.   Bacon Objection (ECF Nos. 53 and 55) .................................................... 3

      2.   Crone/Leen/Lubell/Nielson Objection (ECF No. 74) ................................ 7

        a.   The Settlement Class Meets the Requirements of Rule 23(a)(2) and (a)(3) ............... 8

        b.   The Settlement Is Fair, Reasonable, and Adequate ................................... 12

      3.   Pfeffer/Galitz/Eckhaus Objections (ECF Nos. 63, 64, 69, 71, 72, and 73) ................... 15

        a.   The December 8, 2021 Objection (ECF No. 64) ....................................... 16

        b.   The December 22, 2021 Objection (ECF No. 69) ..................................... 25

      4.   Skovronek Objection (ECF No. 56) ........................................................ 31

      5.   Brown and Borgen Objections (ECF Nos. 62 and 66-67) ........................ 32

      6.   Buben Objection (ECF No. 65) ............................................................... 33

      7.   Brigleb/Barron Objection (ECF No. 70) ................................................. 35

III.  CONCLUSION ......................................................................................................... 36

TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................2

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)................................................................................19

*Brown v. Nucor Corp.*,
   576 F.3d 149 (4th Cir. 2009) ...................................................................8

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ...................................................................9

*Flinn v. FMC Corp.*,
   528 F.2d 1169 (4th Cir. 1975) .................................................................3

*In re Genworth Fin. Sec. Litig.*,
   210 F. Supp. 3d 837 (E.D. Va. 2016) .....................................................2

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices &
   Prods. Liab. Litig.*,
   952 F.3d 471 (4th Cir. 2020) ...................................................................3

*In re The Mills Corp. Sec. Litig.*,
   265 F.R.D. 246 (E.D. Va. 2009) ..............................................................3

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018)..............................................................................20

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ...................................................................6

*Leifer v. Genworth Fin. Inc.*,
   No. 3:16-cv-01008-JAG (E.D. Va.)..................................................29, 30

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal. 2014) ...........................................................19

*Robinson v. Carolina First Bank NA*,
   No. 7:18-cv-02927-JDA, 2019 WL 2591153 (D.S.C. June 21, 2019) ......2

*Robinson v. Carolina First Bank NA*,
   No. 7:18-cv-02927-JDA, 2019 WL 719031 (D.S.C. Feb. 14, 2019)........2

*Schechter v. Crown Life Ins. Co.*,
   No. 2:13-cv-05596-CAS(AJWx), 2014 WL 2094323 (C.D. Cal. May 19, 2014)....................3

TABLE OF AUTHORITIES

*Skochin v. Genworth Fin., Inc.*,
  No. 3:19CV49, 2020 WL 6532833 (E.D. Va. Nov. 5, 2020) ........................................ *passim*

*Soutter v. Equifax Info. Servs., LLC*,
  307 F.R.D. 183 (E.D. Va. 2015) .............................................................................9

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011).....................................................................................6

*United States v. Oregon*,
  913 F.2d 576 (9th Cir. 1990) ...................................................................................3

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................................8, 9, 18

**STATUTES, RULES, AND REGULATIONS**

28 U.S.C. §1715.......................................................................................................21

Federal Rules of Civil Procedure

  Rule 23(a)(2) .........................................................................................7, 8, 11, 12
  Rule 23(a)(3) .........................................................................................7, 8, 11, 12
  Rule 23(b)(2).....................................................................................................20
  Rule 23(b)(3).....................................................................................................20
  Rule 23(c).........................................................................................................18
  N.Y. Comp. Codes R. & Regs. tit. 11, §52.40......................................................28

Va. Code §38.2-1900, *et seq.* .................................................................................7, 28

**SECONDARY AUTHORITIES**

Fed. Trade Comm'n, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (Sept. 2019)...........................................................................................6

Restatement (Second) of Contracts §162(2) .............................................................19

Restatement (Second) of Torts §538(2) ....................................................................19

5 Steven Plitt et al., Couch on Ins. §69:2 (3d ed. 2021) .......................................... 31, 32

Pursuant to the Court's Order Granting Preliminary Approval of Settlement and Directing Notice to Class (ECF No. 52) ("Notice Order"), and in further support of (1) Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF Nos. 57 and 58) and (2) Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs (ECF Nos. 59 and 60), and in opposition to each objection to the Settlement, Class Counsel and the Named Plaintiffs respectfully submit this Reply Memorandum.

## I.    INTRODUCTION

The proposed Settlement has been well received by the Class. Class Counsel has spoken to nearly 2,000 Class members who called with questions about the Settlement and the ***vast*** majority of those policyholders appreciate and favor the Settlement. In the end, only 94 policyholders opted out of the Settlement and there are 11 objections filed by 19 Class members to some aspect of it.[1] Those opt-outs and objections together represent ***0.078 percent*** of the total Class of nearly 145,000 Genworth policyholders that directly received Notice of the Settlement.[2] Moreover, each state's insurance regulator received statutory notice of the proposed Settlement under the Class Action Fairness Act, 28 U.S.C. §1715(b)[3], and a separate communication from Genworth requesting any feedback or input from the State regulators. No state regulator has objected to the Settlement.

Many of the objections submitted by Class members pull in opposite directions and represent disparate assessments of the Settlement. For example, some objectors believe the

---

[1]    *See* Supplemental Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Settlement Notice Plan, Exhibit A, at ¶16.

[2]    Not only is this an exceedingly low number of opt-outs and objections, but it also compares very favorably to the reaction of the Class in the *Skochin* settlement in which .092% of the roughly 207,000 policyholders opted-out and where .017% objected.

[3]    Citations, internal quotations, and footnotes omitted and emphasis added unless otherwise noted.

Settlement offers the Class insignificant monetary value or otherwise benefits Genworth, while others are concerned the Settlement payments are so substantial that they may stress Genworth's financial condition. These divergent opinions reinforce that the Settlement is an appropriate compromise. In the end, the question is not whether everyone in the Settlement is completely satisfied, but whether the settlement is a fair, adequate, and reasonable resolution of the claims asserted, which this Settlement is. *See, e.g.*, *Skochin v. Genworth Fin., Inc.*, No. 3:19CV49, 2020 WL 6532833, at *18 (E.D. Va. Nov. 5, 2020) (citing *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839 (E.D. Va. 2016)). This Settlement tracks the claims Plaintiffs brought. It provides the Disclosures[4] that were sought from the outset of this case, and then offers a series of valuable Special Election Options and monetary or other relief to every eligible member of the Class. Named Plaintiffs and Class Counsel therefore respectfully urge the Court to overrule the objections and approve the Settlement.

## II.    ARGUMENT

### A.    Standards for Reviewing Objections to Class Settlements

"The [Court's] inquiry . . . under Rule 23(e) . . . protects unnamed Class members from unjust or unfair settlements affecting their rights[,]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), while also accounting for the "strong judicial policy in favor of settlement to conserve scarce resources that would otherwise be devoted to protracted litigation," *Robinson v. Carolina First Bank NA*, No. 7:18-cv-02927-JDA, 2019 WL 719031, at *8 (D.S.C. Feb. 14, 2019).[5]

---

[4]    All capitalized words herein are defined in the Parties' Settlement Agreement unless otherwise noted.

[5]    Final approval granted at *Robinson v. Carolina First Bank NA*, No. 7:18-cv-02927-JDA, 2019 WL 2591153 (D.S.C. June 21, 2019).

Courts generally view a low number of objections and opt-outs to a class action settlement as additional indicia of the settlement's fairness.  *See, e.g.*, *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 257 (E.D. Va. 2009).  Indeed, as the Fourth Circuit recently explained, where "only 94 of the 178,859 Class members who responded to the class-action settlement notice opted out of the settlement (about 0.05%), and 12 Class members objected thereto (about 0.006%)[,] [t]hose figures provide further support for the settlement's adequacy."  *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 485 (4th Cir. 2020).  The objection and opt-out rates for this Settlement are similarly low, with only approximately 0.01% of the Class objecting and only 0.04% opting out.[6]

"The objectors to a class settlement generally bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement."  *Skochin*, 2020 WL 6532833, at *10 (citing *United States v. Oregon*, 913 F.2d 576, 581 (9th Cir. 1990); *Schechter v. Crown Life Ins. Co.*, No. 2:13-cv-05596-CAS(AJWx), 2014 WL 2094323, at *2 (C.D. Cal. May 19, 2014) (stating that objectors bear the burden of showing that settlement approval would contravene its equitable objectives).

