IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JUDY HALCOM,
et al.,

    Plaintiffs,

v.                                     Civil Action No. 3:21-cv-19

GENWORTH LIFE INSURANCE COMPANY,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS (ECF No. 59), the JOINT MOTION TO APPROVE SETTLEMENT WITH OBJECTORS (ECF No. 104), the OBJECTORS' PETITION FOR INCENTIVE AWARDS AND ATTORNEYS' FEES (ECF No. 106) (collectively, "the Motions"), as well as the objections to the class settlement submitted to the Court by Herbert Skovronek (ECF No. 56), Angela Brown (ECF No. 62), Michael and Kathleen Buben (ECF No. 65), Rochelle and Roger Borgen (ECF Nos. 66 & 67), Ellen Franck ECF No. 68), Larry and Marsha Brigleb and Joanne Barron (ECF No. 70) (collectively, "the Objections"). The rationale for the Court's approval of the settlement terms is set forth in the accompanying FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE.

The Court has considered the memoranda in support of the

Motions, the accompanying exhibits, the Objections submitted by class members, arguments presented during the February 9, 2022 hearing by the parties and objectors, the parties' post-hearing amendment to the release language in the Settlement Agreement, the renewed objections made by a subset of the plaintiff class to the amended Settlement Agreement, the plaintiffs' response thereto, the objectors' reply, the terms of the resolution reached by the parties with that group of objectors, the motion by objectors' counsel for attorney fees and incentive payments, and arguments in support of that motion at the June 21, 2022 hearing.   For the reasons set forth below, the Motions will be granted and the Objections will be overruled.[1]

I.   **Background**

a.   **Factual History**

Genworth Life Insurance Company ("Genworth") is a Virginia company that provides long-term care ("LTC") insurance to its policyholders.   In exchange for paying ongoing premiums from the time they first take out their policies, policyholders receive the assurance of coverage should they require long-term care.   The CLASS ACTION COMPLAINT (ECF No. 1) (the "CAC") was filed on behalf of Genworth's PCS I and PCS II policyholders.   ECF No. 1 ¶ 2.

---

[1] The objectors' attorneys petition for attorney fees is denied in part insofar as the Court will not award the objectors' attorneys the full measure of fees requested in the petition.

Genworth's policyholders are not guaranteed a fixed premium for their insurance; rather, Genworth can, with clearance from state insurance regulators, adjust policy premiums over time. While the plaintiffs make clear that they do not challenge Genworth's prerogative to raise premiums, subject to certain regulatory conditions, they allege that the manner in which Genworth raised premiums, in combination with disclosures made by Genworth in connection with premium increases, fraudulently deprived them of material information that was necessary to their being able to make informed decisions about their long-term care policies.

The policyholders in the plaintiff class purchased their Genworth policies before 2002. Id. ¶ 10. The CAC alleges that, "[d]uring this time, Genworth and its sales agents typically emphasized that the Company had never raised rates on its LTC policies over the decades it had been providing such insurance." Id. That representation, according to the plaintiffs, "set a reasonable expectation that rates would not increase, or that any increases would be minimal." Id.

As early as 2008, however, the plaintiffs allege that "Genworth began to recognize that some premium rate increases would be needed on its older policy blocks." Id. ¶ 11. Ongoing analysis of the company's financial position over the next six years confirmed this picture. Id. ¶¶ 11-13. Genworth's analysis resulted finally in its "Multi Year Rate Increase Action Plan"

3

(MYRAP). Id. ¶ 14. The MYRAP rate increases were, according to the CAC, then integrated into Genworth's financial accounting, so certain was Genworth that the rate increases could and would be implemented. Id. ¶ 15-16.

But, the plaintiffs say, Genworth did not disclose those anticipated future rate increases to policyholders, nor did it inform them that such rate increases were necessary for Genworth to remain solvent and viable as a long-term business enterprise. The plaintiffs allege that Genworth's illicit withholding of information resulted in many class members' opting to make premium payments they would have elected not to make had they received the disclosures to which they were entitled. Id. ¶¶ 17-20. As a result, the plaintiffs allege, policyholders were led to make decisions about their policies with a mistaken view (encouraged by Genworth's communications, and selective silence) as to the likelihood and magnitude of any future rate increases. Id.

### b. Plaintiffs' Claims

COUNT ONE of the CAC alleges fraudulent inducement by omission. Specifically, the plaintiffs allege that Genworth deliberately withheld information about future rate increases, and that the withheld information was material to policyholders' decisions regarding whether to renew their policies.

COUNT TWO of the CAC states a claim for declaratory relief. The plaintiffs ask the Court to declare that Genworth had a duty

to make a variety of disclosures to the plaintiff class (which disclosures, it is alleged, Genworth did not make).

The CAC asked for several forms of relief: class certification; a ruling that Genworth's failure to make adequate disclosures was unlawful; compensatory, consequential, and general damages to the plaintiff class; injunctive relief; costs; pre-judgment interest; attorney fees; and any other relief "this Court may deem just and proper." Id. ¶¶ 239(A)-(H).

c.   **Procedural History**

This is the second such suit against Genworth that has been brought before the Court. In the first suit, Skochin v. Genworth, No. 3:19cv49, the plaintiff class comprised a different set of Genworth's policyholders but the claims they brought were largely the same as those at issue here. The parties in Skochin engaged in extensive discovery and Genworth moved to dismiss the Claims under Fed. R. Civ. P. 12(b)(6). 3:19cv49, ECF No. 39. The Court granted the motion to dismiss as to one count of the AMENDED COMPLAINT in that case but denied it as to three other counts. ECF No. 79. The parties eventually reached a settlement agreement with terms similar to those proposed here. This suit was filed two years after Skochin, just as that case approached its resolution. Having tested the strength of their respective claims and defenses in the Skochin litigation, the parties were able to engage in significant informal discovery and several rounds of

mediation.  By the time the CAC was filed, the parties had already more or less agreed to the terms of a settlement now under review.

In September 2021, the Court granted the parties' preliminary approval of the settlement and directed that notice be sent to class members.  A final approval hearing was held in February 2022, at which the Court heard from several objectors.  For reasons set forth below, most of those objections will be overruled.  In light of some of those objections, however, the Court expressed concern about the breadth of the language in the settlement's provision governing the release of claims against Genworth by class members. The Court informed the parties that, though the remaining aspects of the settlement merited approval, the settlement could not be approved with the release in the form in which it was submitted.

The parties conferred after the hearing and proposed a modified release, ECF No. 94-2, which resolved the Court's concerns.  Some of the objectors, represented by counsel, then renewed their objections, arguing that even the modified release language left open the possibility that a member of the plaintiff class would be precluded from bringing suit if Genworth committed certain forms of fraud in the execution of the settlement.  ECF No. 97.  After briefing on the issue was completed, but before the Court issued a decision as to the objections, the parties reached a separate settlement agreement with the represented objectors. See ORDER, ECF No. 102.