### B.    The Objections to the Settlement Should Be Overruled

Class Counsel address each of the 15 objections below but have combined overlapping objections and arguments in opposition where appropriate.

### 1.    Bacon Objection (ECF Nos. 53 and 55)

W. Edward Bacon objected to the Settlement by letter dated November 8, 2021.  ECF No. 53.  He then filed an amended objection by letter dated November 21, 2021 that, by his request,

---

[6]    Even if a large percentage of the class had objected, "a settlement is not unfair or unreasonable simply because a large number of Class members oppose it."  *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975).

replaces and supersedes his prior objection.  *See* ECF Nos. 55 and 55-1.  Class Counsel will address the issues raised in his amended objection, ECF No. 55.

Mr. Bacon objects that the Settlement is not fair, reasonable, adequate, or in the best interests of the Class because the options offered in the Settlement require Class members to "give up a substantial amount of their benefits in return for a reduction in premiums and a damage payment."  ECF No. 55 at 1.  He concludes that "[w]hat is gained does not come close to what is loss [sic]."  *Id.*  While he acknowledges "there are policy holders that simply cannot afford more premium increases and the Special Election Options are marginally better than what Genworth is currently offering,"[7] he speculates that most Class members will not elect any of the Special Election Options and will simply maintain their current coverage.  *Id.* at 2.  He, thus, suggests the Settlement should provide an additional option that would allow Class members to "keep the policies as they are and still be subject to premium increases.  But Class members would be given a payment credit or discount equal to some percentage of any premium increase for the life of their policy."  *Id.* at 2.  To that end, he suggests a credit of ten percent.  *Id.*

First, Mr. Bacon is incorrectly assessing the "value" of the Settlement by only comparing the reduction in insurance coverage for each Special Election Option to the new lower premium and the amount of the corresponding cash damages payment, as if the "value" of the Settlement is that policyholders are merely trading one for the other.  This is not the way to assess the value of the Settlement.  After all, policyholders who wish to reduce their premiums must also reduce their coverage, because all policyholders inside and outside the Settlement must pay the regulator approved premium for their level of benefits.  The point of this case was that absent disclosure

---

[7]    Class Counsel does not agree that the Special Election Options are only "marginally" better than what Genworth currently offers policyholders outside of the Settlement.

from Genworth about its plans for future rate increases each time Genworth increased premiums, policyholders were not able to make an informed decision about whether to pay the increased premium to maintain full coverage, or whether to reduce their benefits to pay lower premiums. This Settlement offers *all* Class members disclosures concerning Genworth's plan for future rate increases and its need for those increases to assist them in making an informed decision ***and*** an opportunity to select among the several Special Election Options in light of those disclosures. Importantly, the Settlement compensates policyholders for not having the information sooner through the Cash Damages payments or greatly enhanced paid-up benefits that are triggered by selecting those options.

It is the Disclosures, ***coupled with*** the opportunity to make new elections ***and*** the Cash Damages payments or enhanced paid-up benefits offered in the Settlement that is the true measure of the Settlement's value. *See, e.g.*, *Skochin*, 2020 WL 6532833, at *17 (overruling objections because, *inter alia*, "in essence, the Settlement Agreement offers Class members the ability to make new policy elections, equipped with information about possible premium increases in future years"). Stated another way, the value of the Settlement is not derived by comparing the Cash Damages payments to the reduction of available coverage, but rather by comparing the value of making that same benefit reduction ***in the Settlement*** (with the Cash Damages payments or the enhanced paid-up benefits) ***versus outside of it*** where those elections provide no further compensation. This understanding of the claims in this case and how the Settlement directly addresses those claims is critical to assessing the value of the Settlement.

The fact that some Class members will ultimately decide not to make a settlement election to take advantage of the Settlement's Cash Damages or enhanced paid-up benefits does not render the Settlement "valueless" to them. This is because Class members who decide to maintain their

full coverage after getting the Disclosures will now have made an informed decision to maintain those benefits with a more complete understanding not only of what that coverage may cost over the next several years, but how Genworth's need for future rate increases impacts its ability to pay future claims.

It is also notable that most class action settlements have a very low claims rate, meaning in most cases very few Class members actually take advantage of the benefits of the settlement. In fact, according to the Federal Trade Commission, the average claims rate in a consumer class action lawsuit is around 9%. *See* Fed. Trade Comm'n, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* at 11 (Sept. 2019), https://tinyurl.com/3uy72b7b.[8] But, in the similar *Skochin* settlement, approximately 30% of the premium-paying Class members who have had a full opportunity to make elections have done so to date. That is one of the highest participation rates ever achieved for a consumer class action. Moreover, those elections have already triggered cash payments of over $184 million and are on pace to payout over $200 million. This is substantial value to the *Skochin* class, and it portends a similar valuable result here. Indeed, as noted in the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF No. 58), a modest claims rate in this case of 10% (one-third that in *Skochin*) would result in an estimated $84 million in Cash Damages payments, while a claims rate similar to *Skochin* would result in an estimated $251 million in Cash Damages

---

[8]    It is also common for courts to approve settlements that provide defendants with a class-wide release even where a very small percentage of the class has actually filed a claim and will receive the monetary benefits of the settlement. *See, e.g.*, *Keil v. Lopez*, 862 F.3d 685, 696-97 (8th Cir. 2017) (noting that "a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness"); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (citing evidence suggesting that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns"). This is because the ***availability*** of options, ***in and of itself***, is of sufficient value to support a settlement and to provide notice as required by Due Process, even if those options are not exercised by the vast majority of Class members. *Id.*

payments. ECF No. 58 at 26. And this does not even include the value of enhanced paid-up benefits available to most Class members, the value of obtaining additional Disclosures, or the value of having the choice to revisit their prior decisions and make a new election based on the additional information. This is a valuable settlement.

As to Mr. Bacon's suggestion that the Settlement include a provision whereby Class members who chose to retain their current coverage are given a credit or discount of 10% on all future premium increases, such a provision would improperly invade the insurance regulators' jurisdiction over premium rates. As the Court is aware, one of the regulators' primary purposes is to regulate the premiums insureds pay for their coverage. *See, e.g.*, Va. Code §38.2-1900. A settlement term that would curtail that authority in the future would improperly invade their jurisdiction. In a similar vein, seeking such relief in this case would have surely implicated the filed-rate doctrine. *See Skochin*, 2020 WL 6532833, at *51 ("[B]ecause Genworth's past rate increases were approved by state or federal regulators, any objections to the propriety of the rates themselves are barred by the filed-rate doctrine."). Since Mr. Bacon is seeking settlement relief that could not be obtained in the litigation itself, his request is unreasonable and unwarranted, and his objection should be overruled.

### 2.    Crone/Leen/Lubell/Nielson Objection (ECF No. 74)

Diane and Terry Crone, Walter Leen, Paul Lubell, Bonnie Fontenot Nielson, and Dennis Nielson (the "Crone Objectors") filed an objection on December 28, 2021. ECF No. 74. In it, they raise two primary objections: (1) the Court should decertify the Settlement Class for lack of commonality under Rule 23(a)(2) and lack of typicality under Rule 23(a)(3) (*id.* at 12-15); and (2) the Settlement itself should not be approved because, they contend, it is not fair, reasonable, or adequate (*id.* at 15-17).

### a.    The Settlement Class Meets the Requirements of Rule 23(a)(2) and (a)(3)

The Crone Objectors argue the Class lacks the required commonality and typicality because some of the objectors were recently afforded information "regarding certain and significant future premium rate increases [Genworth] intended to impose on them at the time it imposed more modest premium rate increases" and that Genworth "also seemingly provided the supposedly missing/omitted information at the heart of Plaintiffs' complaint to some Settlement Class members and not others." *Id.* at 14. Specifically, they allege that in December 2013 and October 2020 Mr. Leen received information regarding the amount of a rate increase that Genworth would need to certify that no future rate increases were needed in the future (*id.* at 7-8); in November 2019 the Crones received information that Genworth would seek another rate increase of 20% in the future (*id.* at 6); and in July 2021, Mr. Lubell received information that Genworth planned to seek at least 89% in future rate increases (*id.* at 9-10). They conclude that "whether Genworth had a duty to disclose additional information about its intended future premium rate increases and whether Genworth satisfied that duty will vary by class member." *Id.* at 14. They ask the Court to "decertify" the Settlement Class. *Id.* at 15.