6

The agreement between class counsel, Genworth, and the represented objectors makes further modifications to the language in the release. ECF No. 105-1. Because the revised release language only broadens the plaintiff class's rights under the settlement, the Court's approval of the earlier version of the release remains effective.

On June 21, 2022, the Court held a hearing on objectors' counsels' petition for attorney fees and incentive payments. All matters before the Court are now ripe for disposition. The parties to the case reached a complex, multi-faceted settlement agreement. That agreement, in turn, was supplemented by the terms of the parties' settlement with objectors. It is therefore necessary to explain the structure of the settlement agreement before the Motions can be decided.

## II.  The Settlement Agreement

### a.  Special Election Letters

As part of the settlement, all class members will receive a "Special Election Letter" from Genworth. ECF No. 113-1 ¶ 51(a). The DISCLOSURES portion of the letter, "APPENDIX B" of the Settlement, informs class members of Genworth's projected future rate increases for their policy, with the proviso that Genworth cannot know with perfect accuracy the degree of rate increases given the uncertainty of economic conditions, actuarial necessity, and the approval of state regulatory bodies. Id. at 44-45.

7

The Special Election Letters will further provide class members with Special Election Options, as described in APPENDIX C. Id. Class members are divided into three categories with differing options for each category. The first category comprises "Class Members with Policies That Are Not in Non-Forfeiture Status or Fully Paid-Up Status," excluding "Class Members whose level of benefits are below the level of benefits required for any of the below Options with the exception of Options I.B.3 and I.B.4 . . . ." Id. at 46. These class members will be presented with a choice between "Paid-Up Benefit Options" and "Reduced Benefit Options."

The paid-up benefit option provides class members with two sub-options:

> 1.    A settlement option consisting of two components: (a) a paid-up benefit equivalent to 100% of the Class Member's paid-in premiums through December 31, 2016 plus the Class Member's paid-in premiums paid on or after January 1, 2021, if any, less any claims paid over the lifetime of the policy, and (b) a damages payment equivalent to premiums paid during the time period beginning January 1, 2017 through December 31, 2020. The total paid-up benefit available under this option shall not exceed the Class Member's current actual lifetime benefit at the time his or her election is processed less the Class Member's damages payment under this option.

> 2.    A settlement option consisting of a paid-up benefit option equivalent to two times the difference between the Class Member's paid-in premiums to date less claims paid to the Class Member to date. The total paid-up benefit amount available under this option is capped at the Class Member's current actual lifetime benefit at the time his or her election is processed. This option will not include any damages payment.

The reduced benefit option for class members without stable premium options or lifetime stable premium option policies has four sub-options:

1.   For Class Members with policies with a Benefit Inflation Option ("BIO"), a settlement option consisting of two components: (a) a change in the Class Member's policy benefits that removes BIO with a reduction of their Daily Benefit Amount ("DBA") to their original DBA (i.e., the DBA that he or she hadprior to any BIO increases) for a reduced annual premium, and (b) a damages payment equal to four times the differential between the Class Member's current (as billed) annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits.

2.   For Class Members with lifetime benefit period policies and/or who have Partnership Plan policies, a settlement option consisting of two components: (a) a reduction of the Class Member's existing benefit period to the next lowest benefit option available (in the case for Class Members with lifetime benefit period policies, a 6-year benefit period) and a reduction to his or her current DBA (after benefit inflation) by 25%, for a reduced annual premium, and (b) a damages payment equal to four times the differential between the Class Member's current (as billed) annual premium for his or her existing policy and the current annual premium for the new reduced level of benefits.

3.   For Class Members whose policies are regulated by States that have approved the LSPO, a LSPO with an extended elimination period that will maintain the Class Member's premiums at a stable rate for the life of his or her policy and consist of two additional components: (a) a change to his or her existing benefits reducing his or her DBA by 30%, and (b) a damages payment equal to four times the differential between the Class Member's current (as billed) annual premium and the current annual premium for the new LSPO, or $1,000, whichever is higher.

4.   For Class Members whose policies are regulated by States that have approved the SPO but not the LSPO, a SPO with an extended elimination period that will maintain the Class Member's premiums at a stable rate until at least January 1, 2028 and consist of two additional components: (a) a reduction of the Class Member's DBA by 30%, and (b) a damages payment

> equal to four times the differential between the Class
> Member's current (as billed) annual premium and the current
> annual premium for the new SPO with the reduced level of
> benefits, or $1,000, whichever is higher.

Id. at 48-49.  Class members with lifetime stable premium options

or stable premium options may opt for the following reduced benefit

option:

> Class Members who currently have LSPO or SPO Policies will
> have an option that maintains their LSPO or SPO status and
> consists of two additional components: (a) a reduction of the
> Class Member's DBA by 40%, and (b) a damages payment equal to
> four times the differential between the Class Member's
> current (as billed) annual premium and the current annual
> premium for the new LSPO or SPO with the reduced level of
> benefits.

Id.

Class members in fully paid-up status may select from among

two options:

> 1.   A settlement option consisting of two components: (a) a
> paid-up benefit equivalent to 100% of the Class Member's paid-
> in premiums through December 31, 2016 plus the Class Member's
> paid-in premiums paid on or after January 1, 2021, if any,
> less any claims paid over the lifetime of the policy, and (b)
> a damages payment equivalent to four times the Class Member's
> last annual premium when he or she was in premium-paying
> status. The total paid-up benefit available under this option
> shall not exceed the Class Member's current actual lifetime
> benefit at the time his or her election is processed less the
> Class Member's damages payment under this option.

> 2.   A settlement option consisting of two components: (a) a
> reduction of the Class Member's existing benefit period to
> the next lowest benefit option available (in the case for
> Class Members in a Fully Paid-Up Status that have lifetime
> benefit period policies, a 6-year benefit period) and a
> reduction to his or her current DBA (after benefit inflation)
> by 25%, and (b) a damages payment equal to four times the
> differential between (i) what the Class Member's annual
> premium for his or her existing policy would be as of January

10

1, 2022 if the Class Member were still in a premium-paying status, and (ii) what the Class Member's annual premium for his or her existing policy would be as of January 1, 2022 for the new reduced level of benefits if the Class Member were still in a premium paying status.

Id. at 49-50.

Class members in non-forfeiture status are given only a single special election option: a damages payment of $2500 in combination with retaining their current paid-up benefit. Id. at 50.[2]

The damages payments have the effect of returning the allegedly defrauded party to the *status quo ante*, or as near an approximation of it as is feasible. The members of the plaintiff class are in effect offered the option of redoing their earlier selections with the advantage of the additional information regarding Genworth's actual and projected rate increases that they allege they were owed in the first place. Class members who do make a different election from what they originally made are given damages payments to compensate them for the difference between the premiums they actually paid and the premiums they would have paid if they had, at the time, made the elections they make now with the benefit of the information they are alleged to have been owed.