This Circuit and others have long recognized that "[t]he threshold requirements of commonality and typicality are not high; Rule 23(a) requires only that resolution of the common questions affect all or a substantial number of the Class members." *Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009). The Supreme Court's holding in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), did not heighten this standard, but rather clarified that commonality requires that class claims "depend upon a common contention . . . of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.  As this Court previously explained,

> In other words, the proposed points of commonality must possess the capacity to generate common answers apt to drive the resolution of the litigation.  ***Minor differences in the underlying facts of individual Class members' cases do not defeat a showing of commonality where there are common questions of law.*** But, commonality requires that the class present dispositive questions which will propel the case through the system.

*Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 200-01 (E.D. Va. 2015) (Payne, J.).  In this regard, "the Rule does not require that ***all*** questions of law or fact raised in the litigation be common; indeed, [e]ven a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart*, 564 U.S. at 368-69 (alteration in original).

With regard to typicality, the Supreme Court has observed that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S.Ct. at 2551 n.5 (alteration in original).  But, whereas commonality "looks at the relationship among the Class members generally," typicality looks "at the relationship between the proposed class representative and the rest of the class." *Soutter*, 307 F.R.D. at 200.  Simply stated, "[t]he essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).

Recent disclosures that Genworth began voluntarily making to some Class members as a result of the *Skochin* litigation do not defeat commonality or typicality here.  The central issue in this case is whether Genworth's partial disclosures about the "likelihood" of future rate increases created a duty to make more complete disclosures about: (1) its internal plans for future rate increases, including the magnitude and timing of those increases; (2) how dependent Genworth is on obtaining those future rate increases to pay future claims; and (3) Genworth's current financial rating.  *See* Complaint, ECF No. 1, ¶¶8, 16-17, 19-22, 43-57, 78, 84, 101-102, 127, 143, 161-162,

173, 189-201, 222-225, 229-232, and 238. These are the complete disclosures that Plaintiffs alleged were required ***throughout the Class Period*** as a result of Genworth's prior partial disclosures. No one, not even the objectors, contend that any Class Member was afforded these full Disclosures for at least the first nine years of the Class Period.

Moreover, unlike any prior voluntary disclosures Genworth began making as a result of the *Skochin* litigation, this Settlement obligates Genworth to give the entire set of allegedly material information to Class members in one place, for the specific purpose of informing their decisions on coverage and premium adjustments and, if appropriate, accompanied by Cash Damages or enhanced paid-up benefits. The Disclosures explain what Genworth's plans for future rate increases are and the timing and magnitude of those plans. The Disclosures also explain how the need for such rate increases impacts Genworth's ability to pay future claims and Genworth's current A.M. Best financial rating. While this information may have recently been made available to some Class members, it has not been provided in this form and context, where it can be specifically reviewed, evaluated, and acted upon to make new policy decisions, and importantly, obtain corresponding Cash Damages or enhanced paid-up benefits to compensate policyholders for not having had the information sooner. And the Objectors do not contend that any Class members received the full disclosures for the first nine years of the Class Period.[9]

Moreover, unlike its recent voluntary disclosures, Genworth is not free to change its mind or provide different information under the terms of the Settlement. Perhaps most importantly, the purpose of the Special Election Letters with the Disclosures and Special Election Options are to remedy ***past***, allegedly incomplete disclosures that affected all Class members for the first nine

---

[9]    While the Objectors allege that Mr. Leen received some information about rate increases in 2013, as explained herein at page 11, the information he received is not the same information about Genworth's internal plans for rate increases that this litigation sought to require.

years of the Class Period, and provide Class members an opportunity to, in effect, re-do their coverage selections in light of the allegedly complete information.  In other words, the Settlement Election Letters remedy the alleged misconduct that is common to the entire Class, even if now *some* of the alleged misconduct has ceased for *some* of the Class members.

The Crone Objectors also fail to recognize that some of the information that they categorize as relating to future rate increases is not the same information about Genworth's internal Multi-Year Rate Action Plan ("MYRAP") that Plaintiffs sought as required disclosures in this case.  For example, when Genworth informed objector Leen in 2013 that it would require a rate increase of 165% to certify that no future rate increases would be anticipated, that partial disclosure informed him of Genworth's actuarial justification for rate increases based upon its annual testing, ***but it did not disclose what future rate increases Genworth actually plans to seek on his policy***.  Indeed, in its MYRAP iterations, Genworth has consistently noted that the increases it could justify actuarially are considerably higher than the increases for which it will seek regulatory approval. It is the MYRAP plans for what Genworth will actually seek in future rate increases, and over what period of time it plans to seek those increases, that Plaintiffs contend is substantively different from what may have recently been disclosed to some (but not all) policyholders.

Thus, all Class members are in the same position – they were all allegedly deprived of the full Disclosures for most, if not all, of the Class Period.  Moreover, none of the Class members has yet been afforded the Disclosures in the specific context of evaluating their coverage and premium amounts in connection with a commensurate award of Cash Damages or enhanced paid-up benefits to compensate them for having not had that information sooner.  Thus, the central issue in this case regarding Genworth's duty to make a full disclosure during the Class Period is still common to all Class members, and, therefore, the commonality requirement is met under Rule 23(a)(2).

Moreover, since Genworth owes that duty to the Class Representatives and Class members alike, the representatives claims are typical of those of the rest of the Class, so the typicality requirement under Rule 23(a)(3) is also satisfied.

If the Crone Objectors' views were to prevail it would simply serve to exclude certain policyholders from the Settlement, and those policyholders would likely be left with no avenue for relief. No one disputes that policyholders cannot challenge the actual rate increases as a breach of their contracts, since all Class members' policies permit Genworth to increase premiums. They cannot lodge any viable court challenge to the propriety of the rate increases themselves, since those claims would be barred by the filed-rate doctrine and are otherwise baseless because Genworth has consistently established the actuarial justification for those increases to regulators. What they would be left with are the same claims that were advanced in this case, but without a Class in which to assert those claims. While the Crone Objectors are concerned that the Settlement's Release is of significant value to Genworth, the reality is the only viable claims being released are those that were asserted in this case. This objection is not in ***any*** Class Member's best interest, and not even in the best interests of the Crone Objectors themselves.

Finally, it bears emphasis that this is not a common fund settlement and that ***none*** of the Class Member elections will negatively affect the availability, number, ***or*** value of Settlement options offered to other Class members, meaning there are no inter class conflicts and no practical or legal basis to exclude anyone from the Settlement Class. At bottom, this Settlement is fair, reasonable, and adequate to the entire the Class.

### b.    The Settlement Is Fair, Reasonable, and Adequate

The Crone Objectors also argue that "[b]ecause Genworth has already disclosed its plans to seek future premium rate increases to [some] Massachusetts, Maryland and Virginia LTCI policyholders . . . the 'Special Election Letter' fails to provide such insureds any meaningful

benefit." ECF No. 74 at 16. But, as just explained, the Disclosures in the Special Election Letter are more meaningful than the information Class members have received to date. Moreover, the value of the Settlement is not limited to the Disclosures alone, but also includes the ability to elect from a menu of Special Election Options that allows the policyholder to **use** the information from the Disclosures to either maintain their existing benefits or elect new coverage while obtaining meaningful Cash Damages payments or enhanced paid-up benefits if they choose to adjust their coverage in light of the Disclosures.

Next, the Crone Objectors aver that "Settlement Class members who select Special Election Option I.A.1 (the first paid-up benefit option) fail to receive any benefit greater than what is already available to them." *Id.* at 16. That is false. Under the Settlement, policyholders who elect this option can receive a cash payment equal to the premiums they paid between January 1, 2017 and December 31, 2020, and then retain a paid-up coverage benefit equal to the premiums they paid before and after that period. *See* Settlement Agreement, Appendix C, I.A.1, ECF No. 61-2 at 44-45.