Policyholders who, upon receiving the disclosures, elect not to choose a reduced benefits option, are thereby treated as not

---

[2] The settlement included an additional provision for class members in states that did not permit the disclosures, id. at 51, but, because there are no such states, that provision was not triggered and is not relevant to the settlement agreement.

having suffered cognizable harms over and above the fact of not having receive the disclosures to which they are alleged to be entitled.   Those policyholders thus do not receive any damage payments and are treated as having been made whole by the new disclosures and opportunity to revise their past benefits elections.

### b.   Release of Claims

At the settlement approval hearing, the objectors Diane and Terry Crone, Walter Leen, Paul Lubell, Bonnie Fontenot Nielson and Dennis Nielson, represented by counsel, objected to many different aspects of the settlement agreement, including the provisions governing the release of claims.   After reviewing the provisions of the settlement agreement to which the objectors had drawn attention, the Court noted that the original settlement agreement seemed to release both plaintiffs' and defendants' attorneys, and Genworth itself, from liability arising out of any form of fraud or false pretenses in connection with the execution of the settlement.   Insofar as the cause of action in the case related to what are claimed to be material misrepresentations by Genworth, the Court expressed concern that the release of claims would leave policyholders without recourse if Genworth were less than forthcoming in disclosures that were themselves intended to remedy past disclosures that were less than forthcoming.   The Court therefore informed the parties that the release in its existing

form could not be approved.

After the hearing, the parties submitted a revised version of Paragraph 46(a) that incorporated the Court's concerns about the issues raised by the objectors.

The paragraph that originally troubled the Court read as follows:

> Named Plaintiffs and Class Members will further release the Genworth Released Parties and Class Counsel from any future claims, on any legal or equitable basis, relating to or arising out of the Special Election Options and/or statements and representations provided in connection with the Special Election Options including (but not limited to) any claim specifically relating to any decision, or non-decision, to maintain, modify, or give up coverage. Collectively, the claims described in this paragraph shall be referred to as the "Released Claims."

The modified release read as follows:

> Upon the Final Settlement Date, each Class Member, as well as each Named Plaintiff, releases and discharges the Genworth Released Parties of and from any and all known or unknown, contingent or absolute, matured or unmatured, suspected or unsuspected, disclosed or undisclosed, foreseeable or unforeseeable, liquidated or unliquidated, existing or arising in the future, and accrued or unaccrued claims, demands, interest, penalties, fines, and causes of action, that the Named Plaintiffs and Class Members may have from the beginning of time through and including the Final Settlement Date that relate to claims alleged, or that have a reasonable connection with any matter of fact set forth in the Action including, but not limited to, any claims relating to rate increases on Class Policies. This release specifically includes any legal or equitable claim arising from or related to any election or policy change made or not made by any Class Members to his or her policy benefits prior to the Final Settlement Date. Named Plaintiffs and Class Members, subject to the exception set forth below, will further release the Genworth Released Parties and Class Counsel from any claims relating to or arising out of the Disclosures the Class Members are provided as part of the Settlement Agreement, including (but not limited to) claims specifically relating

to any alleged omissions in the Disclosures or any decision, or non-decision, to maintain, modify, or give up coverage based on the Disclosures or Special Election Options offered. Collectively, the claims described in this paragraph shall be referred to as the "Released Claims." The following claim shall not be a Released Claim: if within one year of the date a Class Member makes a Special Election or one year of the deadline for the Class Member to make a Special Election, whichever is earlier, a Class Member who believes he or she was harmed by an express and intentional misrepresentation in the Disclosures or in representations made by the Genworth Released Parties or Class Counsel about the Disclosures can pursue a claim in this Court via verified complaint or verified petition, provided that, before filing any such claim, the Class Member shall first notify the Parties of the basis for the claim and provide them with a reasonable opportunity to investigate and, if appropriate, remedy the alleged harm.

ECF No. 94-2.

The new language thus excepted from the general release claims not only regarding alleged misrepresentation "in the Disclosures," but also claims regarding "representations made by the Genworth Released Parties or Class Counsel <u>about</u> the Disclosures" (emphasis added).   This avoided the Court's worry regarding the original release language, namely, that the Agreement was "asking them [*i.e.*, the plaintiff class] to give up fraud in the inducement claims." Class counsel, Genworth, and all of Genworth's affiliates (the "Genworth Released Parties") were made explicitly liable for the kinds of misrepresentations the Court had contemplated at the hearing (and which are most naturally a concern given the nature of the suit).

The objectors, however, did not agree that this modification

14

resolved their concerns and renewed their objections to the settlement. ECF No. 97. Their objection focused on the requirement that a class member having such claims must go through a dispute resolution process with Genworth and must file a verified complaint to get the claim into court. They also objected to the one-year limitation put on the release's exception for fraud claims. ECF No. 94 at 4-5.

The plaintiffs' response, ECF No. 100, informed that the Crone objectors had not even objected specifically to the breadth of the release in their initial submission to the Court, much less to the release's purported waiver of claims based on future conduct of the defendants. *Id.* at 2 ("Objectors *never* criticized or challenged those provisions in their written objection in any way."). The plaintiffs further argued that: (1) the release "does not bar claims based on future conduct, nor did the Parties intend it (or the original Release) to bar claims for future conduct";[3] and (2) "[t]o the extent that Genworth would deviate from the content of these Disclosures or not make accurate Disclosures when mailing Special Election Letters in accordance with the terms of the Amended Settlement Agreement, claims for breach of the Settlement Agreement are also not released and are subject to this Court's continuing jurisdiction."[4]

---

[3] *Id.* at 3.
[4] *Id.* at 4.

Before the Court ruled on the renewed objections to the settlement, the parties and the Crone objectors informed the Court that they had reached a compromise and that the revised settlement (at ECF No. 105 at 6-7) made several changes to the release language. The final version of the relevant portion of the release now reads:

> A claim that a Class Member was harmed by an express and intentional misrepresentation: in the completed portion of the Disclosures that currently is bracketed in the template Special Election Letter appended as Appendix D to this Settlement Agreement, in the completed portions of the Special Election Options that are made available to that Class Member that currently are bracketed in the template Special Election Letter, or by the Genworth Released Parties or Class Counsel about the Disclosures, shall not be a Released Claim. A Class Member may pursue such a claim in this Court via complaint or petition within three years of the date the Class Member makes a Special Election or three years of the deadline for the Class Member to make a Special Election, whichever is earlier, provided that, before filing any such claim, the Class Member shall first notify the Parties of the basis for the claim and provide them with a reasonable opportunity to investigate and, if appropriate, remedy the alleged harm.