Genworth has **never** offered these Class members such a paid-up benefit option through which policyholders can receive a cash payment equal to four years of prior premium payments. While Genworth has offered policyholders in five states an option to obtain a cash payment equal to 50% of the premiums paid-in and a paid-up coverage benefit equal to the rest of premiums paid-in, it has not offered that option to the vast majority of the Class. That one Special Election Option, out of a potential set of six Special Election Options, resembles (but is not identical to) something that a small number of Class members could obtain outside the Settlement does not render the entire Settlement unfair, unreasonable, or inadequate. Again, the point of the Settlement is to obtain the Disclosures and then give policyholders a wide menu of options to adjust their

coverage in light of the additional information.  If a Class Member receives the Disclosures, prefers a paid-up benefit option and wants to receive as much cash as possible, then they can take advantage of the first Special Election Option.  If, instead, they prefer the second Special Election Option, which *doubles* the value of their paid-up coverage, they can select that one.  Or Class members may select any available options to adjust their coverage and reduce their premiums.  The value of the Settlement, again, is not limited to a single option, or a single partial disclosure, but rather the full set of Disclosures and the opportunity to select from a wide range of Special Election Options.

Finally, the Crone Objectors argue that the Settlement is not fair, reasonable, or adequate because it is impossible to calculate, right now, each Class Member's Cash Damages payments or post-reduction premiums, and, thus, they cannot assess the amount of money they are saving relative to the amount of benefits they may choose to reduce as part of the Settlement.  *Id.* at 17.  But, Class members will have *all* of that information when they are actually offered the opportunity to make an election in the Settlement.  Each Class Member's new lower premium rates, Cash Damages payments, and enhanced paid-up benefit amounts will all be set forth in an easy to digest table of Special Election Options in the Special Election Letter.  In part because of the time, effort, and expense that such individual calculations will require, and because such figures would, at this point, only be projections due to future factors such as premium increases, claims made, and the like, the Court already recognized, in approving the *Skochin* settlement, that providing such information prior to the Special Election Letter was not required, and, in fact, would not be feasible.  *See Skochin*, 2020 WL 6532833, at *15-16 ("[T]he alternative proposed (or implied by the objectors) is not a viable one.  The proposed alternative is to have Genworth distribute the Special Election Letters and then allow Class members to opt out if they do not like the options

made available to them.  Genworth has explained that an estimate of that sort would be only preliminary because policies renew at different times and an estimate today likely would not be valid when the time for policy renewal arrives.  In other words, Class members would be confused because the information they receive - a preliminary disclosure and estimate now and another disclosure and estimate proximate to removal - would almost certainly conflict.").  The objections of the Crone Objectors should be overruled.

### 3.    Pfeffer/Galitz/Eckhaus Objections (ECF Nos. 63, 64, 69, 71, 72, and 73)

By letters dated December 8, 2021, Alan A. Pfeffer and his wife, Lenora Galitz, objected to the Settlement raising four main issues: (1) the settlement is "antithetical to the best interest of the Defendant's policyholders" because it reduces the Company's "capitalization" (ECF No. 64 at 1-3);[10] (2) the Class should not be certified (*id.* at 3-6); (3) the attorney's fees and service awards requested are unreasonable (*id.* at 6); and (4) an objection to the "nature of the remedy" that essentially incorporates the prior three objections (*id.* at 7-8).  Mr. Pfeffer then filed an amended objection by letter dated December 22, 2021.  ECF No. 69.  His wife, mother-in-law Salia Galitz (through a purported power of attorney), and Barbara Eckhaus[11] also sent letters dated December 22, 2021, in which they repeat and incorporate Mr. Pfeffer's amended objections.  ECF Nos. 72, 73, and 71, respectively.

In the December 22, 2021 objection, Mr. Pfeffer offers "clarifications and suggested improvements in the terms of the settlement," including that the reduced benefit Special Election

---

[10]    Alan A. Pfeffer filed a comprehensive objection consisting of eight pages of argument.  *See id.* His wife, Lenora Galitz, filed an objection that incorporates by reference all of her husband's objections.  *See* ECF No. 63.  Plaintiffs address these objections by citing to Mr. Pfeffer's objection at ECF No. 64.

[11]    Based on Genworth's records Barbara Eckhaus is not a PSC I or PCS II policyholder, is not a member of the Class, and has no standing to object.

Options should require additional specificity, that an additional term be added that would freeze premiums for those with policies in effect for at least 15 years, and that all the Settlement Special Election Options be offered again in the future each time Genworth increases premiums. ECF No. 69 at 1-3. He also requests clarification regarding how the Special Election Options would affect the 5% benefit inflation protection provision of his policy. *Id.* at 3. He then suggests that Judy Halcom might not be an adequate class representative by speculating that she might no longer have a Genworth policy or have a fully paid-up policy, and that she might have actual knowledge of the underlying facts in this case based on her involvement in a prior case. *Id.* at 3-4. Finally, he requests that all documents filed in *Skochin* be incorporated in this action. *Id.* at 4.

### a.    The December 8, 2021 Objection (ECF No. 64)

*First*, Mr. Pfeffer objects that the Settlement is not fair, reasonable, or adequate because any settlement that requires Genworth to pay money to policyholders is "antithetical" to policyholders' interests because it weakens Genworth's "capitalization." ECF No. 64 at 1. He points out that his and his wife's interest "is the long term stability of the company and assurances that it will have sufficient assets to pay claims that either of [them] may file in the future." *Id.* But he fears "[t]he huge payout required by this settlement undermines the long term capitalization of the company and threatens to undermine the security [they] seek." *Id.*

This argument has several flaws. First, none of the Cash Damages paid in the Settlement will negatively affect Genworth's ability to pay future claims. In fact, the Settlement Agreement specifically addresses Mr. Pfeffer's concern in paragraph 63(a), wherein Genworth and GLICNY "represent and warrant that they are solvent as determined by their respective State insurance regulator(s)" and that "based on their respective current best estimates as of the date of the execution of this Agreement, the payment of Cash Damages, the Injunctive Relief Fee, Contingency Fees, Class Counsel's litigation expenses, and Named Plaintiffs' Service Payments

(the "Settlement Costs") will not cause GLIC or GLICNY to become insolvent under applicable State insurance rehabilitation, liquidation, and/or receivership laws."  Settlement Agreement, ¶63(a), ECF No. 61-2 at 25; and Declaration of Angela Simmons, Exhibit B.

Genworth and GLIC also have affirmed as a term of the Settlement "that they will not use the Settlement Costs as part of the actuarial justification in seeking any additional future rate increases." *See* Settlement Agreement, ¶63(b), ECF No. 61-2 at 25.  Thus, Mr. Pfeffer's concerns that funding this Settlement will undermine Genworth's "capitalization" or threaten its solvency are unfounded and, indeed, directly contradicted by representations from Genworth obtained by Plaintiffs as part of the Settlement.

Furthermore, the Court has already overruled identical objections to the *Skochin* settlement. *See Skochin*, 2020 WL 6532833, at *19-20. There, the Court addressed nine objections that argued "that terms of the settlement will further strain Genworth's resources and will negatively affect Genworth's financial situation." *Id.* at *19.  Based on similar representations from Defendants that paying the costs of the settlement would not "put an untenable financial strain on Genworth," the Court rightly overruled those objections. *Id.* at *20.  It should do so here as well.

***Second***, Mr. Pfeffer objects that the Class should not be certified because, he argues, "the differences among the purported Class members far outweighs what they may have in common." ECF No. 64 at 3.  According to him, these purported differences include the different decisions each policyholder would make if properly afforded the disclosures sought in the lawsuit (among policyholders living throughout all 50 states and the District of Columbia and whose policies are governed by 51 different insurance regulators).  In essence, he argues that a fraud claim should never be certified as a class because it requires a showing of reliance, "an occasion of the operation of the mind, and a choice of behavior." *Id.*  Citing *Wal-Mart*, 564 U.S. 338, he further argues that

since several settlement election options are offered to the Class and that not all Class members will choose the same option, "it fails the indivisible relief provisions of the Federal rules." *Id* at 5-6.[12]

Again, this Court has already addressed most of these issues when overruling similar challenges to certification of the *Skochin* settlement class. After an extensive analysis, the Court found that neither the issue of materiality nor reliance prevented class certification and found instead that common issues predominated over any individual issues. *See Skochin*, 2020 WL 6532833, at *22-24. The same result should hold here.