In addition to revised wording at the beginning of the paragraph, the second revised release extends the period within which claims of the sort described can be brought to a period of three years instead of one and no longer requires that a complaint making such a claim be a verified complaint. The parties' settlement with the objectors included not only revisions to the release language but also attorney fees for the objectors' counsel and incentive payments for the objectors. The objectors also agreed to withdraw

16

all previous objections.  Because a modification to a settlement that serves only to expand class members' rights under the settlement does not require a new notice and approval process, the Court instead held a fairness hearing pursuant to Fed. R. Civ. P. 23(e)(5), which requires Court approval for class action settlements between objectors and the parties that involve some payment to the objectors as part of the consideration for retraction of objections.

### c.  Attorney Fees and Costs

#### *Class Counsel*

The settlement agreement provides a lump-sum attorney fee for class counsel in the form of a $1 million payment.  That payment "[relates] to the injunctive relief that is substantially in the form of the Disclosures and Special Election Option" described above.  ECF No. 113 ¶ 60(a).  The settlement further provides for a contingency fee "equivalent to 15% . . . of the damages payments paid to Class Members who elect any of the following Special Election Options described in Appendix C, Options I.A.1, I.B.1, I.B.2, I.B.3, I.B.4, I.C.1, II.1, II.2, or III.1 (the 'Contingency Fees')."  Id. ¶ 60(b).  The contingency portion of class counsel's attorney fees are capped at $18.5 million.  The payment of these fees does not subtract from the amount that Genworth will disburse to plaintiffs as part of their damages payments; rather, the 15% attorney fee will be paid by Genworth over and above the damage

17

payments to class members.  The settlement provides class counsel with payment of litigation expenses up to $50,000, id. ¶ 61(a), but the petition for attorney fees requests $26,701.96.  These amounts are in every respect lower than the attorney fees requested and awarded in the Skochin litigation.

### Objectors' Counsel

The parties and the Crone objectors agreed that the objectors' attorneys could seek attorney fees of up to $1.4 million without objection from the parties.  They further agreed that, if the objectors' attorneys pursued any form of appeal of the Court's decision with regard to the fees, that appeal would not disturb the finality of the Court's appeal of the settlement, which can be executed simultaneously with any appeal of attorney fees. ECF No. 105 at 7-8.

At the Rule 23(e)(5) hearing, the Court approved the petition for attorney fees but reduced the award to $1.2 million.  The attorney fees will be paid to objectors' counsel out of the parties' own funds and will not in any way subtract from the amount disbursed to members of the settlement class as part of the settlement.

### d.  Incentive Payments

### Named Plaintiffs

The settlement also includes incentive payments for the named plaintiffs in the case as compensation for their contributions to

the case.  Under the terms of the agreement, each named plaintiff will receive $15,000 in compensation for the investment of time, risk, and effort they put into the litigation.

### *Objectors*

The parties' settlement with the objectors also included a provision of incentive payments to the Crone objectors.  Those payments will be for $7500 each and will be paid directly to the objectors by Genworth.

## II.  LEGAL STANDARD

### a.  Attorney Fees and Costs

Fed. R. Civ. P. 23(h) requires that a Court's award of attorney fees be "reasonable."  Attorney fees are generally calculated by one of two methods.  The lodestar method calculates the product of hours worked by each attorney multiplied by each attorney's respective hourly rate.  The common fund method apportions counsel a percentage of the settlement fund paid out to plaintiffs by defendants.  The Court in Brown v. Transurban USA, Inc. further noted that "[the] current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases."  318 F.R.D. 560, 575 (E.D. Va. 2016) (internal quotation marks and citation omitted). In the Skochin litigation, the Court treated a settlement with a structure closely analogous to that here as a "constructive common fund" settlement.  Skochin v. Genworth Financial, Inc., No.

3:19cv49, 2020 WL 6536140, at *6 (E.D. Va. Nov. 5, 2020).   It is only constructively treated as a common fund settlement because the attorney fees and damages payments are not actually paid out of a common fund.   Instead, as described above, for each class member who selects an option that entails a damages payment, class counsel will receive a separate payment from Genworth corresponding to 15% of the damage payment awarded to the class member.

As the Court further noted in Skochin, no rule exists that dictates application of either approach in this case.   But the "favored method" for determining attorney fees in common fund cases is the percent-of-fund method.   2020 WL at *3-4.   Either way, however, "courts will typically employ one method as the primary calculation method and use the other as a cross[-]check on the reasonableness of the first."   Id. at *4.

An obstacle to the application of the percent-of-fund calculation in this case, as in Skochin, is that the "constructive" common fund at issue does not have a determinate value.   Its value, instead, is a function of the elections that will be made by class members in the future.   In Skochin this posed a particular difficulty because class counsel asked for a fee with a floor of $10 million irrespective of the eventual total sum of damage payments made by Genworth.   There were, therefore, possible scenarios in which the floor was triggered because only a small

20

number of class members made an election that involved a damage payment, thus potentially providing class counsel a fee that represented an outsize percentage of the sum of the damages payment. That concern is foreclosed here because class counsel have not included a floor provision in their petition for attorney fees. The uncertainty at issue in Skochin is further reduced here because the parties and the Court now have the benefit of provisional data on claim rates among the plaintiff class in Skochin. The Court will therefore apply a percent-of-fund approach, treating 15% as a ceiling for the proportion of attorney fees to plaintiff class damage payments, with that proportion to shrink for any damage payment total above $123.33 million (the amount of damages payments at which the $18.5 million ceiling would be triggered).

As in Skochin, the Court will also apply a lodestar cross-check, though recognizing the limitations of the lodestar method as applied to constructive or actual common-fund cases such as this one. Again following Skochin, the Court will consider the reasonableness factors from both Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (1974) (adopted by the Fourth Circuit in Barber v. Kimbrell's, Inc., 577 F.2d 226 n.28 (4th Cir. 1978)) and Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3d Cir. 2000).[5]

---

[5] In the absence of clear guidance as to whether the Gunter factors may be used in place of the Johnson factors in cases where a

The <u>Johnson</u> factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

<u>Barber</u>, 577 F.2d at 226 n.28.  The <u>Gunter</u> factors are:

> (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys' involved; (3) the complexity and duration of the case; (4) the risk of nonpayment; (5) awards in similar case; (6) objections; and (7) the amount of time devoted to the case by plaintiffs' counsel.

<u>Gunter</u>, 223 F.3d at 195 n.1.

    **b.   Incentive Payments**

Incentive payments, also called "service awards," "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." <u>Berry v. Schulman</u>, 807 F.3d 600, 613 (4th Cir. 2015) (citing <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d

---

percent-of-fund approach is used to calculate fees, and following the Court's approach in <u>Skochin</u>, both the <u>Johnson</u> and <u>Gunter</u> factors will be analyzed for reasonableness. <u>See Skochin</u>, 2020 WL at *4-6.