Every member of the Class has a PCS I or PCS II Genworth LTC policy. As explained above, Plaintiffs allege that all Class members were deprived of the same material information by Genworth in connection with their rate increases. The Settlement affords all Class members the new Disclosures to cure those alleged deficiencies, and then offers them a menu of up to six Special Election Options to keep their benefits where they are or to modify their contracts in light of those Disclosures. For those Class members who choose to modify their contracts in the Settlement, there are Cash Damages payments or enhanced paid-up benefits available. These are all issues and relief common to the Class.

Moreover, the Disclosures are equally material to all Class members, as they will change the total mix of information for each Class Member alike when considering how to assess their Special Election Options in the Settlement, or how to deal with future rate increases. The fact that Class members will choose different Options based on their individual long-term care insurance

---

[12] Mr. Pfeffer also argues that his review of the docket does not show a class certification order by the Court as required by Rule 23(c). That is untrue. This Court preliminarily certified the class in its Notice Order, *see* ECF No. 52 at 3-4, which is wholly consistent with Rule 23(c) and decades of federal jurisprudence permitting the certification of a class for settlement purposes.

needs and the affordability of the premiums does not make the Disclosures more or less material to one policyholder versus another, even though their response to that information may be different.  That is why materiality is measured objectively, while damages are calculated more subjectively.[13]

As the objection notes, there are many possible reactions to these Disclosures and it is not possible to know who will make what decision.  One of the strongest features of this Settlement, however, is that it self-qualifies each Class Member's damages through the Special Election Letters.  By giving policyholders the Disclosures Plaintiffs sought in the lawsuit, and then allowing them to either keep their existing coverage or opt for lower-premium or no-premium options similar to those they could have elected years ago, the administration of the Settlement basically gives policyholders a "do-over" of those very elections and then compensates them in recognition that they may have been financially harmed by not having those disclosures sooner.  In this way, the Settlement honors all the commonality among the Class of policyholders, while also embracing their differences.

That there are several different options for policyholders to elect from does not run afoul of any "indivisible relief provisions of the Federal rules" as Mr. Pfeffer also argues.  ECF No. 64 at 5.  First, the law that Mr. Pfeffer cites in his objection relates to certification of Rule 23(b)(2)

---

[13]  *See, e.g.*, *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014) ("materiality is judged by an objective standard rather than any understandings specific to the individual consumer"); Restatement (Second) of Contracts §162(2) (A misrepresentation is "material if it would be likely to induce a reasonable person to manifest his [or her] assent" to enter a contract); Restatement (Second) of Torts §538(2) (a "matter is material if . . . a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction"); *cf. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class Connecticut Retirement would represent.").

class, not the Rule 23(b)(3) class Plaintiffs seek certification of here. That distinction is meaningful because Rule 23(b)(2) classes deal with injunctive relief alone and class certification is binding on all Class members, meaning there is no right to exclude oneself from a Rule 23(b)(2) class.

Second, the omission of material facts alleged in this case was Genworth's failure to make a complete disclosure of its plans to seek additional future rate increases, its reliance on obtaining rate increases to be able to pay future claims, and its current A.M. Best financial rating. Indeed, that is the basis for Plaintiffs' injunctive relief claim. *See* Complaint, ECF No. 1 at ¶238. Genworth's alleged conduct in this respect was common to all Class members, and had Plaintiffs succeeded in obtaining a judgment on that claim, that declaratory judgment and resulting injunction would have provided the same disclosure relief to all Class members. The injunctive relief obtained in the Settlement requiring the Disclosures also provides that same relief to all Class members. Therefore, this claim ***and*** this Settlement are perfectly harmonious with the holdings in *Wal-Mart* and *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the cases cited by Mr. Pfeffer, even if the Rule 23(b)(2) hypothetical were applied.

In this same section of his objection, Mr. Pfeffer further argues that policyholders in New York were afforded "constructive or actual notice of the underlying conditions . . . by virtue of State regulation, couple[d] with the Notice provided by Genworth at the time of the premium notice increases." ECF No. 64 at 3-4. He reasons that because Genworth sought and was approved for a rate increase, that action should have informed policyholders "that the underlying assumptions underlying the original premium were wrong." *Id.* at 4. This leads him to conclude that "[t]hus, the principal component of fraud alleged in the Complaint is unwarranted" because "[i]n [his] opinion, Genworth gave sufficient notice and more detailed notice not be reasonable . . . because

it would require that the policyholder have the degree of expertise of a stock analysis [sic] or a State regulator." *Id.*

This, however, supports requiring actual as opposed to "constructive" notice through the Disclosures here. A policyholder cannot be expected to glean all the information Mr. Pfeffer describes from the mere fact that Genworth was approved for a rate increase. Nor could every policyholder be expected to glean from the fact that a rate increase was approved that ***additional*** rate increases would be needed in the future, much less how many additional rate increase requests Genworth planned to seek or the amount of those requests. If anything, Mr. Pfeffer's objection highlights the importance of the Disclosures obtained in the Settlement ***and*** the materiality of those disclosures to policyholders.

Mr. Pfeffer also objects that Insurance regulators should have been "impleaded" ***or*** should have been given notice of the action under CAFA. Of course, every insurance regulator ***was*** given notice of this action and Settlement pursuant to CAFA. *See* Defendants' Notice of Compliance with 28 U.S.C. §1715, ECF No. 50. They have all been afforded the opportunity to review the Settlement and comment on it ***before*** the Final Approval Hearing. As Genworth detailed in its contemporaneous report on the feedback it received from these insurance regulators, none of the state Departments of Insurance have objected to the Settlement. This is precisely the reason CAFA was enacted and following those procedures should alleviate the concerns of this objection.

***Third***, Mr. Pfeffer objects that the amount of attorneys' fees as unreasonable. ECF No. 64 at 6. He believes the fees are not justified by the amount of time or work Class Counsel dedicated to this case. He offers that "[t]he flat sum of One Million in [his] opinion gives rise as to whether it is supported by accurate, timely, and detailed billing records." *Id.* He's also concerned that a "duplicate" payment might be secured by Class Counsel for the same work performed in *Skochin*,

including for the same "intellectual capital and expertise" developed through litigating *Skochin*, and questions whether Class Counsel billed time for reviewing the documents submitted in *Skochin* a second time. He also believes, incorrectly, that Settlement options in *Skochin* were of a superior number, variety, or benefit than those offered here. Finally, he reiterates his concern that payment of these fees "is contrary to our interest and the interest of policyholders in the capitalization of Genworth." *Id.*[14] Each of Mr. Pfeffer's objections to attorneys' fees should be overruled.

**First**, Mr. Pfeffer does not appreciate that the Settlement options offered here are of the same nature as those successfully offered in *Skochin*. Indeed, in this Settlement there is an additional "stable premium" option that was ***not offered*** in *Skochin*. Moreover, he believes the settlement options offered in *Skochin* were "unique" whereas the Special Election Options offered here are not. He is again mistaken. The Special Election Options offered in both settlements were modeled after benefit-reduction options that have previously been made available to policyholders at the time of a rate actions, but without the option of Cash Damages to compensate them for the harm alleged in this case. What makes ***all*** the Settlement options in *Skochin* and this case unique is that they also trigger either Cash Damages payments or enhanced paid-up benefits that can ***double*** the value of their paid-up coverage benefit, none of which were offered previously.

**Second**, the time that Class Counsel has submitted to support their fee request in this case was not duplicative of their time billed in *Skochin*. In fact, any efficiencies derived from the "intellectual capital" earned through litigating *Skochin* have inured to this Class' benefit. For example, less time was needed for Class Counsel to draft the Complaint and prepare for mediation than was needed in *Skochin*. Additionally, motion to dismiss briefing was not needed here due to

---

[14]  Mr. Pfeffer also argues that without class certification, there is no basis for an award of attorney fees. *Id.* at 6. This objection, however, is based on his misapprehension that class certification is not part of the Court's settlement approval process.

the work that resulted in this Court's Order sustaining most of Plaintiffs' claims in *Skochin*, which helped streamline the litigation here. None of that time has been billed to the *Halcom* case.