22

948, 958-59 (9th Cir. 2009)).  They are not without controversy.
See Johnson v. NPAS Solutions, LLC, 975 F.3d 1244 (11th Cir. 2020)
(ruling that service awards compensating class representative for
time spent and as reward for bringing suit were impermissible);
see also In re Dry Max Pampers Litig., 724 F.3d 713, 722 (6th Cir.
2013) ("[T]o the extent that incentive awards are common, they are
like dandelions on an unmowed lawn—present more by inattention
than by design.").  As the Court noted in Skochin, however, courts
in the Fourth Circuit have approved incentive payments as high as
$25,000 when the movant has shown the award to be merited by effort
or risk undertaken by the named plaintiff.

   c.   Settlement with Objectors

Additionally, the Court must also assess the propriety of the
parties' settlement with the objectors under Fed. R. Civ. P.
23(e)(5)(B).  Rule 23's Advisory Committee notes further direct
that payment to objectors—and, by extension, their counsel—should
be sought under Fed. R. Civ. P. 23(h).  The analysis of the
objectors' attorneys' petition for attorney fees and incentive
payments will thus follow the same form of analysis that guides a
Court's assessment of fee petitions for class counsel.

## III. DISCUSSION

   a.   Attorney Fees and Costs

Plaintiffs' counsel indicate at several points in its

briefing that, because the 15% payments are not deducted from damage payments to class members, and because they were negotiated after the terms of the settlement, they need not be subject to close scrutiny.  After all, as class counsel observes, a reduction in the 15% fee would merely redound to Genworth's benefits and would do nothing for the class.  That is true in a limited sense. But it is likewise true that, from Genworth's perspective, a dollar is a dollar, and the settlement's value for Genworth is measured against the financial outlay it requires of Genworth.  There are, conceivably, different or additional possible terms that the settlement could have included that would have been still more favorable for class members, and Genworth conceivably would have agreed to a settlement keyed to those terms had the additional cost been offset by a reduced attorney fee payment to class counsel.  Class counsel instead negotiated the present settlement terms and attorney fee award.  It is therefore necessary that the Court ensure that the attorney fees requested are reasonable on their own terms.

With these preliminary points out of the way, the Court is now in a position to analyze the settlement with a view to the Johnson and Gunter factors.  Courts need not analyze each of the 12 factors individually if not all factors are specifically relevant to the case because the determination is to some extent already "subsumed within the initial calculation of hours

reasonably expended." <u>Brown</u>, 318 F.R.D. at 577 (internal quotation marks and citation omitted).

The <u>Johnson</u> factors that tell in favor of the fee award are time and labor expended, the skill required to perform the services rendered, the amount in controversy and the results obtained, the experience and ability of the attorneys, and fee awards in similar cases.  The <u>Gunter</u> factors that tell in favor of the fee award are the results obtained for the class; the quality, skill and efficiency of the attorneys involved; awards in similar cases; and the risk of nonpayment.  Because the applicable <u>Johnson</u> and <u>Gunter</u> factors overlap, they are combined in the discussion below.

<u>Time and labor expended</u>.  The attorneys expended an enormous amount of time and labor, and that time only increased with the additional labor expended resolving objections and coming to an agreement with some of the objectors.  Moreover, that labor was targeted toward producing the result that was achieved:  the parties reached an efficient resolution of their dispute and no time was spent on motions practice or pursuing claims that were unmeritorious or unlikely to succeed.  Even so, the lodestar hours totaled nearly 6000 as of the date of the final approval hearing.  ECF Nos. 91-1, 91-2, 91-3, 91-4.  The resulting lodestar fee is $2.323 million, resulting in an 8.4x multiplier (in contrast to the 9.05x multiplier that the Court approved in <u>Skochin</u>).

<u>Skill required to perform services rendered and skill of</u>

attorneys. The attorneys for the plaintiff class are well qualified and performed their work very well. Most relevantly, however, they brought to bear the expertise they had developed during the course of the Skochin litigation. That fact is evident from the ways in which the course of litigation in this case has been still more streamlined than in Skochin and from the consistent high quality of work product submitted by plaintiffs' counsel.

Amount in controversy and results obtained. As in Skochin, an exact calculation both of the amount in controversy and of the value of the settlement is difficult to state here. But it is certainly true that the damages payments that class members receive are payments they would not have received in the absence of the settlement agreement. While there is some doubt as to whether the full amount of the damages payments can properly be treated as a net gain for the class members (because electing a damages option involves foregoing some benefits of the coverage plan for which they had originally signed up), the value of the damages on the whole is nevertheless substantial. This conclusion is made more certain because the elections will be made with the benefit of substantial disclosures regarding Genworth's planned future rate increases. Class members who elect one of the options that result in a damage award will presumably have determined that a damage award election is more to their benefit than maintaining their coverage in the face of rising premiums—and that is to say that

they have received a net benefit from the settlement.

_Awards in similar cases_.   The nearest comparator for the attorney fees in this case is the _Skochin_ litigation.   As compared to that case, the attorneys in this case have achieved a very similar result with greater efficiency.   At the same time, the attorneys in this case request a lower flat fee as compensation for the injunctive relief obtained for the entire class ($1 million instead of $2 million); and they set a lower cap on the total sum of fees that they may collect for the entire litigation ($18.5 million instead of $24.5 million) at the same 15% rate.   ECF No. 60 at 1-2.

_Risk of nonpayment_.   As in many similar cases, the attorneys in this case worked on a contingency:  had they failed to settle the dispute with Genworth and had they then failed to prevail on the merits, they would have received nothing.   It is therefore reasonable to compensate successful class action attorneys working on contingency for the risk they undertake in helping the plaintiff class members assert their rights.

Finally, though there were a number of objections to the settlement, the denominator for those objections is the "more than 144,821 Notices" that were sent to the plaintiff class.   Id. at 9. Though (contrary to the attorneys' claim in their memorandum in support of their petition) some of the objections did take issue with the requested attorney fees, none stated a substantive reason

why the chosen method of calculating the fees is inappropriate or
what alternative means of calculating fees would be superior.  The
qualms expressed can therefore be regarded as something akin to
sticker shock—-an understandable reaction for those not accustomed
to seeing bills from law firms.  Moreover, as plaintiffs' counsel
notes, the proportion of objections and opt-outs relative to class
size is overall indicative of a highly favorable reaction from the
members of the plaintiff class.