That being said, this case still warranted its own considerable work. For example, while Class Counsel reviewed many of the same documents that were produced in *Skochin*, that work was entirely necessary. When reviewing the *Skochin* production (in a very short period of time), Class Counsel focused entirely on building their case for a different class of policyholders who were subject to their own unique circumstances and a different schedule of rate increases. None of the work performed in reviewing the documents in connection with the *Skochin* case focused on the PCS I and PCS II block of policies at issue in this case and not at issue in *Skochin*. Thus, Class Counsel needed to re-review those documents to analyze the underlying facts of the PCS I and PCS II policyholders, including:

- what Genworth's plans for future rate increases were for the Class Policies;

- what rate increase requests were made on those policies, to which states, and when;

- what rate increases were approved in which amounts, in which states, and when;

- importantly, what the communications between Genworth and state regulators regarding those rate actions were; and

- what was communicated to this Class of policyholders about those rate increases.

None of this information was scrutinized in *Skochin* and it would not have been prudent, diligent, or in keeping with Class Counsel's adequacy requirements to make assumptions about the facts of this case simply based on what Class Counsel focused on in *Skochin* without doing the necessary

work to analyze the applicable facts relevant here.[15]  Mr. Pfeffer's objection to Class Counsel's fee request should be overruled.

**Third**, Mr. Pfeffer objects that, in his opinion, the proper remedy to Plaintiffs' claims is the "clawback" of dividends Defendants paid to their holding company.  ECF No. 64 at 7.  But, Plaintiffs do not allege that any dividend payments were unwarranted or unearned let alone seek to recover them as part of this case.  He also contends that General Electric Company ("GE") should have been named as a defendant.  *Id.*  But Genworth was not owned by GE at the time of the conduct alleged in this case.  Moreover, Plaintiffs do not allege that GE played any role in the claims asserted.  Thus, these objections should also be overruled.

In this same section of his second letter, Mr. Pfeffer then pivots to object to the Named Plaintiffs' service awards, noting the $15,000 payment "greatly exceeds any premium increases paid by the named individual [plaintiffs]."  *Id.*  But Mr. Pfeffer misunderstands the purpose of a service award.  It is not an additional recovery for the claims alleged, but rather a payment to compensate those individuals that worked with Class Counsel to investigate, sue, and settle these claims on behalf of the Class, as well as for having to expose private personal health and financial information to the Defendants through discovery.  Named Plaintiffs have earned this payment for their effort, diligence, and dedication to the Class.[16]

---

[15]  Professor Fitzpatrick, the preeminent expert in class action fee applications and approvals, has submitted a Declaration explaining why it is **most** reasonable to compensate Class Counsel for their prior work in *Skochin*, even if that work were duplicative (which it was not).  *See* Declaration of Brian T. Fitzpatrick, ¶26, ECF No. 61-3 at 22.

[16] Shortly before filing this memorandum, Class Counsel learned that Named Plaintiff Hugh Penson passed away at the end of 2021.  Prior to his passing, Mr. Penson performed all the duties required of him as a Named Plaintiff and he did them with great attention and care.  Class Counsel firmly believes that he has earned his Service Award and we implore the Court to approve it.  Moreover, there is already a provision in the Settlement Agreement whereby Genworth has agreed to pay any Service Award approved by the Court to the "Named Plaintiffs

Mr. Pfeffer then pivots, again inconsistently, to object that cash payments in this Settlement are "unjust enrichment" to Class members that obtain them since they received the benefit of the insurance they paid for until they make reductions in the Settlement to trigger the cash awards. *Id.* at 7. Again, Mr. Pfeffer does not appreciate that the payments are meant to compensate Class members for Genworth's alleged failure to make the Disclosures ***sooner***. Plaintiffs allege that this failure deceived policyholders and caused them to maintain a level of benefits – and continue to pay the premiums for those benefits – longer than they otherwise would have. As a result of this alleged fraud, the Cash Damages payments to compensate Class members for these damages are entirely warranted.

***Finally***, Mr. Pfeffer objects that the Special Election Options in this case are "substantially the same" as options he has been offered by Genworth in the past. *Id.* As explained above, however, while the Special Election Options are designed to be similar to options offered in the past, they also provide Cash Damages payments or enhanced paid-up benefits (never offered to these Class members before) that are meant to compensate Class members for the alleged monetary harmed caused to them by not having the Disclosures sooner. All of the objections raised in Mr. Pfeffer's December 8, 2021 objection should be overruled.

### b.    The December 22, 2021 Objection (ECF No. 69)

In his December 22, 2021 Objection, Mr. Pfeffer makes several suggested improvements to the Settlement while raising several additional issues, some of which directly contradict the points made in his first letter.

***First***, Mr. Pfeffer suggests that the reduced benefit Special Election Options should be clarified by requiring the following information: "the amount of prior premiums paid," the Cash

_____

(or if the Named Plaintiff passes away at any time following the execution of this Settlement Agreement, to Named Plaintiffs' estate)" *See* ECF No. 61-2 at p. 19.

Damages payment for each option, information that compares the current cost of long-term care in the geographic area where the policyholder currently resides to the coverage options available under the Settlement, and "the exact value of the forfeit of policy benefit incurred by each reduced benefit option."  ECF No. 69 at 1-2.  But the Special Election Letter already shows each policyholder's current benefits and premiums in comparison to the benefits and premiums that would result under each available Special Election Option.  It also provides the additional information Mr. Pfeffer requests.

For instance, the Cash Damages payment for each Special Election Option will be calculated for each Class Member and, indeed, will be listed and bolded in the very first line of the Special Election Options chart.  Regarding the cost of care in each Class Member's geographic region, the Special Election Letter offers the following resource: "For information about the cost of long term care in your area, and to see how those costs may change in the future, visit our 20[##] Cost of Care Survey at [URL to be provided in final letter]."  *See* Settlement Agreement, Appendix D, Special Election Letter, ECF No. 61-2 at 59. Regarding the amount of each benefit reduction, the Special Election Options chart in the Special Election Letter also includes a line showing the value of the "Total Lifetime Benefit" for each option as well as the value of each policyholder's current benefits.  *See id*. at 54.  This information essentially fulfills Mr. Pfeffer's entire wish list. As the Court held in *Skochin,* the information set forth in the Special Election Letter provides Class members with sufficient information to "discern, from among them, which best fits their respective circumstances."  *Skochin*, 2020 WL 6532833, at *14.

***Second***, Mr. Pfeffer suggests the following additional settlement term: "[a]ll policies in effect for 15 years shall have full benefits and no additional premiums."  ECF No. 69 at 2.  As an alternative, he suggests that all such policies have no further rate increases.  *Id.*  Notably, these

suggested additional terms completely contradict Mr. Pfeffer's first objection, the primary concern of which was to protect Genworth's "capitalization" and ability to pay future claims above all else. *See supra* at pp. 16-17. And they are inconsistent with the Disclosures which state that "Future rate increases are important to Genworth's ability to pay future claims" and "the inability to obtain future rate increases may impair Genworth's ability to do so." *See* ECF No. 61-2 at 55. Moreover, as this Court recognized in *Skochin,* the fact that a settlement does not present Class members "with every conceivable option, or even, the best option in light of the particular circumstances faced by each class member" does not mean the Settlement lacks value. *Skochin*, 2020 WL 6532833, at *18.

Nevertheless, Mr. Pfeffer argues such a provision is justified because benefit reductions appear to be in Genworth's best interest and that Genworth should not "benefit" from its own alleged wrongdoing. ECF No. 69 at 2. Here, he misunderstands the nature of the claims asserted in this lawsuit and also appears to forget that portion of his first objection where he opposes "the huge payout required by this settlement." ECF No. 64 at 1. In the end, Mr. Pfeffer is asking for a windfall that he would never have been entitled to outside of this Settlement; there is no argument that any Class Member would have been entitled to such a benefit under any scenario. In any event, as explained above, benefit reductions on Class Member policies as a result of rate increases is a condition that exists ***outside*** this Settlement. The point of the Settlement is to allow all policyholders to make an informed decision about what level of coverage they want to maintain in light of the future premiums that will be required to maintain that coverage, and then to compensate policyholders that choose to reduce their benefits in light of the Disclosures for the increased premiums they paid as a result of not having that information sooner. Those are the "huge" Cash

Damages payments Genworth will have to make as a result of this Settlement which of course will directly benefit Class members.