    The one factor from Johnson and Gunter that might tell
somewhat against the requested award of fees is the second Johnson
factor ("the novelty and difficulty of the questions raised").
Though this litigation required a substantial amount of work from
class counsel, it is also true that it was in many respects a
repetition of the course already laid down in Skochin.  See Tr.,
ECF No. 95 at 189-90 ("We had a pretty good idea of what we were
going to find, but we had to go through the working of finding,
charting, and discovering [it].")  Treating this as a reason to
lower the award of attorney fees would, however, set this factor
in tension with the Johnson and Gunter factors regarding the
experience and efficiency of the attorneys.  It is better
understood as a factor that might justify an otherwise outsized
award rather than a factor that would indicate the need to lower
an already reasonable fee request.

    Having analyzed the attorney fees under the common fund

28

approach, there remains the task of performing a lodestar crosscheck. As of the date the fee petition was submitted, the lodestar multiplier for the requested fee was 8.4x. ECF No. 60 at 6. It is now presumably somewhat lower given the work that class counsel has performed since. In Skochin, the Court approved a fee award that represented a 9.05x lodestar multiplier for two reasons:

> First, Class Counsel would only receive $26.5 million if enough class members choose one of the five Special Election Options negotiated by Class Counsel (rather than keep their policy as is) and also select Special Election Options with a cash damages component. In that case, the settlement fund would have to be valued at roughly $163.5 million or higher (at which point the 15% contingency fee ceiling would be triggered since $24.5 million is roughly 15% of $163.5 million). That is a sizeable award that can only be achieved if class members perceive the settlement negotiated by Class Counsel as more valuable than the pre-litigation status quo. Second, the lodestar is only used as a cross-check rather than the primary method of assessing the reasonableness of the attorneys' fees in this case. Because the Court has found the 15% fee reasonable in light of the significant value that Class Counsel has secured for the class, the lodestar should not preclude recovery.

2020 WL at *10. Both considerations apply equally well here, the more so because the multiplier in this case is lower. See Stop & Shop Supermarket Co. v. SmithKline Beechman Corp., 2005 WL 1213926 (E.D. Pa. May 19, 2005) ("The Court further notes that the high lodestar multiplier (15.6) which results from the Court's award of attorneys' fees in this case is neutralized with respect to the reasonableness of a percentage fee award of 20% . . . ."). Taking all of these considerations into account, the 8.4x multiplier is acceptable and the requested attorney fees are reasonable.

The fee petition includes a request for expenses of $26,701.96. Those expenses were supported with documentation and are less than the $50,000 that plaintiffs' counsel had initially requested be allotted. The petition incorrectly states that no objectors have taken issue with the requested compensation for expenses accrued: Angela Brown stated in her objection that "[t]he attorneys' fees + litigation expenses seem high to me." ECF No. 60. But that objection does not state with adequate specificity the basis on which Brown objects to the fees. See 1988 Trust for the Allen Children Dated 8/8/88 v. Banner Life Ins. Co., 28 F.4th 513, 520 (4th Cir. 2022). The expenses are, accordingly, approved.

### b.   Named Plaintiffs' Incentive Payments

The $15,000 incentive payments for named plaintiffs are reasonable. They are reduced in comparison with the $25,000 the Court approved for named plaintiffs in Skochin. As the memorandum in support of the fee petition describes the named plaintiffs' efforts in this litigation,

> [They] actively participated in the prosecution of this case by regularly communicating and working with Class Counsel to produce the Complaint in this case and responding to all written discovery served by Genworth. They produced all relevant documents in their possession, custody, and control to Genworth, which included producing extremely private financial and medical information. The Named Plaintiffs kept abreast of the litigation and mediation throughout and have consistently demonstrated their commitment to the Class by pursuing this case with passion and diligence. In seeking to hold Genworth accountable, the Named Plaintiffs subjected themselves to public attention and exposure of their personal information. Named Plaintiffs pursued these claims

30

> notwithstanding the risks that private information would likely be discoverable and perhaps at some point unsealed; in effect, they risked forfeiting their own privacy rights to vindicate the rights of others like them.

ECF No. 60 at 20-21 (internal citation omitted).  In addition to the comparison with Skochin, the fee petition cites to a variety of other cases granting incentive payments as high as $50,000.  See, e.g., Jones v. Dominion Res. Servs., Inc., 601 F. Supp. 2d 756, 768 (S.D. W. Va. 2009) (granting a $15,000 incentive payment even where court had "no evidence of the class representatives' participation in th[e] case" and award was approved solely "to reward the class representatives . . . for enabling the pursuit of th[e] matter on behalf of the class").

   c.   Objectors' Counsel's Attorney Fees

   As noted above, the analysis of the attorney fee petition for objectors' counsel adheres to essentially the same standard as the analysis for class counsel.  The appropriate method of calculation for objectors' attorneys' fee is, however, somewhat different insofar as even a constructive common fund approach is not practical where the benefit conferred on the class by the objectors' attorneys' work is in the form of non-quantifiable changes to the settlement agreement.

   Objectors' counsel initially petitioned the court for an award of $1.4 million, to be paid for jointly by the parties without subtracting from the value of the settlement.  That figure

represented the attorneys' lodestar fee ($502,100) with a multiplier of 2.8x. The parties had already agreed not to oppose a petition for attorney fees up to that amount.

The assessment of the reasonableness of the objectors' fee petition is complicated by the fact that the objectors who are represented originally pressed a variety of objections to the settlement agreement that had little to nothing to do with the grounds on which the Court eventually required the parties to modify the language in the release. The objectors had initially objected on the basis of a hodgepodge of arguments essentially taking the position that the requirements for class certification had not been met. ECF No. 74, *passim*. They further argued that, though many class members stood to gain little from the suit, Genworth stood to gain a lot from the broad release of claims. This, they said, was a bad deal. Still other objectors (who originally advocated *pro se* but later joined with the represented objectors) made other arguments against the settlement that were likewise entirely without any relation to the eventual compromise on the release language.

Alan Pfeffer, for example, argued that the Court lacks jurisdiction under Article III of the United States Constitution because a federal court has no jurisdiction unless there is some case or controversy. ECF No. 92 at 1. And, the argument continued, there is no case or controversy here because there is reason to

believe that the terms of the settlement are ultimately in
Genworth's best interests.  The objection went on to assert a
variety of other purported problems with the settlement, including
the allegation that Genworth and class counsel had engaged in
collusion.  Id. at 4.  Another objector who later joined with the
represented objectors, W. Edward Bacon, objected originally on the
grounds that the settlement did not provide adequate value to the
class.  ECF No. 55.  His objection, again, in no way raised the
issue of the breadth of the release language.

The focus on the breadth of the release language came only
during the final approval hearing in February 2022.  At that
hearing, objectors' counsel initially pressed the argument that
many members of the plaintiff class had not been harmed.  Counsel
argued that, though the class members had not been harmed, it was
important that they retain the right to sue Genworth in the event
that claims arose from the settlement process itself.  ECF No. 95
at 24-25.  Though this argument was unsuccessful, the Court
acknowledged in reviewing the language in the settlement's
provisions related to the release of claims that the release was
too broad.  That determination led to the eventual revision of the
language, described above.