Mr. Pfeffer also notes that one state insurance regulator has denied Genworth a rate increase on some policyholders aged 70+, while another regulator has required a different long-term care insurer to guarantee premiums for life on certain policies while denying a rate increase on those aged 74+. ECF No. 69 at 3. He believes this supports his prior suggestion that state regulators are "necessary parties" to this Settlement (which, per CAFA, they are not). Of course, this only demonstrates why insurance regulators are *not* necessary parties in this case. Genworth's regulators already have the authority and discretion to approve or disapprove its future rate increase requests. Insurance regulators can condition their approval on certain terms within their statutory mandates and reach their own agreements with Genworth about rate guarantees. *See, e.g.*, Va. Code §38.2-1900, *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 11, §52.40. This Settlement does not interfere with this jurisdiction of the Insurance regulators or seek to curtail their authority over rates, or future rate increases, nor could it. Indeed, Mr. Pfeffer has separately petitioned the New York Department of Insurance requesting that it intervene in this case. Not only has that regulator not intervened, but it has also not raised any issue with the proposed Settlement. As noted, the Department of Insurance already has the authority to regulate Genworth's rate increases outside of this litigation and Mr. Pfeffer can address any concerns regarding future rate action by Genworth directly with the Department of Insurance.

*Third*, Mr. Pfeffer suggests that all Settlement options be offered each time Genworth raises premiums in the future. ECF No. 69 at 3. While it is unclear why Mr. Pfeffer would request these options be offered multiple times in the future if they were not fair, reasonable, and adequate, this is not something that would make sense in the context of this case or this Settlement. The

substantial Cash Damages payments Genworth will pay will be the result of allowing Class members to revisit their prior decisions regarding their benefit coverage in the face of past rate increases.  That is, the Special Election Options allow the Class member to essentially go back and make a new choice with the benefit of additional information (the Disclosures) and, if warranted, Cash Damages or enhanced paid-up benefits. By contrast, providing benefit reduction options outside of the Settlement that are different from the options normally provided by Genworth in the context of rate actions or providing Cash Damages payments with respect to future rate actions, when Class members have been provided all of the information they allegedly lacked previously and then given the chance to act on that information to remedy alleged past injuries, is neither logical nor feasible.

*Fourth*, Mr. Pfeffer requests clarification on how electing any of the reduced benefit options in the Settlement will affect his daily benefit maximums and his 5% inflation protection. ECF No. 69 at 3.  That information is provided in *several places* in the Special Election Letter. Perhaps the clearest place to see this is in the Special Election Letter's table of options.  *See* Settlement Agreement, Appendix D, ECF No. 61-2 at 66.  As set forth there, in Option 3, the daily benefit maximum reverts to its original level and the inflation benefit is removed.  For Option 4, the daily benefit maximum is reduced by 25%, but the 5% inflation benefit remains.  For policyholders who have already elected a stable premium, Option 5 reduces the daily benefit maximum by 30% and retains the 1% inflation benefit.  The information is already provided and, thus, obviates Mr. Pfeffer's request for "clarification."

*Fifth*, Mr. Pfeffer speculates that Judy Halcom is not an adequate plaintiff because she might have a fully paid-up policy with Genworth if her husband has passed away. ECF No. 69 at 3-4.  He also speculates that she may have been afforded the allegedly material information about

future rate increases that is sought in this suit by virtue of her involvement in a prior lawsuit against Genworth (the *Leifer* action[17]).  *Id.* at 4.  He is also concerned, again, that Class Counsel not be paid "three times" for work done on the *Leifer*, *Skochin*, and *Halcom* cases.  *Id.*

Judy Halcom is more than an adequate plaintiff.  Her husband is still alive, and she still has an active policy with Genworth for which she still pays annual premiums.  As for the *Leifer* case, that complaint advanced an entirely different theory that did not address allegedly inadequate disclosures regarding future rate increases or uncover Genworth's internal rate increase action plans.  Those plans are the centerpiece of the *Halcom* (and *Skochin* claims).  Plaintiff Halcom had no information about Genworth's internal rate increases plans until recently, when she again retained Class Counsel to represent her in this matter.  Thus, contrary to Mr. Pfeffer's supposition, she did not have advance knowledge of these claims from her involvement in the *Leifer* case.[18]

As for the work that some (but not all) Class Counsel devoted to *Leifer*, none of that time has ever been compensated, nor are Class Counsel seeking to be compensated for that time in this case.  The plaintiffs' attorneys in *Leifer* dismissed the claims in that case with no payments.  The time that went into drafting the *Leifer* complaint was **not** added to the *Skochin* or *Halcom* lodestar.  And, to the extent any of current Class Counsel learned about the long-term care industry as a result of involvement in *Leifer*, that work benefited the *Skochin* and *Halcom* classes as institutional knowledge.

**Finally**, Mr. Pfeffer requests "that all documents filed with the Court in the *Skochin* matter be incorporated by reference in this proceeding as if set forth in full."  ECF No. 69 at 4.  But he makes no effort to explain why this would be appropriate, or even beneficial to him.  After all, the

---

[17]  *Leifer v. Genworth Fin. Inc.*, No. 3:16-cv-01008-JAG (E.D. Va.).
[18]  Further, the *Leifer* case was voluntarily dismissed before any discovery had taken place.

Court properly and in great detail overruled all the objections to the *Skochin* settlement, including many objections that echo his own. And, while the *Skochin* record includes the statement by the California Department of Insurance, it also includes that Department's acknowledgement on the record that all of its concerns with the Settlement had been addressed by the parties prior to final approval. There is no need, nor any basis or legal precedent, to grant Mr. Pfeffer's request to incorporate the entire *Skochin* record into this case.

Mr. Pfeffer's objections, as well as those of his wife, mother-in-law, and Ms. Ekhaus (who is ***not*** a Class member), should be overruled.

### 4.    Skovronek Objection (ECF No. 56)

Herbert S. Skovronek objected to the Settlement via letter dated November 27, 2021. ECF No. 56. He raises several issues, most of which address Genworth's need or justification for rate increases, issues this lawsuit does not (and could not) address. For example, in his first three points, he is concerned that Genworth has not managed its reserves adequately and he believes that those policyholders who have passed away without claiming benefits were "pure profit" to Genworth. ECF No. 56 at 1-2. He is also concerned that Genworth will need to raise premiums again in the future and attributes that need to Genworth's poor planning. *Id.* He believes the Settlement should somehow address this and protect policyholders if Genworth goes insolvent in the future. *Id.* He also thinks premium increases are "simply as a means to scare off older clients." *Id.* at 1.

All of these concerns deal with the propriety of rate increases or the solvency of Genworth, issues that are outside the scope of this lawsuit and the primary responsibility of state insurance regulators. *See* Complaint at ¶3 ("To be clear, this case does not challenge Genworth's contractual right to increase these premiums . . . ."); *Skochin*, 2020 WL 6532833, at *19 ("[B]ecause

Genworth's past rate increases were approved by state or federal regulators, any objections to the propriety of the rates themselves are barred by the filed-rate doctrine.")

With regard to policyholders who have passed away without claiming benefits or before this Settlement is approved, they did not receive "nothing" in exchange for their premiums; rather, they received the protection of their policies throughout their duration and would have been able to make a claim at any time they were covered. *See, e.g.*, 5 Steven Plitt et al., Couch on Ins. §69:2 (3d ed. 2021) ("The payment or undertaking of the insured to pay premiums is the consideration for which the insurer agrees to assume the risk specified in the policy.").

In his fourth point, Mr. Skovronek notes that the "sample chart shown in Appendix C or D will be a big help" and hopes such a chart "will have specifics based on [each policyholders'] actual premiums, benefits, etc." Id. at 2. That is precisely what the Special Election Letter and its chart will contain.

Finally, while admitting to having no basis for it, Mr. Skovronek feels the attorneys' fees "seem to be excessive." Id. For the reasons set forth in the Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorney's Fees and Expenses and Service Awards to the Named Plaintiffs (ECF No. 60), the Declarations of Class Counsel filed in support of that Motion (ECF Nos. 61-5, 61-6, 61-7, and 61-8), the Declarations of Brian T. Fitzpatrick (ECF No. 61-3) and Harris D. Butler, III (ECF No. 61-10), and arguments above at pages 22-24, Class Counsel submits the requested fees are warranted. All of Mr. Skovronek's objections should be overruled.