At the hearing on the fee petition, the Court asked objectors'
counsel why they should receive payment for the work done in
service of the initial objections when those objections lacked

merit and, furthermore, when the objection that <u>did</u> eventually prevail was essentially a facial objection to the breadth of the release language.  Counsel responded that the work done in service of the initial objections was inseparable from the eventual relief obtained by the plaintiff class in the form of a narrower release of claims.  The core of the objection, they argued, was that the original settlement agreement gave Genworth too much consideration for too little in return.  This flaw was remedied, they continued, because the narrowed release of claims offset the fact that the class should not have been certified.

These arguments are perplexing because they posit some unspecified analytic construct by which a narrowed release of claims provision can appropriately be traded off against a purportedly fatal jurisdictional defect, *i.e.*, a purported failure to satisfy Fed. R. Civ. P. 23's requirements for class certification (a defect which the Court finds not to exist).  Even if the tradeoff described is an accurate account of the pragmatic decision made by the objectors (*i.e.*, to abandon an objection in order to secure an offsetting improvement to the settlement), there is still the question of the basis on which it is appropriate to award the objectors attorney fees for their entire body of work when the vast majority of the claims they put forward have not prevailed.

In <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983), the Supreme

34

Court instructed that an award of attorney fees (in the context of civil rights actions) should take into account the degree of success achieved by counsel:

> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

Id. at 434.  The Supreme Court went on to say that, in determining whether a party's failure to succeed on some of its claims ought to result in a reduction of an award of attorney fees,

> [t]here is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

Id. at 436.  That logic guides the Court's determination here. When asked what proportion of hours in the lodestar calculation were directed at ultimately successful claims, objectors' counsel stated that they could not disentangle the different legal issues from one another in their accounting of hours.  They proposed instead an alternative method of reducing their requested fee by lowering the lodestar multiplier rather than recalculating the

number of hours worked. The Court accepted this concession, resulting in a fee award of $1.2 million (at a multiplier of approximately 2.4x). Objectors' counsel notes that that amount is less than 2% of the projected value of the settlement. ECF No. 106 at 15. That fee is a reasonable compromise between the defects in the initial fee petition just described and the service done to the plaintiff class by the objectors—directly and indirectly—in narrowing the release of claims and ensuring that Genworth would be answerable in the event of any fraud in the execution of the settlement agreement.

Of the Johnson factors, numbers (4) and (8) tell most in favor of the reasonableness of this fee award. The opportunity cost for the attorneys involved was certainly substantial and the work was undertaken with no assurance whatever that their objections would prevail or that they would be in a position to obtain compensation for their efforts. Additionally, the amount in controversy and the results obtained likewise tell in favor of the fee award. This is a significant case representing the interests of well over 100,000 people and having tens or hundreds of millions of dollars at stake. In a case on such a substantial scale, even modest improvement to the terms of settlement has a considerable aggregate value. The remaining Johnson factors do not tell especially strongly for or against the fee award.

Finally, several extrinsic factors further support the

reasonableness of the fee award.  First, the award will be paid out by plaintiffs' counsel and Genworth and the plaintiff class's benefit will in no way be reduced.  Second, the hourly rates for objectors' counsel are within the range of rates already approved for plaintiffs' counsel.  Finally, objectors' counsel has not requested any compensation for expenses undertaken as part of this litigation.  Taking all of these factors into account, the Court concludes that a fee of $1.2 million is reasonable.

### d.    Objectors' Incentive Payments

Finally, objectors' counsel requests incentive payments of $7500 for each of the represented objectors.  The declarations submitted by the objectors (ECF No. 106-1) attest to the work done by each of the objectors in pursuing their aim of improving the terms of the settlement.  That work involved studying case filings, drafting objections, and discussing the case with objectors' counsel.  As the fee petition notes, the value of these awards is one-half the value of the awards for named plaintiffs and less than one-third the value of the awards for named plaintiffs in Skochin.  Moreover, these payments, too, will not detract from the value of the relief obtained by the plaintiff class.  The Court therefore finds that they are reasonable.

### IV.  Other Objections

The Court received a variety of objections from class members other than those whose claims were resolved by stipulation.  As a

37

preliminary to individualized consideration of the objections, it is worth calling attention to what the Court previously stated in responding to objections in the <u>Skochin</u> litigation:

> [I]t is necessary to understand the claims asserted by the Plaintiffs because it is those claims, not others that might have been asserted, that are being resolved by compromise. And, of course, any relief that might be awarded in the event of success at a trial on those claims is circumscribed by the claims that would be tried. Thus, relief achieved by settlement must be measured in perspective of what relief is sought and what relief is conceptually available.

No. 3:19cv49, 2020 WL 6532833 at *1 (Nov. 5, 2020). The same applies here.

### a.   Summary of Objections

#### 1.   Herbert Skovronek (ECF No. 56)

Herbert Skovronek wished to remain in the settlement class but registered several objections to the form of the settlement. Skovronek's objection goes to five separate aspects of the settlement.

First, Skovronek expresses concern that Genworth is in a long-term actuarial spiral, hoisting ever-escalating fees on its older policyholders to offset unexpectedly high expenditures. Skovronek's fear is that the settlement does not fix structural problems with what he perceives to be Genworth's deficit of income in relation to its spiraling costs.

Second, Skovronek raises the concern that Genworth will continue to increase its premiums and may even face bankruptcy due

38

to its financial concerns.

Third, Skovronek suggests that the settlement class ought to include deceased policyholders who would otherwise have qualified for inclusion under the class definition.

Fourth, Skovronek expresses the desire that the final form of the letters class members will receive will be individualized.

Fifth, Skovronek suggests that the attorney fees are excessively high, noting in particular that the attorneys had the benefit of having gone through the Skochin litigation (and had a mediator who had helped with that litigation as well).

### 2.   Angela Brown (ECF No. 62)

Angela Brown opted to remain a member of the settlement class but expresses concerns regarding the attorney fees and litigation expenses.  She also articulates the concern that payment of these fees and expenses will only further weaken Genworth's financial stability, the clear implication being that, if that is the case, the settlement might not actually be in the class's best interest.

### 3.   Michael and Kathleen Buben (ECF No. 65)

Michael and Kathleen Buben note first that the amount of detail given to them on their sample election letters is not sufficient to give them a clear sense of which option they would prefer to select, which in turn makes it difficult for them to assess the settlement as a whole.

The Bubens' first specific objection is that class members in

39

non-forfeiture status receive lower payments than class members who are not in non-forfeiture status. The Bubens' second specific objection is that the second election option would provide them with a benefit only double the value of the premiums they have paid in, which in turn would be only a fraction of the value of the benefits they are due under the current terms of their policy. The Bubens' third specific objection is that, once an amendment to the special election options in response to their second objection is implemented, further revisions to the special election options would be warranted. The Bubens conclude that "[s]omething seems wrong about a lawsuit that benefits and favors the company being sued." ECF No. 65 at 2.