### 5.    Brown and Borgen Objections (ECF Nos. 62 and 66-67)

Angela S. Brown submitted an objection by letter dated December 2, 2021. ECF No. 62. She is concerned "about [Genworth] staying in good shape financially so that they are able to help me with my bills when I need their help" and fears the attorneys' fees and litigation expenses Genworth will pay as a result of the Settlement might threaten that stability. Roger and Rochelle

Borgen submitted objections by letters dated December 10, 2021. ECF Nos. 66 and 67. They too are concerned "this settlement will negatively affect the continuation of the company and will have a negative impact on policyholders."

All three of these objections mirror several other objections that the Settlement will harm Genworth's financial condition, which concerns have been directly addressed in the Settlement Agreement, the accompanying Declaration from Angela Simmons of Genworth and above at pages 16-17. Such assurances from Genworth are sufficient to address the Brown and Borgen objections. *See, e.g.*, *Skochin*, 2020 WL 6532833, at *20 (accepting representations of counsel and statement from defendant Genworth that settlement would not put financial strain on the company).

### 6.    Buben Objection (ECF No. 65)

Michael and Kathleen Buben submitted an objection by letter dated December 14, 2021. ECF No. 65. In it, they raise three issues with respect to the Special Election Options. First, they aver that "Option 1"[19] may result in a lower benefit than the option afforded policyholders that are already in Non-Forfeiture status because Option 1 offers those not currently in Non-Forfeiture status a cash payment that is equal to four years of premium payments and then calculates the remaining paid-up coverage benefit by subtracting the cash payment amount from the premiums the policyholder has paid to Genworth, whereas the option for those already in Non-Forfeiture status provides a one-time cash payment of $2,500 with no other changes to their paid-up coverage amount. ECF No. 65 at 1. The Bubens suggest this is somehow unfair.

---

[19]    This is the Special Election Option set forth in the Settlement Agreement at Appendix C, paragraph I.A.1. *See* ECF No. 61-2 at 44-45 (describing a settlement option consisting of two components: (a) a paid-up benefit equivalent to 100% of the Class Member's paid-in premiums through December 31, 2016 plus the Class Member's paid-in premiums paid on or after January 1, 2021, if any, less any claims paid over the lifetime of the policy; and (b) a damages payment equivalent to premiums paid during the time period beginning January 1, 2017 through December 31, 2020).

This is an apples-to-oranges comparison. For those Class members **already** in Non-Forfeiture status, the $2,500 payment is the only Special Election Option offered. It recognizes that those policyholders have already opted to reduce their coverage and stop paying premiums **before** getting the Disclosures in the Settlement, but also that many may have selected that option sooner if given the Disclosures sooner. The payment was negotiated by the Parties as a compromise of those two competing factors. On the other hand, those Class members who have **not yet elected** a Non-Forfeiture option will have two paid-up options in the Settlement and likely several reduced benefit options as well. For example, such policyholders can **double** the value of their paid-up benefit if they value the coverage more than cash. They can get a cash payment equal to four years of premium payments if they value the cash more than the coverage. They can also choose a reduced benefit option with a Cash Damages payment if they prefer to maintain some of their original coverage but pay lower premiums. This is not a question of which option is more "valuable" because each individual Class Member may "value" certain options more than others. Again, the Settlement endeavors to provide material information and options for policyholders to use that information to their benefit. All of the options are fair, reasonable, and adequate based on the claims asserted in this case.

Next, the Bubens argue that the "two-times" multiplication factor in establishing the paid-up coverage in "Option 2"[20] is "inadequate" because the resulting coverage benefit is well below their current Maximum Benefit under their policies. ECF No. 65 at 2. But, the Bubens ignore two critical points on this option. First, paid-up coverage under a non-forfeiture option does not require

---

[20] This is the Special Election Option set forth in the Settlement Agreement at Appendix C, paragraph I.A.2. *See* ECF No. 61-2 at 45 (describing a settlement option consisting of a paid-up benefit option equivalent to two times the difference between the Class Member's paid-in premiums to date less claims paid to the Class Member to date).

*any* further premiums to be paid and is not designed to provide the same level of benefits available if the policyholder continued to pay premiums to maintain the policy.  Second, Option 2 actually provides *twice* the coverage that would otherwise be available to the Bubens for any Non-Forfeiture option outside the Settlement.  In its proper context, Option 2 is a very valuable option at its current offering in the Settlement.

Finally, the Bubens argue that once a new value for the "two-times" multiplier is determined, then Option 1 should be renegotiated.  ECF No. 65 at 2.  As explained above, the multiplier in Option 2 is more than adequate and provides excellent value to any policyholder who elects it.  There is no basis to renegotiate Option 1 (or any other Special Election Option in the Settlement).

### 7.    Bribleb/Barron Objection (ECF No. 70)

Larry and Marsha Brigleb and Joanne Barron submitted an objection by letter dated December 23, 2021.  ECF No. 70.  All three Class members have Genworth long-term care policies that have California Partnership Plan status.  They request that for each Special Election Option offered in the Settlement, Genworth affirmatively state whether those options will compromise their partnership plan status.

Initially, in Appendix C to the Settlement Agreement, at I.B, the Parties noted that certain reduced benefit options will not be offered to "Class members with Partnership Status whose election of a defined option would cause them to lose Partnership Status." As specifically pertains to the Brigleb/Baron objectors, Genworth has received confirmation from the California Partnership Plan that its members' Partnership Plan Status will not be affected by electing any of the Paid-Up Special Election Options provided in the Settlement.  With respect to Partnership Plans in California and other Partnership states, if Genworth makes a Special Election Option available that Genworth understands will result in the loss of Partnership Status, then Genworth

will inform the Class member of its understanding that the selection of that Special Election Option will result in the loss of Partnership Status.  Genworth will also advise Class members with Partnership Plan policies that, before making any Special Election, they can contact their Partnership Plan for additional information.[21]

## III.    CONCLUSION

For the reasons set forth herein and in the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF No. 58) and the Memorandum of Law in Support of Class Counsel's Motion for an Award of Attorneys' Fees and Expenses and Service Awards to the Named Plaintiffs (ECF No. 60), all objections to the Settlement should be overruled and the Settlement and the requested attorneys' fees, expenses, and service awards should be approved.[22]

Respectfully submitted,

DATED: January 27, 2022                      PHELAN PETTY PLC

/s/ Jonathan M. Petty

JONATHAN M. PETTY (VSB No. 43100)
MICHAEL G. PHELAN (VSB No. 29725)
3315 W. Broad Street
Richmond, VA  23230
Telephone:  804/980-7100
804/767-4601 (fax)
jpetty@phelanpetty.com
mphelan@phelanpetty.com

---

[21]  An updated template Special Election Letter, reflecting this and other non-material clarifications and emphasis including as informed by Genworth's discussions with certain insurance regulators, is attached as Exhibit C for the Court's review and final approval.

[22]  A [Proposed] Final Judgement and Order of Dismissal with Prejudice and a [Proposed] Order Awarding Attorneys' Fees and Expenses to Class Counsel, and Service Awards to Named Plaintiffs are attached as Exhibits D and E.

GOLDMAN SCARLATO & PENNY, P.C.
BRIAN DOUGLAS PENNY
Eight Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Telephone: 484/342-0700
484/342-0701 (fax)
penny@lawgsp.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON (*pro hac vice*)
BRADLEY BEALL (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
bbeall@rgrdlaw.com

BERGER MONTAGUE PC
SHANON J. CARSON
GLEN L. ABRAMSON
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 215/875-3000
215/875-4604 (fax)
scarson@bm.net
gabramson@bm.net

*Class Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2022, I filed the foregoing pleading or paper through

the Court's CM/ECF system, which sent a notice of electronic filing to all registered users.


/s/ Jonathan M. Petty

Jonathan M. Petty (VSB No. 43100)
PHELAN PETTY, LLC
3315 West Broad Street
Richmond, VA  23230
Telephone:  804/980-7100
804/767-4601 (fax)
jpetty@phelanpetty.com

*Counsel for Plaintiffs*