### 4. Rochelle and Roger Borgen (ECF Nos. 66 & 67)

Roger and Rochelle Borgen separately filed identical comments regarding the settlement agreement. They express the concern that the settlement will negatively affect both plaintiff class members and the long-term viability of Genworth while benefiting only the attorneys.

### 5. Ellen Franck (ECF No. 68)

Ellen Franck's letter is included in the record because it was submitted to this Court. It does not, however, say anything at all about this settlement agreement, and is instead a letter from Ms. Franck to Genworth alleging a variety of shortcomings in Genworth's customer service.

6.    Larry and Marsha Brigleb and Joanne Barron (ECF No. 70)

Larry Brigleb, writing on behalf of himself, his wife, and his sister, all Genworth LTC policyholders, asks that "the Special Election Letter . . . be amended in a way that *clearly* states for each option whether our current Partnership status will be retained or lost."  ECF No. 70 at 1.

    b.    Analysis

The objections related to attorney fees for class counsel will be overruled because, as set forth above, the Court finds that the attorney fees are reasonable.

Several of the objections raise the concern that the costs of the settlement will undermine Genworth's financial stability.  As class counsel point out in their response to objections, ECF No. 86, that argument is foreclosed by Genworth's own sworn declaration (ECF No. 86-2) affirming that the costs of the settlement will not cause Genworth to become insolvent.  The objection is also directly in tension with a different objection made by some objectors, namely, that the settlement provides class members with insufficient value while potentially relieving Genworth of substantial future financial obligations.    It is certainly conceivable that, at least in some cases, it will inure to Genworth's benefit to pay out a damages payment that in turn relieves it of the obligation to make much larger benefits payouts some time down the road.  But it is no part of the law of class

41

actions that the terms of a settlement must exclusively harm the defendant.  Indeed, were there such an expectation, Genworth would have little reason to agree to a settlement at all.  Moreover, the terms of this settlement agreement, as discussed above and in the FINAL JUDGMENT AND ORDER OF DISMISSAL, are keyed to the relief to which the plaintiff class would have been entitled had it prevailed on the merits as to the causes of action set forth in the CAC. Many of the objections appear to be borne of the frustration that the value proposition for long-term care insurance is less favorable now than it was when objectors' policies were first purchased.  That may be true, and to whatever extent it is true, it is unfortunate.  But as has been made explicitly clear since the very outset of the case, the plaintiffs do not—-and claim that they cannot-—substantively challenge Genworth's premium increases, insofar as those increases have been approved by each state's respective regulatory body.  Because the scope of the COMPLAINT is restricted to the disclosures Genworth did and did not make in connection with its premium increases, the relief available to the plaintiffs is only the relief generally available in a fraud action:  a return to the nearest possible approximation of the *status quo ante*.  Because this settlement comes very near achieving that, the objections keyed to a dissatisfaction with the substance of what has been awarded to plaintiffs will be overruled.

The objections will now be addressed in turn.

Mr. Skovronek's objection (ECF No. 56) will be overruled because concerns related to Genworth's actuarial decisions and its long-term prospects for business success(beyond its avowal that it can meet its obligations under the settlement while remaining solvent) is beyond the scope of this case. As to the concern regarding deceased policyholders, as class counsel noted in its response, "they did not receive 'nothing' in exchange for their premiums; rather, they received the protection of their policies throughout their duration and would have been able to make a claim at any time they were covered." ECF No. 86 at 32. As to the concern about the clarity of the letters, the actual Special Election Letter that Skovronek will receive will, in fact, contain the information he hopes for it to contain.

Ms. Brown's objection (ECF No. 62) will be overruled because, as already discussed, the attorney fees have been found fair and reasonable and Genworth has been found able to meet its obligations under the settlement while remaining solvent.

The Buben objection (ECF No. 65) will be overruled because the proposed modifications to the settlement terms do not fit the logic of the bargain that was struck between the plaintiffs and Genworth. The Buben objection first criticizes the first election option on the grounds that the payouts for those not in non-forfeiture status should not differ from those in non-forfeiture status to the extent that they do. As the plaintiffs' attorneys

43

explain their response, however:

> This is an apples-to-oranges comparison. For those Class members *already* in Non-Forfeiture status, the $2,500 payment is the only Special Election Option offered. It recognizes that those policyholders have already opted to reduce their coverage and stop paying premiums *before* getting the Disclosures in the Settlement, but also that many may have selected that option sooner if given the Disclosures sooner. The payment was negotiated by the Parties as a compromise of those two competing factors. On the other hand, those Class members who have *not yet elected* a Non-Forfeiture option will have two paid-up options in the Settlement and likely several reduced benefit options as well.

ECF No. 86 at 34. The second objection, which is aimed at the ratio of paid-up coverage to premiums in the second election option, is likewise reasonable for two reasons explained by the plaintiffs' attorneys:

> First, paid-up coverage under a non-forfeiture option does not require *any* further premiums to be paid and is not designed to provide the same level of benefits available if the policyholder continued to pay premiums to maintain the policy. Second, Option 2 actually provides *twice* the coverage that would otherwise be available to the Bubens for any Non-Forfeiture option outside the Settlement.

Id. at 33-34. The third objection, being premised on the logic of the second objection, will also be overruled for the reason given.

The Borgen objections (ECF Nos. 66 & 67), which expresses dissatisfaction with the benefits to class members and the perceived outsize magnitude of the attorney fees, will be overruled for the reasons set forth above.

The concern expressed in the Brigleb and Barron objection (ECF No. 70) have been adequately addressed by plaintiffs counsel

both as to the objectors and as to the class as a whole:

> With respect to Partnership Plans in California and other Partnership states, if Genworth makes a Special Election Option available that Genworth understands will result in the loss of Partnership Status, then Genworth will inform the Class member of its understanding that the selection of that Special Election Option will result in the loss of Partnership Status. Genworth will also advise Class members with Partnership Plan policies that, before making any Special Election, they can contact their Partnership Plan for additional information.

ECF No. 86 at 35-36.  The Court so holds.

## CONCLUSION

For the reasons set forth above, CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND SERVICE AWARDS TO THE NAMED PLAINTIFFS (ECF No. 59) will be granted.  OBJECTORS' PETITION FOR INCENTIVE AWARDS AND ATTORNEYS' FEES (ECF No. 106) will be granted in part and denied in part, awarding $1.2 million to objectors' counsel and $7500 in incentive payments to each of the represented objectors.  The remaining objections (ECF Nos. 56, 62, 65, 66, 67, 68, 70, 71) will be overruled.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne

Senior United States District Judge

Richmond, Virginia

Date:  June _28_, 2022